**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| | ) **No. 4:16-CR-528 AGF/PLC** |
| | ) |
| **TODD BECKMAN,** | ) |
| | ) |
| **Defendant.** | ) |

**EVIDENTIARY HEARING**

**BEFORE THE HONORABLE PATRICIA L. COHEN**
**UNITED STATES MAGISTRATE JUDGE**

**MARCH 30, 2017**

APPEARANCES:

For Plaintiff: John T. Davis, Esq.
Stephen R. Casey, Esq.
OFFICE OF THE U.S. ATTORNEY
111 South 10th Street, 20th Floor
St. Louis, MO 63102

For Defendant: Travis L. Noble, Jr., Esq.
Grant C. Boyd, Esq.
SINDEL, SINDEL & NOBLE P.C.
8000 Maryland Avenue, Suite 350
Clayton, MO 63105

Reported By: SHANNON L. WHITE, RMR, CRR, CSR, CCR
Official Court Reporter
United States District Court
111 South Tenth Street, Third Floor
St. Louis, MO 63102
(314) 244-7966

PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

# INDEX OF WITNESSES

## GOVERNMENT'S WITNESSES


| **OWEN CUNNINGHAM** | **PAGE** |
|---|---|
| Direct Examination by Mr. Davis .................... | 4 |
| Cross-Examination by Mr. Noble ..................... | 10 |
| Redirect Examination by Mr. Davis .................. | 14 |
| **BRANDON MCKINNON** | |
| Direct Examination by Mr. Davis .................... | 15 |
| Cross-Examination by Mr. Noble ..................... | 24 |
| Redirect Examination by Mr. Davis .................. | 40 |
| Recross-Examination by Mr. Noble ................... | 43 |
| **DAVID BROWN** | |
| Direct Examination by Mr. Davis .................... | 46 |
| Cross-Examination by Mr. Noble ..................... | 66 |
| **JOSEPH SOMOGYE** | |
| Direct Examination by Mr. Davis .................... | 101 |
| Cross-Examination by Mr. Noble ..................... | 130 |
| Redirect Examination by Mr. Davis .................. | 151 |
| Recross-Examination by Mr. Noble ................... | 153 |


## DEFENDANT'S WITNESSES


| **GRANT BOYD** | |
|---|---|
| Direct Examination by Mr. Noble .................... | 155 |

**(PROCEEDINGS STARTED AT 10:17 AM.)**

**(THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT AND WITH THE DEFENDANT PRESENT:)**

THE COURT: Okay. Everybody ready to go?

MR. DAVIS: Government's ready.

THE COURT: Okay. We're on the record in 4:16-CR-528, *USA v. Todd Beckman*. Counsel, let's get some announcements.

MR. DAVIS: John Davis on behalf of the United States.

MR. NOBLE: Travis Noble and Grant Boyd on behalf of the defendant, Your Honor.

THE COURT: Okay. This is a hearing on Mr. Beckman's motions to suppress statements and evidence. I think there's an amended motion; correct, Mr. Noble?

MR. NOBLE: Yes, Your Honor.

THE COURT: Okay. All right. Counsel, are you ready to go?

MR. DAVIS: Government's ready. First witness would be Owen Cunningham.

THE COURT: Okay.

**(WITNESS SWORN BY THE CLERK.)**

THE COURT: Go ahead.

MR. DAVIS: May it please the Court.

**OWEN CUNNINGHAM,**

**HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

**DIRECT EXAMINATION**

**BY MR. DAVIS:**

Q Sir, could you -- well, you've stated your name. Your name is Owen Cunningham; correct?
A Correct.
Q Correct. How are you employed?
A I'm a special agent with St. Louis FBI.
Q How long have you been an FBI agent?
A Nine years.
Q All of those nine years here in St. Louis?
A Correct.
Q In your capacity as a special agent with the FBI here in St. Louis, are you familiar with an investigation involving the kidnapping, perhaps alleged kidnapping, of Ellis Athanas in November of last year?
A Yes.
Q Have you participated in that investigation?
A Yes.
Q Taking you up to December 1 of 2016, was that the day Mr. Beckman and others were arrested in association with that offense?
A Yes.
Q Could you describe for the Court what you were doing

early morning December 1, 2016, in relation to that investigation?
A We were doing surveillance on Todd Beckman's residence at 5016 Romaine, in Fenton.
Q Did you have a warrant for his arrest at that time?
A No.
Q If the day played out the way you had it planned, what was going to happen that day?
A We were going to file a complaint.
Q Were you going to make a probable cause arrest of the defendant prior to that?
A Yes.
Q And other defendants; true?
A Correct.
Q The Romaine address. You were there conducting surveillance?
A Correct.
Q With others?
A Correct.
Q Was there anyone else in your vehicle?
A Yes.
Q Who?
A Task Force Officer Amen Talic, St. Louis City P.D.
Q What was the vehicle you were in?
A Dodge Charger.

Q Could you describe for the Court what, if anything, you observed at the Romaine address as it relates to Mr. Beckman?
A We observed a white 2016 Subaru leave the residence, and we followed that to a convenience store a short distance away, in Fenton.
Q Were you able to determine who was driving the Subaru?
A Yes.
Q Who was that?
A That was Todd Beckman.
Q What happened at the convenience store?
A Beckman exited the white Subaru, went into the convenience store for a short time, and then returned to the white Subaru.
Q From the convenience store did you surveil Mr. Beckman?
A Yes.
Q Where did he go from there?
A He went over to a condo in Fenton, 1164.
Q Do you know the street?
A Yeah. I believe it was Stone Bluff.
Q In Fenton?
A Correct.
Q It's a condominium?
A Yes.
Q They're attached, then?
A Correct.

Q This particular unit that you associate with Mr. Beckman, can you describe that for the Court?
A It's an end unit condo with approximately four parking spaces immediately in front of the condo. No driveway.
Q Did you see Mr. Beckman park and exit the car?
A Yes.
Q Can you describe for the Court what happened?
A Todd Beckman exited his vehicle and approached his front door. Myself and Task Force Officer Amen Talic exited my vehicle. We identified ourselves as police and ordered Beckman to the ground. Beckman turned back, looked at us, and then proceeded to make his way to the front door. He was attempting to manipulate the keypad on his front door.
Q The front door is not a traditional key lock system?
A No.
Q How is it operated?
A It has a handle with a digital keypad just above the door handle.
Q How were you dressed that day?
A I was in a black tactical vest which had "police" on the front. Amen Talic had the same.
Q After you ordered Mr. Beckman to stop, did he proceed to the door after that?
A Correct.
Q And what did you see him doing or attempting to do?

A He had a backpack on, and he had a number of items in his hand. It appeared like he was trying to shift the items out of his hand, and that's when we --
Q What happened next?
A When we get up to Beckman, he would still not put his hands up. We took him from the porch area down to the lawn, which was to the immediate left of the door, and we attempted to put his hands behind his back. That's when Task Force Officer Brian Jost and Michael Langsdorf arrived, and Brian Jost was able to put handcuffs on Todd Beckman.
Q When you say you took him off the porch, you tackled him?
A Correct.
Q Jost -- J-O-S-T; correct?
A Correct.
Q -- is backup to you and the task force officer?
A Correct.
Q He arrives, physically arrives, at the address prior to you shouting out to Mr. Beckman "stop"?
A Yes.
Q Yet while you have Mr. Beckman on the ground, that's when Jost arrives and helps physically subdue the defendant. Is that true?
A Correct.
Q Do you hear Jost say anything to the defendant?
A He stated, "Put your hands behind your back."

Q Do you know if Mr. Beckman was Mirandized about that time?
A After he was put in handcuffs, Task Force Officer Brian Jost provided *Miranda* to Todd Beckman.
Q Were you present for that?
A I was.
Q Did you hear what Mr. Beckman said in response?
A He asked why he was being arrested. We moved him to the front step, and then myself and Amen Talic moved around to secure the rear of the property.
Q Did you hear if anyone asked the defendant if he was around or not?
A Yes.
Q When did that happen?
A As we were moving him up to the front step of the door.
Q And is that something that's commonly done just for officer safety and everyone's safety?
A Correct.
Q What did Mr. Beckman reply?
A He stated he had a firearm in the glove box of his Subaru.
Q Do you know if he was asked for consent to search the Subaru in order to seize the weapon?
A He was.
Q What was his response?

A He denied our request for consent.
Q Did anyone ask for consent to search anything else?
A Yes.
Q What?
A The residence.
Q And his response?
A He denied the request.

MR. DAVIS: I don't have anything further of Agent Cunningham. Thank you.

THE COURT: Go ahead, Mr. Noble.

MR. NOBLE: Thank you, Judge.

**CROSS-EXAMINATION**

**BY MR. NOBLE:**

Q Special Agent Cunningham, let me ask you when -- so was there a search conducted at that time of the Subaru?
A No, sir.
Q All right. Of the residence?
A No.
Q Was Mr. Beckman taken into the residence, or was he taken directly to a car?
A No. He remained on the front step.
Q Front step. After you all -- were you finished? When he's sitting on the front step, you said he's handcuffed?
A He was sitting.
Q Sitting? All right.

A Yes.
Q And I think it's Jost and Langsdorf are out front with him?
A Correct.
Q And you and Amen Talic are in the back?
A Correct.
Q All right. So you don't hear the conversation at that time between Mr. Beckman and the other two police officers out on the front porch; correct?
A No.
Q All right. No, it's not correct, or, no, you didn't hear it?
A No, I did not. I was in the rear of the property.
Q All right. And then how long are you in the back of the property?
A TFO Joe Somogye arrived at the property at approximately 8:30. We remained in the rear of the property until about 8:30.
Q And what time did you get to the rear of the property?
A At approximately 8:00.
Q All right. So you're out back for about 30 minutes?
A Correct.
Q All right. Do you know whether or not the other officers take Mr. Beckman inside the residence?
A No. He was not taken inside the residence.

Q So Mr. Beckman never goes inside the residence?
A Correct.
Q All right. And did you ever look through the items Mr. Beckman had there on the front porch?
A No, I did not.
Q At 8:30, when you are relieved at the back door, where do you go?
A I went out front.
Q All right. And where is Mr. Beckman at that time?
A He had left with Task Force Officer Joe Somogye. He was taken to the DEA building.
Q Do you know how long Mr. Beckman is on scene between 8:00 and 8:30?
A The entire time.
Q The entire time?
A Correct.
Q So when you come back around from the back, Mr. Beckman is gone, though, isn't he? Or is he still there when you get there?
A He was still there.
Q Still there?
A Yeah.
Q When you come around, what's going on?
A They were taking him to the vehicle, the transport vehicle.

Q All right. So what's going on out there on the front porch between 8:00 and 8:30? Why do they have them sitting there on the front porch for those 30 minutes?
A We were going to get a search warrant for the residence and the vehicle.
Q But I guess my question is why does he need to be sitting on the front steps for those 30 minutes?
A We were waiting for Task Force Officer Somogye to arrive and transport him to DEA.
Q Okay. So were you in the vehicle -- so you were not in the vehicle transporting Mr. Beckman back to DEA headquarters?
A No, I was not.
Q So you don't know whether or not Mr. Beckman ever requested a lawyer on the front porch between 8:00 or 8:30. You don't have any information to that, do you?
A No. I was not present.
Q All right. You don't know whether he might have asked for a lawyer on the way back to the office?
A Correct.
Q Have you watched the video in this case?
A I have.
Q You have?
A Yes.
Q Okay. And so you're aware that Mr. Beckman, in the initial stages of that interview, he's talking about an

attorney; right?
A Yes.
Q Talking about me -- right? -- Travis Noble, his attorney. Did you see that?
A He mentioned an attorney.
Q All right. Well, it's more than a mention. They talk about me for 10, 15 minutes, don't they?
MR. DAVIS: Objection to the relevance, Your Honor.
THE COURT: Well, I'll let it go.
MR. NOBLE: I have no further questions. I'll withdraw, Judge. I'll withdraw.

**REDIRECT EXAMINATION**

**BY MR. DAVIS:**

Q Agent, the only thing I want to clear up, the 8:00 and 8:30 references are AM; correct?
A Correct.
MR. DAVIS: I have nothing further. Thank you.
THE COURT: Mr. Noble?
MR. NOBLE: Nothing, Your Honor.
THE COURT: Okay. Call your next witness, please.
MR. DAVIS: That would be Brandon McKinnon, please.

**(WITNESS SWORN BY THE CLERK.)**

THE COURT: Go ahead, Mr. Davis.

**BRANDON MCKINNON,**

**HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

**FOLLOWS:**

**DIRECT EXAMINATION**

**BY MR. DAVIS:**

Q Mr. McKinnon, how are you employed?
A As a task force officer with DEA.
Q How long have you been assigned as a task force officer?
A Two years.
Q That means you're detached from a department as a police officer somewhere?
A Yes, sir.
Q Where?
A Maryland Heights.
Q How long have you been a Maryland Heights police officer?
A Fourteen years.
Q You have any law enforcement experience prior to Maryland Heights?
A No, sir.
Q In your two years as a task force officer with DEA, are you familiar with an investigation of the alleged kidnapping of a man named Ellis Athanas in November of 2016?
A Yes, I am.
Q Are you involved in that investigation in some way or another?
A Yes, sir.
Q I want to take you to Thursday, December 1 of last year.

Do you recall the arrest of the defendant, Todd Beckman?
A I do.
Q Early morning, say, 7:30, 8:00 AM that morning, what were you doing in relation to the investigation of the kidnapping?
A I had participated with a search warrant previously, and then I was with another task force officer, Joe Somogye, and we were diverted to pick up Mr. Beckman at another location.
Q If I said 1164 Stone Bluff in Fenton, a condominium, does that sound like it would be where he was that you were diverted to?
A Yes, sir. Sounds correct.
Q The search warrant you were executing prior to that, did it have anything to do with Mr. Beckman personally?
A Not personally.
Q But this investigation; correct?
A Yes, sir.
Q A different defendant?
A Correct.
Q When you got diverted to 1164 Stone Bluff, who were you with?
A Joe Somogye.
Q Who was driving?
A Joe was.
Q What was the purpose of going to the Stone Bluff residence?

A We were informed that Mr. Beckman was in custody there. We were going to pick him up and take him down to DEA.
Q Did you do that?
A Correct. Yes, sir.
Q When you got to the condominium, where was Mr. Beckman, if you remember?
A I believe he was seated off to the side of one of the condos there.
Q Did you assist Task Force Officer Somogye in placing Mr. Beckman in the car and transporting him to DEA then?
A I did briefly. We were together in the car. We relocated to pick up my vehicle, and I followed Joe, along with Mr. Beckman, down to DEA.
Q So I have this right, the three of you -- Somogye, you, and Mr. Beckman -- are in the car, but you're being taken to your vehicle which is somewhere else, and then Somogye and Beckman travel on by themselves to DEA?
A Correct.
Q Do you recall what kind of car it was that you were in with Somogye?
A I believe it was a Cadillac Escalade.
Q While you were in the vehicle -- the Escalade -- with the other two gentlemen, did Mr. Beckman ever ask for an attorney?
A No, he did not.
Q Did he ever invoke his right to remain silent in any way?

A No.
Q In fact, can you describe his attitude during your portion of the car ride?
A What I can recall the most, he was basically concerned with his backpack and the contents within the backpack.
Q Are you familiar with the backpack that he had?
A Not really. It was just a backpack that -- he was mainly concerned with, I believe, money that was inside it.
Q Okay. Did you ever search the backpack yourself?
A He asked me to look for it. I briefly looked for it. There were several things inside. I couldn't tell you all that was inside. And I said I wasn't going to look for it any further; we'll take care of it at DEA.
Q The things you did see, can you relate that to the Court?
A Briefly, I believe there was a bottle of liquor in there. I don't recall the kind. Maybe some sealed 5-Hour Energy drinks. Clothing. That was about it.
Q Okay. You're dropped off at your car, and what do you do when you get in your car?
A I followed Joe Somogye back to DEA along with Mr. Beckman.
Q That's the DEA office right here downtown?
A Yes, sir.
Q What was your assignment when you got to the DEA office downtown?

A I was down in the booking area with Joe. I can't recall who else was all there at that time, as people were coming from different locations. At some point I sat with Mr. Beckman in an interview room.
Q Several people were arrested pursuant to this kidnapping investigation on that day at roughly the same time; correct?
A Yes, sir.
Q Was it safe to say there was some confusion at DEA with the number of people coming and going?
A Correct. Yes, sir.
Q You indicated you sat in an interview room with Mr. Beckman. Is that because you were going to interview Mr. Beckman?
A No. That's not correct.
Q In fact, why were you in the interview room with Mr. Beckman?
A Just to remain with him until he could be interviewed and/or questioned.
Q Although you didn't interview him, did you converse with him at all?
A Yes, sir.
Q Do you recall him mentioning the name "Travis Noble," "Travis," or "Noble" in any form?
A I recall him mentioning "Travis."
Q Can you describe for the Court -- well, let me ask you

this. You're aware that that interview room where you were sitting with Mr. Beckman was being video recorded?

A Yes, sir.

Q You, in fact, have seen the video recording subsequent to that interview -- or that conversation; correct?

A Yes, I have.

Q From your memory of what happened that day, can you relate to the Court what that conversation was?

A The conversation? Briefly he mentioned something about Travis. I asked him if he was referring to Travis Noble. He said -- he stated he was. Said something along the lines of taking care of a previous DWI. And then I basically just talked with him further about, you know, I knew Travis as a DWI attorney, a very good attorney. That was the gist of the conversation.

Q From your memory of that conversation, did Mr. Beckman ever request the presence of an attorney, Travis Noble, or any other lawyer? Pardon?

A No, sir.

Q Have you ever interviewed in your -- what did you say, 14 years experience as a police officer?

A Yes, sir.

Q Have you ever interviewed a defendant who has requested an attorney?

A Yes, I have.

Q What do you do when that happens?
A I stopped questioning, advise that subject if they would like to call their attorney, who their attorney was. From that point, that would kind of decide where I was going to go with the investigation, but all questioning was stopped.
Q And did that happen here?
A No, sir.

MR. DAVIS: Your Honor, the videotape that we're referring to has been marked as Government's Exhibit 1-A. There's also a time line. That's Government Exhibit 1-B. I've talked to defense counsel prior to that. There's no objection to the admission of that video. At this time, I would like to play the portion with the Court's permission, and no objection from counsel, of course.

THE COURT: Let me hear what he has to say just so we have a clear record on this. So you want to play the video at this point.

MR. DAVIS: The portion of what the witness has testified to.

THE COURT: And you would like to have it admitted; correct?

MR. DAVIS: Correct.

THE COURT: Mr. Noble, is there any objection?

MR. NOBLE: No objection.

THE COURT: All right. It's admitted.

MR. DAVIS: MC-1.

**(VIDEO PLAYED.)**

Q (BY MR. DAVIS) Agent, if we learn anything from that video, it's that the DEA's recording equipment is not top shelf; correct?
A Yes, sir. That's correct.
Q Your memory, your independent memory of that conversation, did Mr. Beckman ask you for an attorney?
A No, sir.
Q Did you have contact with Mr. Beckman the next day, which would be Friday, December 2 of 2016?
A Yes, sir, I did.
Q Can you describe for the Court how that happened, how it came about?
A Yes, sir. TFO Jeff Ashton and I responded to Jennings, where Mr. Beckman and some other defendants were being held. We picked them up there and conveyed them here, downtown.
Q Can we safely assume, then, from DEA, after this interview that you just watched, at some point Mr. Beckman spent the night -- was transported to and spent the night at the Jennings jail for an initial appearance the next day, Friday?
A Yes, sir. That's correct.
Q Did you have any contact with Mr. Beckman after this portion of the interview until the next day when you saw him?

A No, sir.
Q The trip from Jennings to here with Mr. Beckman, who else was with you, if you recall?
A With the defendants? And Jeff Ashton?
Q Which other defendants?
A Kerry Roades and Caleb.
Q Laubinger?
A Yes, sir.
Q Two co-defendants in this case?
A Correct.
Q During that ride from Jennings to here, did Mr. Beckman ask for an attorney?
A No, sir.
Q Did he indicate he wished to remain silent?
A No, sir.
Q Did you question or interrogate him in any way?
A I did not.
Q However, did he mention anything to you about medication?
A He did briefly.
Q What did he say?
A He said something along the lines that, if he did not take Xanax, he could suffer a seizure.
MR. DAVIS: I don't have any further of TFO McKinnon. Thank you.
THE COURT: Counsel?

CROSS-EXAMINATION

**BY MR. NOBLE:**

Q Agent McKinnon, did you draft a report or memorialize that statement about the Xanax in any way?
A No, sir.
Q No?
A No, sir.
Q Okay. And so you didn't write a report or document that Mr. Beckman allegedly told you that without Xanax he would have a seizure?
A Correct.
Q When was it that you notified the U.S. Attorney's office about that statement?
A I believe it was a couple weeks ago.
Q Just a couple weeks ago?
A Yes, sir.
Q Why was it just a couple weeks ago you decided to disclose to them about this alleged statement?
A It was just something that we brought up in conversation.
Q Who did?
A I did, recalling that.
Q Who did you tell?
A Mr. Davis.
Q What was the context of why now, you know, some time passing, that you now decide to mention that Mr. Beckman has

now disclosed that he would have a seizure without Xanax?
A It was just during the conversation, and I recalled that conversation going on in the vehicle on the way downtown, sir.
Q Were you having a conversation, or was the discussion at that time about the fact that Mr. Beckman did, in fact, have a seizure at the Jennings jail the day after your arrest?
A I believe I was informed that he did have a seizure.
Q When were you informed of that?
A I believe sometime on Friday.
Q Okay.
A The day of the seizure.
Q The day of the seizure.
A I believe, yes, sir.
Q Okay. So this is back December; correct?
A Correct.
Q So your conversation with Mr. Davis occurred when? February?
A Yes, sir.
Q All right. So you understand that Mr. Beckman has a seizure in December, and you don't mention to anyone for two months Mr. Beckman had told you that he may have seizures without Xanax? You don't find that to be significant in any way to memorialize or tell someone?
A No, sir.
Q No? Let me take you back. What time do you first arrive

at the residence, the condo in Fenton?
A I don't know the exact time, sir. I know it was still in the morning.
Q Sometime in the morning?
A If I toss out a time, I'm just going to toss out 8:30 --
Q 8:30?
A -- roughly, 8:00.
Q But when you arrive, you were with Joe Somogye?
A Yes, sir.
Q Am I saying that? Somogye?
A Yes, sir.
Q Okay. And where is Mr. Beckman when you arrive?
A I believe he is seated to the left of wherever he was taken into custody. Left of the condo.
Q Okay. Well, is he in the yard? Is he up on the porch? Where is he?
A Like the porch to the yard area.
Q Well, do you remember whether he's in the yard or whether he's on the porch?
A He's to the left of the condo, sir.
Q So the answer to my question is no, you don't remember where he was?
A Correct.
Q All right. And so there -- how many agents are there with Mr. Beckman when you arrive?

A I want to say two, three.
Q Okay. Who were the agents there that you observed that morning?
A Special Agent Owen Cunningham and some of the other individuals I don't know by name at that time.
Q Okay. And so then when you arrive, what do you do? Do you go over to those agents and to Mr. Beckman?
A TFO Somogye and I did, yes, sir.
Q Okay. And how long are you on scene before you all put Mr. Beckman in the car?
A I'd say 5 to 10 minutes.
Q Okay. Did any of the agents on scene advise you that they Mirandized Mr. Beckman?
A I don't recall that at all, sir.
Q Do you or Officer Somogye ever Mirandize Mr. Beckman on scene?
A I do not.
Q Do you ever -- when you all place Mr. Beckman in your vehicle, once you get inside the vehicle do you Mirandize Mr. Beckman?
A I do not, sir.
Q And so do you undertake -- you undertake a conversation with Mr. Beckman then on the way to your car about the backpack contents, things of that nature; correct?
A Can you repeat the question?

Q Sure. You and Officer Somogye undertake a conversation with Mr. Beckman in the car on the way to your car; correct?
A Yes, sir.
Q And you're asking him about the backpack, things of that nature; correct?
A I'm not asking him anything about the backpack, no.
Q Do you ask him any questions at all on the ride from the condo to your car?
A I don't. I don't ask him any questions, no.
Q You don't ask him any questions, all right. And where are you sitting, where is Officer Somogye sitting, and where is Mr. Beckman seated in the Escalade?
A Somogye is driving, Mr. Beckman is in the front seat, and I'm positioned behind Mr. Beckman.
Q Okay. Where is the backpack?
A Right behind -- no. Basically next to me.
Q Next to you?
A Yes, sir.
Q And you say that you noticed different contents that were inside the backpack; correct?
A Correct.
Q So you search the backpack at that time?
A Per Mr. Beckman's request, looking for his money.
Q So the three of you are driving in your vehicle, and he requests that you -- he gives you a request that you search

his backpack?
A     Correct.
Q     For money?
A     Correct.
Q     Why was he asking you to -- did you have a conversation with him about why he's asking you to search the backpack for money?
A     He just kept mentioning something along the lines "Do you have my money?"
Q     So Mr. Beckman asked you if you had his money?
A     Yes, sir.
Q     And then that prompted you to then search the backpack?
A     Per his request, yes, sir.
Q     Well, what is exactly -- what was his specific --
A     He asked me if I could look for it.
          THE COURT REPORTER:  I'm sorry.  Could you state your question again?
Q     What were his specific words when he requested you search his backpack?
A     "Can you look for it?"
Q     "Can you look for it?"
A     Yes, sir.
Q     All right.  And you noticed there was a bottle of vodka in the bag?
A     I believe there was a bottle of liquor.  I'm not sure on

vodka, sir.
Q Did you make note of what type of liquor it was?
A No, sir.
Q Did you make note of how much liquor was in the bottle?
A No, sir.
Q Did you inquire from Beckman that had he drank any liquor that morning?
A No, sir.
Q And, now, you also said that there were 5-Hour Energy drinks; is that correct?
A Yes, sir.
Q And I noted that you said that they were sealed 5-Hour Energy drinks. Do you remember saying that just a minute ago?
A Yes, sir.
Q You made a very specific point to say they were sealed; right?
A Yes, sir.
Q Why? You didn't say whether the liquor bottle was sealed, did you?
A No, sir.
Q Why?
A I don't know.
Q Have you had a discussion with anybody prior to your testimony, in preparation for your testimony today, about these Five-Hour Energy drinks and whether they contained any

liquor?
A No, sir.
Q No? All right. And did you open any of the 5-Hour Energy drinks?
A I believe I gave him one, sir.
Q You handed him one?
A Yes, sir.
Q And you believe it was sealed when you opened it?
A It was sealed when I opened it.
Q It was sealed when you opened it. All right. Did you ever observe Mr. Beckman pour anything into the 5-Hour Energy drinks?
A Can you repeat the question? I'm sorry.
Q Did you ever see Mr. Beckman pour anything into the 5-Hour Energy drinks?
A No, sir.
Q Could you smell the odor of alcohol while inside the vehicle coming from Mr. Beckman?
A No, sir.
Q No? All right. Did you ever observe Mr. Beckman consume any alcohol on the date of the arrest?
A No, sir.
Q Were you present when Mr. Beckman was in his shop looking for the keys to the van for you?
A No, sir.

Q Have you had a conversation with any other agents about Mr. Beckman consuming alcohol on that day?
A Yes, sir.
Q All right. Who did you speak with?
A I believe it was Somogye.
Q All right. And what did you and Officer Somogye talk about in terms of Mr. Beckman consuming alcohol while in your custody?
A Just that he had drank a bottle of I believe to be alcohol. Not a bottle, but he had a drink.
Q So Officer Somogye informed you that Mr. Beckman had, in fact, drank alcohol while in your custody; correct?
A In DEA's custody, yes, sir. Not mine.
Q Okay. And when did Officer Somogye indicate to you that Mr. Beckman is allowed to consume alcohol while in the custody of the Drug Enforcement Administration?
A I'm not sure if I understand the question.
Q When was it that Mr. Beckman drank alcohol while in the custody of the Drug Enforcement Administration?
A What time?
Q Yeah.
A Don't have an exact time, sir. I believe it was in the afternoon.
Q You believe it was in the afternoon, but you don't know?
A I don't know. I was not there.

Q All right. All right. But you were told by your partner that Mr. Beckman had been allowed to consume alcohol while in the custody of the DEA; correct?
A Correct.
Q Now, where was your car located that morning?
A I'm not sure of the exact address. It was a new location where we briefed.
Q Where you briefed?
A In the morning.
Q Well, I mean, give me an idea. Are we talking about Maryland Heights? Fenton?
A Fenton, yes, sir.
Q Down in Fenton. All right. How long did it take you to get from the condo to your vehicle?
A Ten minutes, roughly.
Q Ten minutes, okay. And then you exited the vehicle and left Mr. Beckman in the front seat with Officer Somogye; right?
A Yes, sir.
Q All right. And then you don't know whether or not Mr. Beckman on the ride with Officer Somogye consumed any alcohol on the way to the DEA office, do you?
A I do not.
Q You do not. Only that Officer Somogye later told you that Mr. Beckman did, in fact, drink alcohol while in the

custody of the DEA; correct?
A Later that day.
Q Well, I asked you that. I said, "When?"
You said you didn't really know.
I said, "So you don't know what time?"
Do you remember that soliloquy? Tell me, then, when it was Mr. Beckman consumed alcohol that day while in the custody of the DEA, what time.
A In the afternoon.
Q What time?
A I don't know the exact time, sir.
Q You don't know. Have you ever been involved in a case while working with the DEA, allowing defendants to consume alcohol while in your custody?
MR. DAVIS: Objection. Irrelevant.
THE COURT: It's cross-examination. I'll allow it.
A I have not.
Q Okay. So this is the first case that you've ever been involved in working with the DEA that the DEA would have allowed a defendant to consume alcohol?
MR. DAVIS: Your Honor, I'm going to object to the characterization that defense counsel keeps making. The defendant was never allowed to drink alcohol. There is no evidence of that.
THE COURT: Okay. I'll allow it.

Q (BY MR. NOBLE) You can answer.
A What's the question again, sir? Can you repeat it, please?
Q Sure. Is this the only case you've been involved in that you're aware that a defendant, while in the custody of the DEA, consumed alcohol?
A The only one I can recall, yes, sir.
Q Okay. Now, when you get back to -- you follow, I assume, Mr. Beckman and Officer Somogye back to the DEA headquarters down here; correct?
A Yes, sir.
Q All right. And then do you participate in taking Mr. Beckman from the vehicle inside the building?
A Yes, sir.
Q Once inside the building, Mr. Beckman is put into the interview room that we just observed on the video?
A Yes, sir.
Q And you're tasked with going in and sitting with him initially; correct?
A Correct.
Q So you're the first person that we're allowed to see then with Mr. Beckman now being videotaped; correct?
A Yes, sir.
Q All right. Do you ever Mirandize Mr. Beckman?
A No, sir.

Q All right. Were you ever advised by any other agents that Mr. Beckman had been Mirandized up to that point?
A No, sir.
Q Now, Mr. Beckman's clearly in custody, isn't he?
A Yes, he is.
Q All right. And who had unhandcuffed him? Was that you or Officer Somogye?
A I don't remember that for sure.
Q He was handcuffed in the vehicle on the way to the DEA headquarters; correct?
A Correct.
Q And his handcuffs were in the front or the back?
A I believe the back, but I'm not sure.
Q Well, let me ask you. If Mr. Beckman is handcuffed in the back, how was it that you opened a sealed 5-Hour Energy drink and gave it to him to consume?
A Again, I'm not sure where -- how he was handcuffed.
Q Well, that's why I'm asking. You testified earlier you handed him a sealed 5-Hour Energy drink for him to consume; correct?
A Correct.
Q And if you -- you said you believed he was handcuffed in the back; so my question is how did that occur then?
MR. DAVIS: The witness stated he wasn't sure.
THE COURT: Okay. Let's move on.

MR. NOBLE: I'll move on.
Q (BY MR. NOBLE) Once you get inside the interview room, Agent, you have a discussion. Mr. Beckman tells you that Travis is his lawyer; is that right?
A Through the conversation he mentioned Travis.
Q Okay.
A And I, in turn, asked him if he referred to Travis Noble.
Q Okay. So you clearly knew he was -- that conversation was in context to an attorney, because you brought up my name; correct?
A Correct.
Q And at some point on the video do we not hear Mr. Beckman say, "Call Travis and get him over here"?
A I'm not sure exactly what he says on the video.
Q Well, didn't you just hear and watch the video?
A He said something about "Travis" and "over here." I don't know the exact context on there.
Q All right. So Mr. Beckman says to you in that interview something in regard to Travis. You confirm Travis Noble, the attorney; correct?
A Yes, sir.
Q And he said something to the effect of getting Travis over here; correct?
A Yes, sir.
Q But you don't remember the context as to specifically

other than "Get Travis Noble over here"?
A Yes, sir.
Q And you didn't take that meaning that he wanted his lawyer present?
A Correct.
Q You didn't take it as that?
A I did not take it as that.
Q How did you take it, then? How else would you take it?
A Through our conversation, the context I took it that Mr. Noble, yourself, had previously assisted him with a DWI.
Q In context of him stating, "Get him over here," what was that in regard to a DWI? How were you taking that if not that he wanted his lawyer?
A Not really sure.
Q Not real sure. And you asked him "Is that who your attorney is?" Correct?
A Later, yes, sir.
Q And he tells you "yes"?
A Correct.
Q And you asked him questions about the arrest, my contact with him, things of that nature; correct?
A Not this arrest.
Q No, no. Previous arrests.
A I believe he stated something that "He helped me out with a DWI." So I said, "Okay." Further conversation, he just

told me about the DWI.
Q All right. You all talk about my car. You talk about -- I think you call me expensive at one point. I appreciate you calling me a nice guy, but there's a discussion about his lawyer; right?
A Correct.
Q When you leave the room, there's nobody else in the room; correct? Other than Mr. Beckman?
A Yes, that's correct.
Q Did you tell the other officers prior to them entering the room that you had just had a conversation with Mr. Beckman about his lawyer?
A No.
Q Did you tell the next officers entering the room that Mr. Beckman had said something to you to the effect of "Call Travis and get him over here"? Did you tell them that?
A No, sir.
Q On the video we hear you specifically say, "Travis is your lawyer." Do you remember saying that?
A Something to that effect, yes, sir.
Q Okay. You don't indicate -- you don't say, "Travis was your lawyer," in context to a previous case. You specifically ask him "Travis is your lawyer; correct?"
And he responds, "Yes." Correct?
A I believe so.

MR. NOBLE: I have no further questions. Thank you, Judge.

**REDIRECT EXAMINATION**

**BY MR. DAVIS:**

Q TFO, in order to paint the context in which several of these conversations occur, I want to go back to Mr. Noble's questioning about -- in the beginning about there not being a report of Mr. Beckman's statement that, "If I don't have any Xanax, I'm prone to seizure," or something to that effect, okay?

A Yes, sir.

Q Do you have a specific memory of the first time you mentioned that to me?

A Yes, sir.

Q Do you recall where we were standing?

A I believe we were upstairs in the building.

Q And it would be true that we were preparing for your testimony today?

A That is correct.

Q Other people in the room; do you recall?

A Yes.

Q All potential witnesses in this hearing, and we were preparing for testimony. Is that true?

A Yes, sir.

Q Tell the Court your memory of what you said to me and my

reaction.
A Basically what I had already said earlier, that TFO Jeff Ashton and I had picked up Mr. Beckman and the other co-defendants and brought them here, and you seemed pretty surprised on that.
Q I didn't know about it?
A No, sir.
Q And was it something that was in your memory that you were purposely hiding from somebody?
A It was not purposely, no.
Q Counsel also asked if anyone Mirandized the defendant while you were in the Escalade with Somogye heading back to DEA before you got dropped off at your car. He specifically asked, "Did you Mirandize him?" and you did not. Correct?
A Correct.
Q Were you privy to a conversation wherein Somogye Mirandized him?
A Joe Somogye did Mirandize him.
Q In the Escalade after leaving 1164 Stone Bluff.
A Yes.
Q Do you recall what Mr. Beckman said when he asked if he understood his rights?
A Yes. He affirmed yes, he understood.
Q That he understood them. Did he ask for a lawyer?
A No, he did not.

Q Did he say he wanted to remain silent?
A No, he did not.
Q The backpack conversation in that Escalade, who started -- who initiated that conversation?
A Mr. Beckman did.
Q And so your search, looking for the money in the backpack, was at his request?
A Yes, sir. It was.
Q In those conversations that we've had collectively, the witnesses in this hearing upstairs in preparing for this testimony, did I bring up the matter of whether the 5-Hour Energies were sealed or unsealed?
A No.
Q You and I have never had such a discussion?
A I don't believe so.
Q Okay. In the interview room that we see on the videotape -- well, let me back up. In your 14 years as a law enforcement officer, have you ever arrested anyone for DUI/DWI?
A Yes, sir.
Q Are you familiar with common signs of intoxication?
A Yes, sir.
Q Professionally as a police officer and unprofessionally just as a citizen?
A Yes, sir.

Q Did Mr. Beckman appear in any way intoxicated in that interview room that we saw in the video clip?

A He did not.

Q Smell of alcohol?

A No, sir.

Q And finally, Officer, when you left the room for the defendant to be interviewed by other people, did you have any thought in your head that this man has invoked his right to counsel?

A No, sir. I did not.

Q Or his right to remain silent?

A No, sir.

MR. DAVIS: I have nothing further.

MR. NOBLE: Briefly, Your Honor.

THE COURT: Okay.

**RECROSS-EXAMINATION**

**BY MR. NOBLE:**

Q Agent, just so I'm clear, so that morning you're not aware of Mr. Beckman having any alcohol prior to you taking him into that interview room; is that correct?

A That's correct.

Q And your testimony is that, when he's inside that interview room, he doesn't appear as though he's consumed any alcohol whatsoever?

A Correct.

Q He doesn't appear as though that he was intoxicated in any way; correct?
A Correct.
Q And this was on December 1, 2016, at about 10:00 AM?
A I would say a little earlier than that at that time.
Q That's earlier, then. 9:00 AM?
A Are you talking about the interview room?
Q Yes.
A Maybe a little earlier, 9:00, something like that.
Q Okay. And were you aware that Mr. Beckman -- you are aware that Mr. Beckman was taken to the hospital on December 2; correct?
A Yes, sir.
Q That he had -- I think you indicated he had a seizure and was taken to the hospital?
MR. DAVIS: Object. It's beyond the scope.
MR. NOBLE: It goes to the alcohol, Judge. I'll clear it up.
THE COURT: Just keep it within the scope of his testimony.
Q (BY MR. NOBLE) Agent, were you aware that the next day at the hospital Mr. Beckman still had alcohol in his system 24 hours later?
MR. DAVIS: Objection. We have no evidence of that whatsoever.

THE COURT: Let's move on.
Q (BY MR. NOBLE) Who was present during the group preparation for your testimony? You said it was you and other agents in the room when you first told the Assistant U.S. Attorney about the seizures. Who was present during that conversation?
A Mr. Davis was present, Joe Somogye, Brent Nanney. Maplewood detectives were both there.
Q Okay. So during the preparation of the testimony, you all kind of all met together to discuss the -- what had happened, what transpired, and what you all would testify to; is that right?
A Correct.
Q Do you normally prepare for your testimony in a group setting?
MR. DAVIS: Objection to the relevance.
MR. NOBLE: I'll withdraw. I'll withdraw. I have no further questions.
MR. DAVIS: I have nothing further.
THE COURT: Okay. You can step down.
THE WITNESS: Thank you, ma'am.
THE COURT: Do you have another witness, Mr. Davis?
MR. DAVIS: David Brown.

**(WITNESS SWORN BY THE CLERK.)**

**DAVID BROWN,**

**HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

**DIRECT EXAMINATION**

**BY MR. DAVIS:**

Q Mr. Brown, can you inform the Court how you're employed, please?
A I'm a detective with the City of Maplewood?
Q How long have you been assigned as a detective to Maplewood Police Department?
A I've been assigned to the detective bureau for over a year.
Q And how long have you been a Maplewood police officer overall?
A I've been with the City of Maplewood for four years.
Q Four years?
A Correct.
Q Were you employed in law enforcement prior to Maplewood?
A Yes, sir.
Q Where?
A I was a St. Louis city police officer for four years as well.
Q For four years?
A Yes, sir.
Q Anything prior to city police work?
A No, sir.

Q So roughly eight years total as a police officer, one year as a detective of Maplewood?
A Yes, sir.
Q In your position as a detective at Maplewood, are you involved in an investigation of the kidnapping of Ellis Athanas in November of 2016?
A Yes, sir.
Q Did you participate in an interview of Todd Beckman, a defendant in that case, on December 1, Thursday, December 1 of 2016, following his arrest?
A Yes, sir.
Q Where did that interview take place?
A It took place at DEA headquarters.
Q Can you roughly -- I mean briefly describe for the Court the events of that morning, what you did in relation to that investigation, those arrests.
A When it all started, I was with Detective Sergeant John Leclerc. We went to Blake Laubinger's house in Pacific.
Q Co-defendant in this case?
A Yes, sir.
Q Okay. That particularly had nothing to do with Mr. Beckman?
A No, sir.
Q You eventually arrived at the DEA downtown here. Is that true?

A Yes, sir.
Q And participated in the interview of Mr. Beckman?
A Yes, sir.
Q Who assisted you in that interview?
A Sergeant John Leclerc.
Q Prior to -- it's in an interview room at the DEA. Are you aware that it was video and audio recorded?
A Yes, sir.
Q Have you reviewed that audio and video recording?
A Yes, sir.
Q Prior to you and Officer Leclerc walking into the interview room, do you know who was with Mr. Beckman in the interview room?
A Yes, sir.
Q Who was that?
A Brandon McKinnon.
Q The previous witness?
A Yes, sir.
Q The interview is roughly three hours long; is that true?
A Yes, sir.
Q Near the beginning of the interview, did you Mirandize Mr. Beckman?
A I did.
Q Can you describe for the Court how you did it?
A I used a form that has the *Miranda* printed out, and so

Maplewood statement *Miranda* warning form.

MR. DAVIS: If there's no objection, I'd like to play a portion of the video regarding the Mirandizing of the defendant.

MR. NOBLE: No objection.

THE COURT: Why don't we get it admitted first and then we'll play it. So offer its admission. Is this the same one?

MR. DAVIS: Yes. It's all the same one.

THE COURT: All right.

**(OFF THE RECORD.)**

THE COURT: Erica, do you want to get our guy up here? And maybe we'll take a brief break and give the court reporter a break, okay? Let's take a brief break.

Counsel, come on up here for a second.

**(A BENCH CONFERENCE WAS HELD OFF THE RECORD.)**

THE COURT: Let me know when we get it going.

Mr. Davis, I'm assuming you do want to play this with this witness; right?

MR. DAVIS: Yes. And at least one other clip. No. Three other clips.

THE COURT: Okay. All right.

**(COURT RECESSED FROM 11:14 AM UNTIL 11:27 AM.)**

THE COURT: Go ahead, Mr. Davis.

Q (BY MR. DAVIS) Detective Brown, I think where we left off

was you testified that you Mirandized the defendant using a form. Do you recall that?

A Yes, sir.

Q That's true?

A Yes, sir.

MR. DAVIS: I would ask at this time to play that portion of the video that's marked MC-2, please.

THE COURT: Go ahead. The miracle of modern technology.

MR. DAVIS: It makes life easier.

**(OFF THE RECORD.)**

MR. DAVIS: You can fix it. We have a speaker.

THE COURT: You have what?

MR. DAVIS: We have a speaker.

THE COURT: Okay.

**(VIDEO PLAYED.)**

Q (BY MR. DAVIS) Detective, prior to your Mirandizing the defendant that we just witnessed, did you receive any information that the defendant would consent to certain searches?

A I was advised that he would provide.

Q Do you recall who told you that?

A Task Force Officer Joe Somogye.

THE COURT: Just a second. You need to just get up to the mic just a little bit more because you're fading out.

THE WITNESS: Okay. Sorry.

MR. NOBLE: I'm sorry. I didn't hear his last answer about what he was advised --

THE COURT: Let's have the court reporter read it back, if she got it.

**(COURT REPORTER READ BACK REQUESTED PORTION.)**

Q (BY MR. DAVIS) I will rephrase, reask the question. Were you advised, prior to what we just saw on the video, that the defendant, Mr. Beckman, would consent to certain searches?

A Yes, sir.

Q Who advised you of those consents?

A Task Force Officer Joe Somogye.

Q And what was it -- your memory -- that there was a -- that he would consent to a search of?

A To his condo, garage, and his Subaru.

Q The condo would be 1164 Stone Bluff?

A Yes, sir.

Q There's a detached garage associated with that condo?

A Yes, sir.

Q Do you recall when you were told about those consents?

A It was briefly right before I walked in.

Q Into that interview room that we just saw?

A Yes, sir.

Q Do you recall Task Force Officer Somogye actually walking in the room at some point and getting -- giving the defendant

consent forms for those searches?
A Yes, sir.
Q Is it also your memory from watching the videotape that Somogye does that twice and the second time you're not there. Is that true?
A Yes, sir.
Q You've Mirandized the defendant. He indicates he understands his rights. Does he invoke his right to counsel after that?
A No, sir.
Q Does he invoke his right to remain silent after that?
A No, sir.
Q In fact, for three hours after this, would you describe him as talkative?
A Yes, sir.
Q However, did the term "lawyer," "attorney," "counsel" -- anything like that -- come up?
A Yes, sir.
Q Ever in the form that he equivocal invocation "I want my attorney here"?
A Not at all, sir.
Q If we could play, if there's no objection, clip -- it's titled "MC-3."
THE COURT: Any objection?
MR. NOBLE: No objection.

THE COURT: Go ahead.

MR. DAVIS: We'll cross our fingers.

**(VIDEO PLAYED.)**

Q (BY MR. DAVIS) Detective, if I tell you that that is at the one-hour, 28-minute mark of this interview, do you have any reason to doubt that?

A No, sir.

Q In fact, the interview's going to go on for about another hour and a half?

A Yes, sir.

Q After this point, does the defendant ever go back and say, "You know what; I do want my lawyer here"?

A No, sir.

MR. DAVIS: Can we play clip MC-4, please?

**(VIDEO PLAYED.)**

Q (BY MR. DAVIS) Detective, again, after the defendant states that he knows he should have an attorney here, did he say, "I want my attorney here"?

A No, sir.

MR. DAVIS: Can we play the final clip, which is MC-5?

**(VIDEO PLAYED.)**

Q (BY MR. DAVIS) The lawyer mentioned in that snippet is Rosenblum. Is that true?

A Yes, sir.

Q Did he ask at any point after this "I want Scott Rosenblum here"?
A No, sir.
Q Or Travis Noble or anyone else?
A No, sir.
Q The interview is approximately three hours long?
A Yes, sir.
Q There are incriminating statements that the defendant makes in addition to the ones we just saw; true?
A Yes, sir.
Q Concerning the consent search at the Stone Bluff condo -- you said the condo itself, a detached garage, and the Subaru that we've heard testimony about -- did the defendant make any requests about whether he would come with you all when that search is done?
A Yes, sir.
Q What is it he wanted?
A He requested to be present while it was happening.
Q And do you know why at all? Did he express why?
A He just said that he wanted to come along, and he didn't want it to be a big deal, essentially, and people seeing what was happening.
Q Do you recall -- if this interview was three hours long, do you know what time it ended?
A I want to say after lunch, approximately maybe noon, one,

somewhere around there.

Q From the ending of the interview to the traveling to the Stone Bluff condo, how much time in between?

A Forty-five minutes, maybe an hour, tops.

Q Did you accompany the defendant to the Stone Bluff condo?

A Yes, sir.

Q Who else was with you?

A Task Force Officer Somogye.

Q Who was driving?

A Somogye.

Q Do you recall where the defendant was seated in Somogye's vehicle?

A In the front passenger seat.

Q Do you recall that to be a Escalade?

A Yes, sir.

Q And that puts you in the back seat, I assume?

A Yes, sir.

Q Any talk of wanting a lawyer to accompany him during the search of his residence on the ride to Stone Bluff?

A No, sir.

Q Of an attorney at all?

A No, sir.

Q What do you -- you -- what do you do at Stone Bluff?

A When we get there, I was looking for a power of attorney form that the victim had said that he was forced to sign, and

I was searching.
Q The victim, being Ellis Athanas, had told you in his statement that he was forced to sign a power of attorney form?
A He said that he was forced to sign a form that was later determined to be a power of attorney form, sir, yes.
Q And do you know what that was for?
A To get the titles of his vehicle registered to Mr. Beckman.
Q You had reason to believe that form would be in Mr. Beckman's condo?
A Yes, sir.
Q Did you find it?
A I did not.
Q Did you go anywhere else after Stone Bluff?
A Yes, sir.
Q Where?
A I went to 11 Champion Drive.
Q And how was it -- can you describe for the Court how it was you learned that we're going from Stone Bluff to 11 Champion Drive?
A As I was coming downstairs, Mr. Beckman was having a conversation with Task Force Officer Somogye in that he had stated that there was $5,000 of the money provided by the victim's -- Ellis Athanas -- father. $5,000 of that was in the safe at Mr. Beckman's place of work.

Q 11 Champion Drive is his office complex?
A Yes, sir.
Q For his -- he owns several corporations?
A Yes, sir.
Q Do you ride with Somogye and the defendant to 11 Champion?
A Yes, sir.
Q In the Escalade?
A Yes, sir.
Q During that ride does he express a desire to have an attorney present?
A No, sir.
Q Or remain silent?
A No, sir.
Q Does he express any concerns about what's going to happen at the office complex?
A Yes, sir.
Q Can you describe for the Court what it is he's saying, to the best of your memory?
A He is worried about what people are going to say when there's a bunch of police there, law enforcement. He's also worried about Kerry Roades possibly being present and being apprehended at the time. He didn't want to be handcuffed and walked into the premises. And at first he said that he would go in there by himself and break out the stuff, but he agreed

to allow Somogye and myself escort him inside.
Q Did you do anything to cover up the handcuffs to cover that concern?
A We were going to put a coat over it or a sweater.
Q What was Mr. Beckman's concerns about the arrest of Kerry Roades?
A He didn't want us to do it there. He simply wanted us to leave a business card or talk to him at another time. He just didn't want him arrested at the facility.
Q Kerry Roades being one of the co-defendants in this case?
A Yes, sir.
Q When you pull up to 11 Champion Drive, what do you see?
A As we're pulling up, I see Kerry Roades walking out of the business -- there's a garage -- to a black truck that was parked right in front.
Q What happened then?
A Seeing Mr. Roades, I advised Task Force Officer Somogye, along with other members of the FBI crew that were there, that I saw Kerry Roades and that I was going to go ahead and apprehend him.
Q Did you?
A I did, sir.
Q Who are the other officers that are there?
A There was -- officers-wise, it was just myself, but there was --

Q Let's say law enforcement. Sorry.
A I apologize. It was Special Agent Owen Cunningham, Nathaniel Hart, Brian Jost, I believe his name's Chad Talic, and maybe one or two other. I believe Jeff Ashton from DEA as well.
Q Did you have assistance in arresting Roades?
A I did.
Q By whom?
A It would have been -- I believe it was Nathaniel Hart, but I'm not 100 percent sure.
Q So with Mr. Roades in custody while that was going on, do you know where Mr. Beckman was?
A Mr. Beckman was in the Escalade with Task Force Officer Somogye.
Q And no one else?
A No, sir.
Q While you're at 11 Champion, did Mr. Beckman's attorney, Travis Noble, arrive?
A Yes, sir.
Q Can you explain to the Court what happened concerning that?
A Well, we were -- we had just arrested Kerry Roades, and I had Mirandized him, and he had said that he did have a weapon inside the truck. We also located one on his person. At that time, that's when Mr. Noble and Mr. Boyd and another male

arrived on scene. Mr. Noble went inside. Mr. Boyd approached us, asked if anybody else was inside.
Q Let me stop you. You said Mr. Noble arrived and went inside the complex itself?
A Yes, sir.
Q Had law enforcement gone inside the complex prior to that?
A No, sir.
Q Did we have -- "we" meaning law enforcement -- have anyone inside?
A No, sir.
Q How long was Mr. Noble inside; do you know?
A Maybe 15, 20 minutes.
Q And you indicated Mr. Boyd and another individual was with Mr. Noble?
A Yes, sir.
Q Do you know Mr. Boyd to be the gentleman seated at counsel here with Mr. Noble?
A Yes, sir.
Q That's the gentleman who was there?
A Yes, sir.
Q What did he say to you?
A He asked if anybody else was inside the building and then told us that they weren't going to permit a search.
Q There would not be a search?

A Correct.
Q Does Mr. Noble ever come back out of the office and talk to law enforcement?
A Yes, sir.
Q You're standing there?
A Yes, sir.
Q You're one of them to whom he speaks?
A Correct.
Q What is it he says?
A He asked if his client is on site. We tell him that he is. We also give him -- we tell him what's going on; that his client had made statements that part of the ransom money was on the premises and had provided consent to search the contents of his workplace.
Q When you advised him that his client was actually present, was he allowed to confer with Mr. Beckman?
A Yes, sir.
Q How did you all set that up?
A We escorted Mr. Noble and Mr. Boyd and another male. The vehicle was parked on the parking lot. We brought them over to it. Task Force Officer Somogye exited the vehicle, and they were allowed to talk to him as Mr. Beckman was sitting on the passenger side -- or the front passenger seat, with his legs outside of the vehicle with the door open.
Q Do you know how long they conferred with each other,

roughly?
A I'd say 5, maybe 10 minutes.
Q Did Mr. Noble talk to law enforcement, including yourself, after he had the conference with his client?
A Yes, sir.
Q What did Mr. Noble state then?
A Mr. Noble said that they would consent to the search.
Q Of 11 Champion complex?
A Yes, sir.
Q Do you see anything else while you're standing outside the office area that is of interest to you as a law enforcement officer in this kidnapping case?
A Yes, sir.
Q What?
A The victim had described that he had been transported in a Tan Co. minivan back when he was dropped off. I observed that minivan to be parked outside. I advised that that was a vehicle believed to be transported, and we requested consent to sign that -- or consent to search that as well.
Q And the response to the ask, to the request for the consent?
A Mr. Noble said that they would be provided.
Q After Mr. Noble, the defendant's attorney, gives you consent to search the property, do you go in 11 Champion?
A Yes, sir.

Q What happens when you go in?
A We go to Mr. Beckman's office. Mr. Beckman has a safe underneath his desk. He's allowed to open the safe. He backs away. He points out to us that the cash -- he said that there was $5,000 that was retrieved from the victim's father, and there was other money in there that he said belonged to his business.
Q What did you do?
A We took pictures of the money, and Officer -- or Task Force Officer Somogye seized the $5,000.
Q Left the remaining money in the safe that the defendant says is unassociated with the kidnapping?
A Yes, sir.
Q Regarding the seizure and search of the Tan Co. van that you're talking about, did you have the keys to the vehicle?
A We did not, not at first.
Q What happened concerning the keys?
A We -- I accompanied Task Force Officer Somogye and Mr. Beckman looking for the keys for the van.
Q Throughout the complex?
A Yes, sir.
Q Was it easy to find them?
A It took a while.
Q During that process, do you recall -- do you have a specific memory of whether or not Mr. Beckman was handcuffed?

A At that time he was, sir.
Q In the front or behind?
A In the front.
Q Had you, in fact, draped a coat or something over the handcuffs?
A We had given him something to -- when we walked inside. I can't recall if it was a shirt.
Q How long did the search of 11 Champion take?
A From the time of the finding the keys and the safe, when we actually made inside, Mr. Noble provided us, I would say, 30 minutes.
Q Was Mr. Noble with you the entire time?
A Yes, sir.
Q Do you recall at the conclusion of the search, when you all are ready to leave, Mr. Beckman making a request?
A Yes, sir.
Q What did he ask you?
A He asked to use the restroom.
Q Do you have a concern about that?
A I did. I wanted to ensure that there was no weapons inside or any other escape routes.
Q Did you allow him to use the bathroom?
A After searching it, I did, yes, sir.
Q There's no delicate way to ask this. Did he have to be unhandcuffed in order to use the bathroom?

A Yes, sir.
Q So what did you do procedurally? Now you've got a defendant who's unhandcuffed who has to use the bathroom, what did you do?
A I stood at the door with the door open.
Q When he comes out of the bathroom, can you describe for the Court the room, the area, that you're standing in?
A This is a -- it's the warehouse itself. There's a kitchenette to the -- I'm sorry I don't know the directional -- but on the right side of it, there's a refrigerator, I believe a sink, and then there's a door that leads to the bathroom.
Q But there is a kitchenette area?
A Yes, sir.
Q When the defendant comes out of the bathroom unhandcuffed, can you describe for the Court what happened that you specifically saw?
A He came out, and he made a request that if he could get a drink.
Q And do you know what happened?
A At that time we granted him, believing that he was going to get a drink of water. I saw that he opened the freezer. I didn't see what he had poured in the contents, and I was made known that he poured alcohol.
Q Do you know specifically that it was vodka?

A Yes, sir.
Q But you didn't -- you don't have a specific memory yourself?
A No, sir.
Q Do you know, Detective, how Mr. Noble knew to arrive at 11 Champion?
A I do not.
Q At any time did Mr. Beckman ask to use a phone to call his lawyer to have him present?
A No, sir.
MR. DAVIS: I have nothing further. Thank you.

**CROSS-EXAMINATION**

**BY MR. NOBLE:**

Q Officer Brown, were you present when Nicole Beckman called Todd Beckman's cell phone --
THE COURT REPORTER: I'm sorry.
Q I'm sorry. Officer Brown, were you present when Nicole Beckman called Todd Beckman's cell phone and it was answered by one of the detectives at BAM Properties?
A I can't recall.
Q You can't recall?
A No, sir.
Q Were you present when -- well, do you remember one of the agents talking to Nicole Beckman and advising that you had him at BAM Properties, the corporate headquarters?

A No, sir.
Q All right. Were you present when Mr. Beckman was screaming, "Call Travis and get him down here," into the phone?
A No, sir.
Q Were you ever told that Mr. Beckman screamed into the phone, his own personal phone when his wife called, and said, "Tell Travis to get down here"?
A No, sir.
Q All right. And you never observed -- are you aware of Mr. Beckman ever receiving a phone to make a phone call to me?
A Can you say that again?
Q Sure. Was Mr. Beckman ever provided a phone by you or any other officer to call me or another lawyer?
A He was allowed to contact. He called his wife, I know that.
Q When was it that he was allowed to call his wife?
A I can't tell you the exact approximate time. He was worried about the subject coming in from the airport from California, I believe, and he wanted to make arrangements for him to be picked up.
Q So you don't remember what -- during the day when it was Mr. Beckman spoke to his wife?
A I know it was at the conclusion of our interview. I just don't know exactly the time frame.

Q All right. And do you ever wonder how it is I knew to show up there at the properties while you had him there?
A Pardon me?
Q Did you ever wonder how it is I showed -- just happened to show up to the properties there if he'd never been given the opportunity to contact me?
A No, sir.
Q No?
A No, sir.
Q Let's back up. So were you present during the arrest of Mr. Beckman out at the condominium in Fenton?
A No, sir.
Q Were you told by Owen Cunningham of the FBI that Mr. Beckman had, in fact, denied consent to search of both his vehicle, the Subaru, and the condominium there in Fenton?
A No, sir.
Q All right. And so you were advised -- I believe you said that Mr. Beckman had given consent to search the condominium and the Subaru?
A He was going to provide consent, yes, sir.
Q Who was it that provided you the information that Mr. Beckman had actually consented to the search of the condo and the Subaru?
A Task Force Officer Somogye.
Q Somogye?

A Yes, sir.
Q All right. Were you aware that Officer McKinnon had been in the interview room with Todd Beckman prior to your entering?
A I saw as I walked in, yes, sir.
Q I'm sorry?
A I observed him as I walked in.
Q When you walk in, Officer McKinnon is in the room?
A Yes, he is.
Q All right. Do you know how long Officer McKinnon had been in the room with Todd Beckman prior to your entering?
A I did not.
Q Do you know if anyone else had Mirandized Todd Beckman prior to your entering the room that morning?
A I wasn't aware.
Q Do you confer with Officer McKinnon about the discussion he and the defendant, Mr. Beckman, were having prior to your entering the room attempting to interview him?
A Can you say that one more time, please?
Q Sure. Do you talk to Detective McKinnon and inquire from him about what is discussed between he and the defendant, Mr. Beckman, prior to your entering the room for the interview?
A No, sir.
Q So you don't ask Officer McKinnon if he had ever asked for a lawyer?

A No, sir.
Q You don't ever ask Officer McKinnon if he had invoked his right to have a lawyer before him being questioned?
A No, sir.
Q Why not?
A He was just processing him. It wasn't part of the interview itself.
Q Okay. So as far as you know, Officer McKinnon hadn't discussed anything about a lawyer with Todd Beckman?
A I wasn't aware that he had discussed anything relative to this case, no, sir.
Q All right. Are you aware today whether or not Officer McKinnon and Mr. Beckman had discussion about an attorney prior to you entering the room?
A He had mentioned your name.
Q All right. When did you find that out?
A After I viewed the video.
Q After you reviewed the video?
A Yes, sir.
Q All right. Did you ever hear Mr. Beckman say, "Call Travis; get him over here"? Did you see that on the video with Officer McKinnon?
A No, sir.
Q You didn't see that?
A Oh, I'm sorry. Yes, I did see the video. I wasn't aware

of the time, no.

Q Okay. And did you not take from that when Mr. Beckman said, "Call Travis; get him over here," that he was invoking he wanted a lawyer present at -- before your interview?

MR. DAVIS: I'm going to object to the relevance. First off, I'm not exactly sure that that's exactly what he says in that video. That's for the Court to decide. Second off, what he surmises from that is irrelevant. He wasn't there.

THE COURT: Well, first of all, the video speaks for itself; and, second of all, you might want to lay a little better foundation with respect to his knowledge.

Q (BY MR. NOBLE) Officer, you've watched the video since your -- obviously sometime after the interview; right?

A Yes, sir.

Q So prior to your interview, you weren't aware if Mr. Beckman had ever said, "Call Travis; get him over here." You weren't aware of that prior to your interview; correct?

A No, sir.

Q And no one ever made you aware that Mr. Beckman may have requested his lawyer be present?

A No, sir.

Q All right. Since viewing the video, have you -- when you watched the video at a later date, did it appear to you that Mr. Beckman asked the previous agent to get his lawyer there?

MR. DAVIS: Objection. Irrelevant.

THE COURT: Well, he did testify that he viewed the video and that's how he arrived at certain knowledge; so I'm going to allow him to respond to what he saw in the video.

MR. DAVIS: Respectfully, Your Honor, he's testified that he viewed it after.

THE COURT: Correct. But he did testify about his viewing of the video, and I think he can be asked questions about it, you know, for what it's worth. I mean, the video says what the video says. I'm not sure that his understanding of the video is entirely relevant, but this is cross-examination, and I think he can be cross-examined on the matter since he raised it.

MR. DAVIS: Very well.

THE WITNESS: Could you ask your question again?

Q (BY MR. NOBLE) Sure. Since watching the video, were you aware that Mr. Beckman asked the officer, prior to your entering the room, to call his lawyer and have him there? Were you aware?

A My interpretation of the video is that they are having a conversation about a DWI and he makes something to the effect of "This is easier than a DWI. When you get a DWI, you just call Travis," referring that if he was being arrested for DWI, you should contact Travis, which we determined to be you, sir.

Q Did you ever hear on the video Mr. Beckman say, "Call

Travis, and get him over here"?
A That was what he said.
Q Do you remember --
A I apologize.
Q I'm sorry?
A I didn't know if you were done with your question.
Q Did you ever hear Mr. Beckman say that on the video?
A He said it that to the effect like I said, that if this is a DWI, this is harder. At that point, just he basically, you know, "Just call Travis. Have him come up." Something along those lines. I apologize. I don't know verbatim.
Q All right. So he said something about calling a lawyer and having him there but only if it was a DWI. That was your understanding?
A Yes, sir.
Q Okay. Now, at 1:01:30 on the video, and based on the videotape time line, Exhibit No. 1-B of the Government's, it indicates that Mr. Beckman mentions, quote, "my attorney." Is that right?
A Without having it in front of me, I wouldn't know, sir.
MR. NOBLE: May I approach, Your Honor?
THE COURT: Go ahead.
Q (BY MR. NOBLE) Showing you what's been previously marked Government's Exhibit No. 1-B, you see it says 1:01:30.
A Yes, sir.

Q All right. And it indicates there that he asked for -- he says something mentioned my attorney; correct?
A Yes, sir.
Q And then you all indicate at 1:18:55 that the defendant comments, "Time to get an attorney." Do you see that?
A Yes, sir.
Q All right. And you didn't take it at that time, when he said, "It's time to get an attorney," that he was asking for an attorney at that time?
A No, sir. He was jokingly saying it.
Q Jokingly saying it?
A Yes, sir.
Q Okay. So you took that as a joke when the defendant said, "I think it's time for me to get an attorney"?
A He begins laughing. That's why I inferred it was a joke, sir.

THE COURT: Mr. Brown, just keep your voice up, okay?

THE WITNESS: Okay.

THE COURT: Because I can barely hear you. And we're not going to get a clear record unless you keep your voice up.

THE WITNESS: Yes, ma'am.

MR. DAVIS: Your Honor, I'm also going object to the mischaracterization of this exhibit, which is simply a time line for the Court to be able to jump instead of having to -- obviously, you will watch three hours of it, but if you want a

time line. If Mr. Noble wants to classify this as not being a joke, I suggest we play it.

THE COURT: Well, I'm going to leave up to you what you want to play in response if you feel that other areas of the video will clarify the testimony. The document itself is -- my understanding, and I don't have a copy of it -- but is not intended to be a transcript of the video. It's an index.

MR. DAVIS: Correct.

THE COURT: So the testimony is worth what it's worth with respect to this particular exhibit.

But in any event, what I would like for you to do is stand back at the podium, if you don't mind.

MR. NOBLE: Judge, just for what it's worth, I was just asking -- I was merely asking the detective if what the Government's Exhibit No. 1-B, when they have in quotation marks "time to get an attorney," end quote, if the defendant did in fact say that. That's what I was asking.

THE COURT: Okay. The problem with him testifying about Government's Exhibit 1-B is that, first of all, he didn't prepare it --

MR. NOBLE: I understand.

THE COURT: -- and I'm not sure that his testimony is that there's been a sufficient foundation for him to testify with respect to the meaning of Exhibit 1-B.

MR. NOBLE: And I apologize. I was merely showing him the exhibit. I'll rephrase.

Q (BY MR. NOBLE) Detective, do you remember Mr. -- you do remember Mr. Beckman saying to you at some point "I think it's time to get an attorney"?

A He said something to that effect, yes, sir.

Q Okay. And you felt at that time that it was -- that he was joking?

A Yes, sir.

Q Okay. And then do you remember at 1:12:30 in the tape, just prior to that, Mr. Beckman saying that he wanted an attorney? It's not on the Government's 1-B. Do you remember from the video and your interview that Mr. Beckman told you at approximately 1:12:30 that he wanted an attorney?

A No, sir.

Q All right. Do you remember at 1:28:44 in your interview Mr. Beckman told you "You know what; that is exactly what the attorneys say not to do"? Do you remember that, him telling you that?

A I recall that conversation, yes, sir.

Q And that was part of the video that the Government just played -- correct? -- where he said that?

A Yes, sir.

Q All right. Do you remember at 1:29:55, after that, Mr. Beckman told you "Get my attorney"?

A Can you repeat that one more time, please?
Q Sure. Do you remember at 1:29:55 in the video that Mr. Beckman said to you "Get my attorney"? Did he tell you that at some point?
A I believe he made that statement.
Q All right. And did you think that that was a joke as well?
A That's the one that I believe that you were referring to before, sir.
Q No. That was at 1:18:55 in the video, a different time where he said to you "Time to get an attorney," isn't it?
A Uh-huh.
Q He actually says it to you two different ways, doesn't he?
A With the way you're reading it, I believe so. I don't have that government document in front of me.
Q I'm asking you, do you remember from your interview him saying that to you on several occasions, obviously?
A Making comments towards attorney, yes, sir.
Q Okay. And each time Mr. Beckman requested his attorney, you took that as though he was joking; right?
A No. Just the two, the statements that you just referred to, he said it in a joking manner.
Q A joking manner?
A Yes, sir.

Q At some point at 1:34:20 in the video, do you ask to search Mr. Beckman's property and he tells you "I think I need to ask my attorney first"? Do you remember that?

A I believe -- I remember something along those lines, yes, sir.

Q And it was sometime after that, though, that you all came in and provided the consent to search form; is that right?

A I'm not sure of the first time that Task Force Officer Somogye came in, but it was later that he signed it, yes, sir.

Q After Mr. Beckman told you he wanted to ask his lawyer before allowing you consent to search, was Mr. Beckman given the opportunity to call a lawyer?

MR. DAVIS: I'm going to object. He just reclassified what he first said.

MR. NOBLE: I'll rephrase.

MR. DAVIS: The law's clear. If a defendant says, "I think I might need a lawyer," is not the invocation of a Sixth Amendment right.

THE COURT: Okay. I promise you I'm going to give you an opportunity to argue that to me, but at this point, since he's withdrawn the question, I'm not going to rule on it.

MR. DAVIS: Okay.

Q (BY MR. NOBLE) Detective, is Mr. Beckman ever provided an opportunity during that three-hour interview to be able to

speak with an attorney?
A He never requested it, sir.
Q No. My question is did you ever provide Mr. Beckman during the three-hour interview an opportunity to call a lawyer?
A If he would have directly asked for one, I would have, yes, sir.
Q So the answer is no, you never gave him that --
THE COURT REPORTER: Wait. I need you to reask that question.
Q Sure. Was Mr. Beckman ever provided a phone to speak to a lawyer during the three-hour interrogation?
A He did not request one, sir.
Q Now, notice in the Government's last clip there were three bottles of something in front of Mr. Beckman there during the -- at the end of the interview, or at least with regard to the last clip that was shown. What were those three bottles?
A They were Five-Hour Energy drinks.
Q Okay. So during the course of the interview, how many of the Five-Hour Energy drinks did Mr. Beckman drink?
A I'm not sure if he drank all three, but I do remember that there was three in front of him.
Q Okay. And where did the Five-Hour Energy drink bottles come from?

A It came from his bag.
Q I'm sorry?
A From his bag.
Q From his backpack?
A Yes, sir.
Q Where was the backpack when he retrieved -- or when the Five-Hour Energy drinks are retrieved?
A I retrieved them. They were in the holdover cell, if you want to call it that, of the DEA headquarters.
Q They were in the holdover cell?
A Not in the cell itself, but -- I don't know what you want to call their area. The processing area, I guess, would be a more appropriate way to describe it.
Q All right. And did you inspect the bottles at all before you gave them to Mr. Beckman?
A I did.
Q You did. All right. Did you open them?
A I did not.
Q You did not. Mr. Beckman opened them; correct?
A Yes, sir.
Q All right. So you didn't know whether or not they were previously sealed since you didn't open them, do you?
A I inspected them. I observed them to be sealed.
Q You observed them to be sealed?
A Yes, sir.

Q Okay. Was there any alcohol in the bag?
A I believe that there was a bottle of maybe vodka, but I'm not 100 percent sure of the type of alcohol, but I believe there was alcohol in the bag, yes, sir.
Q Okay. Now, when you took Mr. Beckman at some point back over to BAM Properties, that's the corporate headquarters; correct?
A Yes, sir.
Q And when you -- how soon after you get to the corporate headquarters is it before his attorney arrives?
A Can you say that one more time, please?
Q Sure. How long are you at BAM Properties, the corporate headquarters, before the lawyers arrive?
A Fifteen, maybe 20 minutes.
Q Okay. And do you advise Mr. Boyd that Mr. Beckman is not on scene initially?
A No, sir.
Q No? Okay. And my understanding is that -- well, who's inside the building when the attorney -- when Mr. Boyd arrives?
A There was nobody inside the building, to my knowledge. We were standing outside of a warehouse door with Kerry Roades, and that's when we were searching his vehicle.
Q Okay. All right. And then a conversation ensues between you and myself and Mr. Boyd about Mr. Beckman had already

given consent to search the safe; is that right?
A Yes, sir.
Q And you advised that Mr. Beckman had apparently already said that there was $5,000 money belonging to Blake Laubinger in his safe in his office?
A No, sir.
Q No?
A He said that there was $5,000 in the safe that he had retrieved from the victim's father.
Q Okay. But that there was $5,000 worth of money connected to this case in the safe under his desk in his office; correct?
A Yes, sir.
Q And, now, you were requesting to be able to retrieve that money and had indicated that you would leave the other $5,000 that was not connected in the safe; correct?
A I'm not aware how much was actually involved or that was in the safe other than the $5,000. We just agreed that -- he said that it was his business money, he had receipts, and we weren't going to take that.
Q Okay. Let me ask you this. Did you ever look to seize any of the videotapes from the parking lot at BAM Properties?
A No, sir.
Q Did you ever look to seize the videotapes from the inside the corporate headquarters of BAM Properties?

A I wasn't aware that there was videos.
Q Wasn't aware. You didn't see the video cameras?
A I did not.
Q Okay. Let me ask you, let's back up. My understanding of your testimony is that Mr. Beckman is handcuffed when he's taken inside the building to go retrieve the money. Is that your testimony?
A To my best of my knowledge, yes, sir.
Q All right. Is it possible Mr. Beckman is unhandcuffed when he is taken out of the Escalade prior to entering the property?
A I don't recall that.
Q Okay. And so is it possible Mr. Beckman is unhandcuffed when he's taken upstairs to his office by the agents, myself, and Mr. Boyd?
A I can't recall that, sir. I believed he was handcuffed.
Q I'm sorry?
A I couldn't recall that. I believe he was handcuffed. I'm not 100 percent certain.
Q Not 100 percent sure. Okay. So it's possible that Mr. Beckman is not in handcuffs when he's taken into the building; isn't that right?
A I believe that he had a shirt over the handcuffs, but I'm not 100 percent sure.
Q Okay. All right. When you were -- you were taken by

both myself, Mr. Boyd, and Mr. Beckman straight up to the office initially; correct?
A Yes, sir.
Q And Mr. Beckman opens the safe -- is that right? -- under the desk?
A Yes, sir.
Q Then Mr. Beckman then provides the cash to you and the other officer that's there; correct?
A I believe that Task Force Officer Somogye actually retrieved it from the safe.
Q I'm sorry?
A I believe that Task Force Officer Somogye actually retrieved it from the safe.
Q All right. Are you sure about that?
A I'm not 100 percent sure.
Q Who opened the safe then?
A Mr. Beckman did.
Q Okay. And then was there other monies left, then, in the safe?
A Yes, sir.
Q And then are you -- and you never search any other part of Mr. Beckman's office when you're standing there inside there, do you?
A No.
Q Don't open any drawers, do you?

A I do not, sir.
Q You don't go through any files?
A No, sir.
Q You don't look through any other parts of the building?
MR. DAVIS: Your Honor, I'm going to object to the relevance of this.
MR. NOBLE: He already testified that he -- that I gave him consent to search 11 Champion, and now I'm trying to point out that that is simply not the case.
THE COURT: Well, the conclusion we'll draw from it, but I think we're going to allow the cross-examination, given that the -- see what the scope of the consent was.
Q (BY MR. NOBLE) Detective, weren't you advised that -- once you advised that he had told you there was money in the safe, that the permission given to you was you can then go upstairs to the safe, retrieve that money, and that was it?
A It was also that we would need to retrieve the keys for the Tan Co. van.
Q That came up inside, once you were inside the office, not initially; correct?
A That was -- when we were exiting the van, that's when I spoke to you after you conferred with your client at the Escalade.
Q He wasn't in the van. He was in the Escalade; correct?
A Yes, sir. I apologize.

Q All right. So you were taken up and only allowed to retrieve the money in the safe. You were not allowed to search anyplace else in that office, were you?
A Other than for the keys, no, sir.
Q All right. But the keys you didn't -- you never looked for anything else in the office. The keys were downstairs; correct?
A Yes, sir.
Q All right. So you were then escorted by myself, Mr. Boyd, and Mr. Beckman back downstairs into the shop portion of the building; correct?
A Yes, sir.
Q All right. And you were taken over to the area where those disassembled motorcycles were. Do you remember that?
A I believe so. I don't know if they were motorcycles, but there was disassembled parts, mechanical parts.
Q Well, Mr. Beckman used the restroom. Was it upstairs or downstairs; do you remember?
A Downstairs.
Q And he went into the bathroom, and you looked around?
A Yes, sir.
Q And then he was allowed to go into the bathroom and use the restroom; correct?
A Yes, sir.
Q All right. When Mr. Beckman came out of the restroom, he

walked over to the refrigerator, the freezer?
A Yes, sir.
Q Where are you; do you remember?
A I'm standing in the warehouse area essentially, I would say, between your client and where the rest of everyone else was standing.
Q You're within 10 feet of Mr. Beckman, aren't you?
A I believe that's fair to say.
Q Right. And Mr. Beckman and Officer Smugala's standing there in that area of the shop as well, isn't he?
A Can you say that again, please?
Q Officer Smugala is standing there within 10 feet of Mr. Beckman and that refrigerator as well, isn't it?
THE COURT: Mr. Noble, are you talking about Somogye?
MR. NOBLE: Somogye.
THE COURT: Yeah.
MR. NOBLE: Did I say Smugala? I apologize. Somogye, sorry.
THE COURT: Just so we have a clear record.
MR. NOBLE: I apologize.
A I can't recall where Task Force Officer Somogye was standing.
Q (BY MR. NOBLE) Who else was standing there in that section where the refrigerator is when Mr. Beckman goes to the refrigerator? Do you remember?

A I cannot recall.

Q I was standing there; correct. Do you remember that?

A I believe that you were over by the vehicles, but I'm not 100 percent certain.

Q All right. Mr. Boyd is standing there; correct?

A I believe he's standing next to you as well, but I'm not certain.

Q All right. That's within probably the distance from me to you right now, isn't it?

A It would be fair to say.

Q Okay. And you're actually in between us, aren't you?

A That's where I would say I was.

Q Okay. And you remember Mr. Beckman opening the freezer and taking out a bottle of vodka?

A I don't remember the bottle of vodka, sir.

Q All right. You remember Mr. Beckman -- well, let me ask you. Mr. Beckman is in your custody at that time, isn't he?

A Yes, sir.

Q And he's unhandcuffed, is he not --

A At that time he was, yes, sir. Unhandcuffed. I apologize.

THE COURT: Mr. Brown -- okay. You are talking way too fast, okay? So really make an effort to slow down because it's very important that we have a clear transcript for the record, okay?

THE WITNESS: Yes, ma'am.

THE COURT: So even to say "yes, ma'am" you're speaking very quickly.

And, Mr. Noble, you're speeding up to match him; so let's try and slow it down. Go ahead. Let's get the other question again.

Q (BY MR. NOBLE) Mr. Beckman is in your custody at this time, is he not?

A Yes, sir.

Q All right. And he is unhandcuffed; correct?

A I believe at that time, yes, sir.

Q And you're the closest law enforcement officer to him at that time; correct?

A To my knowledge, yes, sir.

Q And he is reaching into a freezer; is that right?

A Yes, sir.

Q And it's your testimony that you have a gentleman under arrest for a kidnapping charge standing in his office building, reaching into a freezer, and you weren't paying attention to what he was reaching for?

A I believed it was ice, sir.

Q You believed it was ice?

A Yes, sir.

Q Did you look to see to make sure that what he was pulling out was actually ice and not something more nefarious, for

your safety?
A No, sir.
Q You were not?
A No, sir.
Q Okay. And when he took out -- do you remember what he took out of the freezer?
A I do not, sir.
Q You do not, all right. Do you remember Mr. Beckman pouring a glass of vodka while he's standing there at the freezer?
A No, sir.
Q Do you remember Mr. Beckman drinking something while he was standing there in that room with you, Officer Somogye, and myself and Mr. Boyd?
A Yes, sir.
Q And do you ever inquire as to what he was drinking?
A It's made known to me, sir.
Q I'm sorry?
A It is made known to me, sir.
Q It's made known to you? Is that what you just said?
A Yes, sir.
Q What was it that he was drinking.
A I believe it was Grey Goose vodka.
Q Who was it that made it known to you that Mr. Beckman, the person in your custody that you were closest to, was

actually drinking vodka while he stood there with you?
A I cannot recall who actually stated. I just remember you stating something to the effect that "I may get you in front of a magistrate, and I don't need you to smell like alcohol."
Q I said that?
A Yes, sir.
Q That I said, "You don't need to be smelling like alcohol"?
A I believe some --
Q That you're going to be in front of a judge?
A Pardon me?
Q Go ahead. No, no. Go ahead. What was it that was said?
A I believe so, yes, sir.
Q Okay. When I said that "You may be in front of a judge, I don't want you smelling like alcohol," what was your reaction? Did you do anything at that time?
A No. I can't recall, sir.
Q Do you remember being asked "Since when does the DEA allow people to drink vodka in their custody?" and you said, "We're a kinder, gentler DEA now." Do you remember that conversation?
A No, sir.
Q No?
A No, sir.
Q Does it seem odd to you that me standing this distance

from Mr. Beckman and you in between us, that I would say to him "I don't need you to drink alcohol; you may be in front of a judge here today?" Did you find that to be odd?
A Could you ask that one more time, please?
Q Sure. Did you find it to be odd that I would say to the defendant, being this distance away, "I don't need you to be smelling like vodka when you're in front of a judge"? Did you find that odd for me to be telling him that?
A Odd? No, sir.
Q Yeah. No, okay. Did you ever attempt to take the drink from him?
A I can't recall.
Q Did you inquire from him if he was, in fact, drinking alcohol when I told him not to drink alcohol?
A No, sir.
Q All right. I certainly wasn't in control of Mr. Beckman at the time, was I?
A No, sir.
Q You were; correct?
A He was in our custody, yes, sir.
Q Well, let me ask you, did you talk to Mr. Beckman after that?
A In the ride back to DEA headquarters, yes, sir.
Q Did he smell like alcohol?
A Not at that time to me, no, sir.

Q Didn't smell like alcohol?
A I didn't smell much on him, no, sir.
Q At any time during your contact with Mr. Beckman that day, did you ever smell alcohol on him?
A No, sir.
Q No. Do you know if he ever received alcohol in the Jennings jail?
A No, sir.
Q Do you know if Mr. -- are you aware if Mr. Beckman had alcohol in his system 24 hours later the next day when he's taken to the hospital?
A I'm not aware, sir.
Q You're not aware? If Mr. Beckman had alcohol in him 24 hours after the arrest, could you explain where that alcohol came from?
A I wasn't aware that he had alcohol in his system 24 hours, sir.
Q All right. Did you ever discuss, when you were preparing for this case, Mr. Beckman's medical records with anyone?
A It was just brought up today that you --
Q Brought up today?
A -- had retrieved the medical records, sir.
Q All right. Who told you that I had retrieved Mr. Beckman's medical records?
MR. DAVIS: Objection to the relevance. We're here

on the motion to suppress, Your Honor.

MR. NOBLE: It was the alcohol.

THE COURT: Yeah, I don't see that it's relevant who told him.

Q (BY MR. NOBLE) You were made aware that Mr. Beckman's medical records were obtained; correct?

A Yes.

Q All right. And you were made aware that Mr. Beckman's medical records indicated that he had alcohol in his system, were you not?

MR. DAVIS: Objection. A, they're not in evidence. That's the defendant's job. B, he can't testify as to what the medical record says. He's not a doctor.

THE COURT: That is true.

MR. NOBLE: What I'm asking now is during their group preparation today, was it discussed?

MR. DAVIS: What's the relevance of that?

THE COURT: Wait, wait, wait, wait. I didn't hear anything about the group preparation, and I don't think he testified to anything related to the group preparations.

MR. NOBLE: I'll withdraw --

THE COURT: So I'm not sure --

MR. NOBLE: I'll start over, Judge.

THE COURT: Okay.

MR. NOBLE: How about that?

Q (BY MR. NOBLE) Officer, did you meet with anybody in preparation of your testimony today?
A Yes, sir.
Q All right. Who did you meet with?
A I met with Mr. Davis.
Q Who else was present?
A It was Owen Cunningham, Sergeant John Leclerc, Brandon McKinnon, and Joe Somogye.
Q And were you all in the same room discussing the testimony today?
A Pardon me?
Q Were you all in the same room during the discussion about the testimony today?
A We were just meeting for the testimony today, sir.
Q So is the answer yes, you were all in the same room?
A We were in the same, yes, sir.
Q And it was during that time period that the discussion came about about Mr. Beckman's medical records; correct?
A Yes, sir.
Q Did you all discuss about whether or not there was or was not alcohol in Mr. Beckman's system?
A No, sir.
Q Did anyone ever ask you about whether or not how Mr. Beckman may have had alcohol in his system?
A No, sir.

Q After Mr. Beckman went into the freezer to obtain -- well, did you ever discover what Mr. Beckman obtained out of the freezer?
A It was indicated that it was Grey Goose vodka.
Q No. I'm asking -- sir, are you telling us that you -- you -- confirmed that Mr. Beckman took Grey Goose vodka out of the freezer?
A No, sir.
Q That's what I'm asking you. Did you ever confirm what was Mr. Beckman took out of that freezer?
A I personally did not, sir.
Q Who did?
A I'm uncertain, sir.
Q All right. So you let a defendant in custody on a kidnapping charge go into a freezer, take something out, and never confirmed what it is he took out of the freezer?
MR. DAVIS: Asked and answered.
THE COURT: It's sustained.
Q (BY MR. NOBLE) Detective, did you ever search that room where the freezer was located?
A Can you say that one more time, please?
Q Did you ever search the room that the freezer was located in?
A No, sir. I just searched the bathroom.
Q You just searched the bathroom. Is it fair to say the

only room at 11 Champion Drive that you searched was the bathroom; correct?
A Prior to getting the keys, yes, sir.
Q What about after getting the keys? Where did you search?
A We didn't search anywhere else. We just found the keys.
Q My question to you is nowhere at 11 Champion Drive do you search other than the bathroom; correct?
MR. DAVIS: Asked and answered. I believe he said other than the keys.
MR. NOBLE: He said other than after the keys.
THE COURT: Okay. Let's -- I haven't heard an answer; so let's get it clear.
MR. DAVIS: Question.
THE COURT: No. Reask your question. Let's see if we can get an answer.
Q (BY MR. NOBLE) Detective, did you ever search anywhere at 11 Champion Drive other than the bathroom?
A In regards to searching for the keys, we searched around his office, yes, sir.
Q So your testimony is now, then, you were -- you walked around his office looking through things looking for keys?
A With Mr. Beckman and a task force officer. We were searching for the keys. We asked his secretary.
Q All right. What did you look in?
A Pardon me?

Q Did what did you look into when you searched? You just said you searched with Mr. Beckman. What did you look at, into?
A I didn't look into anything. We were just looking in the general area, sir.
Q All right. You never searched anything in the office, did you?
A I can't recall it, no, sir.
Q Well, you just said that you did, sir, with Mr. Beckman. Did you or didn't you search the office? Yes or no?
MR. DAVIS: Your Honor, I have to object to the irrelevance. We're here today because they filed a motion alleging that he invoked his right to counsel. Whether they searched the desk drawer or a cabinet or the back of the Lamborghini is irrelevant.
THE COURT: Well, there's been a lot of testimony, and you asked him questions related to the consent forms, and the consent forms relate to the building. And I think he's entitled to ask questions about the scope of the search once you open the door with respect to the search. So that's why I'm going to allow him although I would say, Mr. Noble, that you are going over ground repeatedly, and we're not getting anywhere with it.
MR. NOBLE: I understand. I'm just making sure we understand that 11 -- I will rephrase.

THE COURT: Okay.
Q (BY MR. NOBLE) Other than the keys and the money, did you retrieve anything from 11 Champion Drive?
A The minivan. The van, the Tan Co. van.
Q That was outside; right?
A Yes, sir.
Q Anything other than those three things?
A Not off of -- just Mr. Beckman or in general the entire time we were there?
Q While you were there with Mr. Beckman, did you -- well, let me ask you, tell me what it was you seized from, from an evidentiary standpoint, physical evidence from 11 Champion Drive.
A We seized the firearm from Mr. Kerry Roades on his person. I believe that another firearm and a taser was also seized from inside of Mr. Kerry Roades' vehicle.
Q But with regard to relation to the search with Mr. Beckman, it was only the money and the keys inside the building; correct?
A To the best of my knowledge, yes, sir.
Q All right. Do you have a conversation with Officer Somogye about whether or not Mr. Beckman consumed alcohol inside the property at BAM Properties that day?
A I can't recall. I mean, I believe that in front of you we had a conversation all together, but directly just him and

I, one-on-one, no, sir.

Q Okay.

A Not that I can recall.

MR. NOBLE: I have no further questions.

THE COURT: Okay. Mr. Davis?

MR. DAVIS: I don't have anything further. Sorry. Nothing further.

THE COURT: Okay. You can step down, Officer Brown.

MR. DAVIS: Your Honor, I have one other witness. That is Joe Somogye, obviously. I suspect he will be lengthy.

THE COURT: Yeah. I think what we're going to do is take an hour break. So we'll be back here at 1:30, and then we'll start up with Officer Somogye.

MR. DAVIS: Thank you.

THE COURT: Okay.

**(COURT RECESSED FOR LUNCH FROM 12:30 PM UNTIL 1:32 PM.)**

MR. DAVIS: Joe Somogye.

THE COURT: Somogye, okay.

MR. DAVIS: Common spelling.

**(WITNESS SWORN BY THE CLERK.)**

**JOSEPH SOMOGYE,**

**HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

**DIRECT EXAMINATION**

**BY MR. DAVIS:**

Q Mr. Somogye, we've had some difficulties with hearing and some video too. So can you stay close to the microphone, please, and just speak up, and slowly, so the court reporter can get everything. Your name is Joseph Somogye; correct?
A Yes, sir.
Q How are you employed?
A St. Louis Metropolitan Police Department as a police officer.
Q How long have you been employed in that capacity?
A Twenty-one years.
Q Any law enforcement experience prior to the city?
A No, sir.
Q Are you detached to any federal agency right now?
A Yes, sir, to the Drug Enforcement Administration.
Q How long have you been detached -- as a task force officer; correct?
A Yes, sir.
Q How long have you been a TFO with DEA?
A Going on seven years.
Q In your capacity as a task force officer with the DEA, are you involved with and/or familiar with an investigation of a kidnapping of Ellis Athanas that occurred in November of 2016?
A Yes, sir.
Q Are you personally involved in that investigation?

A I'm one of many investigators in that investigation, yes, sir.
Q Early Thursday, December 1 of last year, did you have an occasion to go to 1164 Stone Bluff, a condominium?
A Yes, sir.
Q Can you explain to the Court why you went to that address?
A Initially that morning I was asked to assist on the search warrant at another location. I was asked to go back to DEA and assist the main investigators, just helping them out at DEA. When I was driving back to DEA, I learned that Mr. Beckman was taken into custody, and I was asked to go pick him up and convey him to DEA.
Q Was anyone with you when you were asked to do that?
A Yes. Task Force Officer Brandon McKinnon.
Q In what vehicle are you driving?
A I was in an unmarked police vehicle. It was a black Cadillac Escalade.
Q Blackened windows?
A Yeah. They were heavy tint.
Q Heavy tint?
A Yes.
Q When you got -- per the request when you got to 1164 Stone Bluff, can you describe for the Court what you saw?
A Mr. Beckman was handcuffed, and he was seated on the

concrete pad of his front porch, and he was just sitting there.

Q Who else was there that you remember?

A Several FBI investigators.

Q Do you have a specific memory if Mr. Beckman was handcuffed in front of his body or behind his body?

A I believe he was handcuffed in the rear.

Q Okay. What did you do when you got there with Task Force Officer McKinnon?

A All we did is we got there from -- he was then placed in my police vehicle, and then from there we drove to DEA.

Q "He" being Mr. Beckman?

A Yes, sir.

Q Can you describe for the Court Mr. Beckman's attitude when you made contact with him and started your drive to DEA?

A Yeah. Initially, Mr. Beckman was uncooperative -- or I wouldn't use -- I would say agitated, nervous.

Q Okay. Did he make any statements to you about what was going on that morning?

A He was just asking what was going on and wanted to know how come he was in handcuffs.

Q What, if any, explanation, did you give?

A Initially when he was put in my vehicle and Brandon McKinnon and I drove from that location, I ended up dropping Mr. McKinnon off at his vehicle because it was at another

location. I didn't really have much to say to Mr. Beckman. I just let them talk, and I didn't really answer any questions.
Q At any point did you Mirandize the defendant?
A Yes, sir.
Q In the vehicle?
A Yes, I did.
Q How is it that you did that?
A I did it by memory.
Q In your memory of your Mirandizing the defendant, did you include his right to an attorney?
A Yes, sir.
Q Do you recall what the defendant's response was to your *Miranda*?
A He verbally told me that he understood his *Miranda* rights, and he agreed to cooperate with investigators.
Q At any point did he request an attorney during that car ride?
A No, sir.
Q Or wish to remain silent, express a wish to remain silent?
A No, sir. He did not.
Q Was he talkative?
A Yes.
Q Did you interrogate him?
A No, sir.

Q Was there any talk between you and Mr. Beckman or anyone else in your presence with Mr. Beckman about him not needing a lawyer or don't get one or suggesting that he not ask for counsel?
A No, sir. That would absolutely not happen.
Q Did you and Mr. Beckman ever discuss the possibility of him consenting to the search of the Stone Bluff residence?
A Yes, sir.
Q What was that discussion?
A Well, one of the things he was talking about, he was angry when he was initially taken into custody, the fact that he was handcuffed and forced to the ground, and he was wanting to know why we would want to search his house and his vehicle.
So during the car ride, Mr. Beckman and I began talking just about everyday life, at which time he and I had a rapport together. At that point in time is when I Mirandized him.
Q Slow down.
A Okay.
Q After you Mirandized him, what was the conversation about Stone Bluff?
A Yes. At that point in time, I asked him if he had anything illegal inside his condominium, which he admitted to me he just had a personal use -- personal use marijuana.
Q The kidnapping investigation at this point, is it your

case?
A It's not my case.
Q You're simply assisting others?
A I'm one of many assists, yes.
Q When he said that there was personal use of marijuana at the condo, what did you do or say?
A And at that point in time, we already knew that he had admitted he had a gun inside the Subaru that he arrived in that morning.
Q How did you know that?
A The FBI investigators had told me that.
Q Okay. Go ahead.
A Because he admitted it to them.
Q Okay. So now you know he's previously stated there's a firearm in the Subaru, and he's telling you there's personal use of marijuana at the condominium. How does the conversation develop from there?
A At that point in time, I advise Mr. Beckman this is not my investigation. I advised him it would behoove him to cooperate with investigators, and I asked him if he would be willing to sign the consent to search for the -- for his condo so we could get the marijuana out of there and then for his Subaru to get the gun.
Q And this is during the car ride?
A It's, yeah, the car ride back. Or it's either in the car

ride back or right when we get at DEA in the little booking area.
Q Regardless, McKinnon was no longer with you when that conversation happened?
A That's correct. It was just Mr. Beckman and I.
Q Did you eventually present to Mr. Beckman consent search forms that the DEA provides for the search, a consent search of Stone Bluff and a 2016 Subaru?
A Yes, sir, I did.
MR. DAVIS: If I may approach, Your Honor?
THE COURT: Go ahead.
Q (BY MR. DAVIS) That's Government's Exhibit 2 and 3. You have those?
A Yes, sir.
Q Can you explain to the Court what those are?
A Government Exhibit 2 is a DEA consent to search form that lists the address of 1164 Stone Bluff and detached garage. That's signed by Mr. Beckman.
Q You presented this form to him?
A Yes, sir, I did.
Q Did you witness him sign it?
A Yes, I did.
Q Do you recall where you were physically when that happened?
A In the DEA booking area or the interview room.

Q In the interview room?
A Yes, sir.
Q You're familiar with a three-hour video?
A Yes, sir.
Q It's actually depicted in the video near the end; correct?
A Yes, sir.
Q Do you recall, however, at the beginning of the video you come into the room and have a discussion with Mr. Beckman about consent, but then the form isn't actually signed until the end of the video?
A That's correct.
Q Can you explain what happened there, from your memory?
A From my memory, Mr. Beckman couldn't remember his address in Stone Bluff.
Q And so you left and came back?
A Yes.
Q Government's Exhibit 3 is what?
A Yes, sir. It's a DEA consent to search form Mr. Beckman filled out for a 2016 Subaru, which he signed and I witnessed.
Q At virtually the same time as Exhibit No. 2?
A Yes, sir. They were both presented at the same time.
Q And that is Mr. Beckman's signature as you saw him sign it?
A Yes.

Q Who are the witnesses there? Do you recognize -- is that your signature?
A I'm at the top, and I want to say the bottom one may be TFO Brandon McKinnon. I'm not sure. It's a scribble.
MR. DAVIS: Very well. I'd move for the admission of Government's Exhibit 2 and 3.
THE COURT: Any objection?
MR. NOBLE: No objection.
THE COURT: They're admitted.
Q (BY MR. DAVIS) Did Mr. Beckman express any concern to you about wanting to be with you when you made those searches that he just consented to?
A Yes.
Q What is it he explained to you?
A Well, from the time that we took him into custody, he was wanting to know why we wanted to search his house; so once he agreed verbally and then signed, physically signed the consent to search forms, he asked that he wanted to be present. He didn't want us to tear up his condo, which I told him that would not happen. But he asked to be present, which I told him that he would be.
Q What else did -- how did you explain to him what is going to happen?
A I told him after he was interviewed we were going to leave DEA and we were going to drive back to 1164 Stone Bluff

where he would allow entry into his condo, which he did, and he was going to then show me exactly where the marijuana was inside his condo.

Q Did that happen?

A Yes, sir.

Q Was there marijuana?

A Yes.

Q Where?

A It was inside -- there's a first floor like a master bedroom, and then there's a walk-in closet. It was in a black bag that was lying in the closet floor.

Q Did he make any statements to you about his marijuana use?

A Yeah. He admitted to me that he smokes marijuana and it helps him sleep at night.

Q Anything else seized from that residence?

A From 1164 Stone Bluff, no, other than the gun that was located inside the Subaru.

Q And that was a subsequent search of the Subaru?

A Yes, sir.

Q The detached garage, was that searched as well?

A Yes. I searched that garage.

Q Anything of evidentiary value inside that?

A No, sir.

Q While you were at Stone Bluff and Mr. Beckman is

accompanying you through the consent search, do you recall if he was handcuffed?

A Yes. He was handcuffed in front.

Q In front. Did he mention 11 Champion or that facility in any way?

A At some point in time while we were at 1164 Stone Bluff, 11 Champion did come up.

Q Can you explain to the Court how that happened?

A At some point in time when we were there, somebody was talking to Mr. Beckman -- I don't recall what investigator it was -- and they were asking him about money, at which time I asked Mr. Beckman, which I routinely do on any consent to search or search warrant, I asked if there's any large sums of money inside the residence we're searching, and Mr. Beckman stated there was not, at which time I proceeded to ask Mr. Beckman "Was there any of the ransom money or money that was given to you by the victim's family at that location?"

Mr. Beckman said there was not. However, he admitted there was $5,000 of that ransom money inside the safe at his office.

Q As you sit here today, do you have a specific memory of him using the word, or anyone else using the word in his presence, "ransom"?

A Do I have any specific memory?

Q Yes.

A I used the word "ransom money."
Q Did you ask for consent then of 11 Champion as well?
A Yes, sir.
Q Did he say where at 11 Champion that money was?
A Yes, he did.
Q What did he say?
A He said that 5,000 of the dollars of that money that was given to him by the victim's family was in the safe underneath his desk in his office.
Q Did you present a consent to search form similar to Exhibits 2 and 3 for 11 Champion?
A Yes, sir.
MR. DAVIS: If I may approach, please?
THE COURT: Go ahead.
Q (BY MR. DAVIS) Can you explain to the Court Government's Exhibit 4 that I just handed to you?
A Yes, sir. Exhibit 4 is a DEA consent to search form that depicts Mr. Beckman's writing "11 Champion safe under my desk," which is signed and then witnessed by me.
Q Same drill. You witnessed him sign that?
A Yes.
Q You're the top signature on the witness?
A Yes.
Q Signatures. And the other handwriting other than the other TFO's signature, who wrote that on the form?

A Mr. Beckman filled the form out.
Q Is that true of 2 and 3 as well?
A Yes, sir.
MR. DAVIS: Move for the admission of 4, please.
THE COURT: Any objection?
MR. NOBLE: No objection.
THE COURT: It's admitted.
Q (BY MR. DAVIS) Does Mr. Beckman express a desire to go with you for the 11 Champion search as well?
A Yes.
Q How do you all get there?
A We drive. I'm driving my Escalade, Mr. Beckman's seated in my front passenger seat, and I believe it was Detective Dave Brown from Maplewood was in the rear seat.
Q Do you recall if Mr. Beckman was handcuffed?
A He was handcuffed in front.
Q In front?
A Yes, sir.
Q During the drive to 11 Champion, does Mr. Beckman express any concern about how it's going to play out once we get there?
A Yes, sir.
Q What does he say? What's his concern?
A He was -- well, during the ride Mr. Beckman was the one who actually directed me there, because we took some back

roads from his condo to 11 Champion. So as we're driving and he's directing me, he's speaking with Detective Brown from Maplewood, and they're speaking about Kerry Roades. And Mr. Beckman was nervous that we were going to take Kerry Roades into custody at his place of business in front of all his work employees.
Q Did he express to you why that made him nervous?
A I think he just didn't want his employees to be nervous or didn't want them to know something was going on, I assume.
Q Did you tell him that Mr. Roades would not be arrested?
A I never said that.
Q Your arrival at 11 Champion, can you explain to the Court from your memory what happened?
A Yes. So to go back a little bit, as we're driving there, Mr. Beckman was also explaining to me how we can go into his office and we could not be seen by a bunch of his employees; that we can enter through a side door.
Q Another concern he had?
A Yes. And he was concerned about being handcuffed, and I told him, well, we can put a jacket over your -- because he was handcuffed in front, because he was handcuffed in front when we went to Stone Bluff because he allowed us into his condo by the keypad. He was still handcuffed in front and so he can get us into the safe because he had the combination, obviously.

So I told him we can put a jacket over his hands to conceal the fact that he was handcuffed. That was one of his concerns.

Q And when you got to Champion, what happened?

A Again, I'm being directed by Mr. Beckman, wherever you want to park, he wants to try to conceal it. As we pull in the parking lot, Mr. Beckman himself points out Kerry Roades who's standing outside the business next to his black F-150, which was parked in front.

Q What happens regarding Mr. Roades?

A So Mr. Beckman points out Mr. Roades, at which time I drive past Mr. Roades, and I park -- I guess what direction that is if you're looking at his business, all the way to the far right side of that parking lot. At that point in time, Detective Dave Brown, along with FBI and DEA investigators that followed us there from Stone Bluff, exited their police vehicles and took Kerry Roades into custody.

Q Does that cause any reaction from Mr. Beckman?

A Absolutely. He was angry. He was yelling and screaming in my car, calling me a liar.

Q How did it go from there?

A He calmed down. I didn't lie to him. At no point in time did we tell him that we were not going to arrest Kerry Roades. He -- I understand he was just -- did not want his employees to know what was going on. And the fact that

several policemen in their bulletproof vests were taking Kerry Roades into custody.

Q Do you remember any other concerns that Mr. Beckman had about responsibilities he had that day.

A Yes. From the time that he got in my police car that morning, he had made mention to me that he was due to -- someone was flying in something to do with his kids and race car driving. And this person was flying in, I believe, from California, and he was due to pick him up at the airport.

Q Did you do anything to help him with his concerns about picking somebody up at the airport?

A Yes.

Q What did you do?

A I told him -- initially, I'm like, "I'm not going to allow you to make any phone calls. This is not my investigation. But when the time comes and this gentleman needs to be picked up and we haven't made arrangements to have him picked up, I will allow you to make a phone call." And that happened while we were in my Escalade on his parking lot.

Q Then at zero hours somebody has to make a phone call or this guy's going to be at the airport by himself?

A Absolutely. He says -- he advises me that this gentleman's going to be landing here shortly and asked if he can make a phone call to arrange to have this gentleman picked up.

Q Did you make a phone call, or did you allow him to make a phone call?
A Mr. Beckman made the phone call.
Q And do you know who he called?
A Yeah. I asked him who he wanted to call, and he asked to call his wife.
Q You handed him your phone and allowed him to do that?
A Yeah. I don't know if it was my phone or his phone, but he made a phone call on a cellular device. I don't recall whose phone it was.
Q And you heard the conversation, at least one side of it?
A Yes. It wasn't on speaker, but I did hear him talking to his wife -- who I believed to be his wife.
Q Could you overhear what she was saying?
A No.
Q What was the conversation that Mr. Beckman had?
A It was brief. It was mainly just to pick up the gentleman at the airport.
Q Mr. Beckman had plans that night too; is that correct?
A Yes, sir.
Q Did he express that to you several times?
A Yes, he did.
Q What was the plan for the evening?
A I believe his daughter -- they were having an engagement party.

Q Does the phone call to who might be the wife about the airport happen while you're seated in the Escalade at 11 Champion?
A Yes, sir.
Q While you're seated in the Escalade, are you aware that Mr. Noble, Travis Noble, shows up?
A At 11 Champion?
Q Yeah.
A Yes, sir.
Q Can you explain for the Court your memory of that, what happened?
A Mr. Beckman and I are seated in my Escalade on the parking lot. He's angry at the way the arrest of Kerry Roades happened. At some point in time, I would say, I don't know, 15 minutes or so after we arrive, I'm not sure the exact amount of time, but Mr. Noble and fellow attorneys of his arrived at No. 11 Champion. I believe they were also driving a black Escalade.
Q Did you ever make contact with Mr. Noble at your Escalade?
A Initially, I did not, but eventually, yes, Mr. Noble and the other attorneys came over to my Escalade and spoke with Mr. Beckman.
Q Did you step away and allow them to confer in as much privacy as possible on a parking lot, I suppose?

A Yes. Mr. Beckman was seated in the front passenger seat, and they stood next to the open front passenger door and spoke with him while myself and other investigators were at the rear of the vehicle and did not hear the conversation.
Q You did not hear the conversation?
A Yes, sir, we did not hear the conversation.
Q Is it safe to say that after that conversation you and others were allowed to enter 11 Champion and retrieve the money from the safe?
A Yes, sir.
Q Did you go directly to the safe?
A Yes. Well, we walked from my Escalade to a side door that led us into a shop area or like a garage area, and then from there we had to take stairs to the second floor where his office was.
Q When you say "we," who does that include?
A Myself, Detective Dave Brown, there were several other investigators from the FBI and DEA also, and Mr. Travis Noble and his fellow attorneys were also there along with Mr. Beckman.
Q And when you get to the safe, who opens it?
A Mr. Beckman.
Q It's a combination safe?
A Yeah. I don't know if it was a key pad or if it was a combination, but it was one or the other from what I recall.

Q And when the safe gets opened, what happens?
A Mr. Beckman points out a stack of cash that he admitted to me that was given to him by the victim's family.
Q And he's previously explained to you there's other cash in there not associated?
A Yes. He was adamant that there was more currency or cash inside that safe, and I advised him that, if he was to point out the money that was given to him by the victim's family, that would be the only money that I would seize.
Q You're talking fast.
A I'm sorry.
Q And is that, in fact, what you did? You seized that amount of cash only that he pointed out?
A Yes, sir.
Q Are you aware of a Tan Co. minivan that is seen at the property that is believed to be used in the kidnapping?
A Yes.
Q What, if anything, happened to that Tan Co. van while you were at the Champion property?
A As we're actually walking in to go to his office, one of the FBI investigators advised me there was a Tan Company van parked on the side of the building that they noticed, and that Tan Company van was allegedly used in this kidnapping. They asked me if I would ask Mr. Noble if Mr. Beckman would sign the consent for that van, which I did inside his office.

Q Did he consent to the search of the van?
A Yes, sir.
Q Using a form identical to Government's Exhibits -- the previous exhibits -- 2, 3, and 4?
A Yes, sir.
MR. DAVIS: If I may approach, Your Honor?
THE COURT: Go ahead.
Q (BY MR. DAVIS) Having shown you 5, do you recognize that?
A Yes, sir. It's a DEA consent to search form for a 1999 Ford Econoline van that's signed by Mr. Beckman and witnessed by me.
Q And, again, you saw Mr. Beckman sign that, and that's your witness signature right below his?
A Yes, sir.
Q The Ford Econoline, that's the Tan Co. van we've been discussing?
A Yes, sir.
Q Was Mr. Noble present when that consent form was signed?
A Yes. I actually was the one that asked Mr. Noble if he would ask Mr. Beckman if he would sign the consent.
Q So they both agreed?
A Yes, sir.
Q Any difficulty in actually seizing the van because of the keys?
A Well, initially, we didn't have the keys. So after we

got the money out of the safe and we left Mr. Beckman's office, he and myself and another investigator walked around his shop area looking for the keys, because we had the vehicle towed.

Q Would it be safe to characterize it as you were not searching the complex; you were simply looking for the keys?

A Yes. Mr. Beckman said the keys were -- could be in one of many places. And I asked him it would make our life a lot easier if we had the keys for the tow truck driver, at which time he and I and, I believe, Detective Dave Brown followed him around that office where he located the keys.

Q During that walk around the facility or closely related to it, did Mr. Beckman take an opportunity to show you things that were in the warehouse that had nothing to do -- I call it a warehouse -- in the facility that had nothing to do with your investigation?

A Yes. The keys weren't found exactly where we were initially at. They were in another shop area. But at some point in time, he was showing cars that he had owned that were inside that shop, yes, sir.

Q In addition to automobiles, anything else?

A I believe there's numerous motorcycles that were also there.

Q Do you recall any makes of those cars?

A No. I'm not a car person. I know they were expensive.

I was to -- a Ferrari or a Lotus or something like that.

Q At that point, when that kind of thing is happening, describe for me Mr. Beckman's demeanor.

A The entirety that I dealt with Mr. Beckman until -- the initial time I dealt with him, he was very uncooperative and belligerent.

Q At Stone Bluff?

A Yes. And when I initially conveyed him from Stone Bluff to DEA. But him and I built a rapport. So at that point in time, he was being cooperative and I got along with him. His attitude was fine.

Q Are you aware near the end of it, just before you leave 11 Champion, that Mr. Beckman needs to use a restroom?

A Yes, sir.

Q Where were you when Mr. Beckman was in the bathroom?

A I was in the -- it's like a little kitchen area, from what I recall. I was standing somewhere around that area. I don't know exactly where I was standing. We were only there for a brief period of time.

Q Do you know if Mr. Beckman was allowed to be uncuffed for use of the bathroom?

A Yes, he was.

Q Can you describe for the Court from your memory what happened as Mr. Beckman exited the bathroom?

A Mr. Beckman exited the bathroom, and he asked me if he

could get something to drink, which I told him he could.
Q In this kitchenette area?
A Yes, sir.
Q What happened?
A At which time he retrieves a bottle of vodka.
Q From?
A The refrigerator.
Q Okay.
A And pours a glass of vodka.
Q Literally takes a glass from somewhere and pours a glass of vodka?
A Yes, sir.
Q What did you do?
A At first I don't -- I wasn't, obviously, looking at him because I would immediately have had stopped that. When I realized what he was doing, it stopped.
Q How many people are standing in that room, that kitchenette area?
A There were several. Pretty much everybody that was there, all the investigators, Mr. Noble's -- or Mr. Noble and the other attorneys and myself.
Q Is the room crowded?
A Well, it's a big area. I think it's like an "L" shape where there were some cars and motorcycles, and you kind of had to veer to the right, and that's where the bathroom and

kitchenette was. So it's a decent size area.
Q As a veteran police officer, did you not have any concern with an uncuffed man walking out of the bathroom?
A No. At that point in time, I had a good rapport with Mr. Beckman, and I didn't fear him. And he was unhandcuffed because he actually had to use the bathroom. That was the only reason he was unhandcuffed.
Q Did you see him pour -- well, I can't remember if you said it. Do we know it was vodka?
A Well, it came from a bottle of vodka. If that was actually vodka inside that bottle, I'm not sure.
Q Okay. Do you know what brand?
A I don't remember the brand.
Q Okay. Did you see him pour the Vodka?
A I don't know if I actually seen him pour it, but I seen him drinking from it; so -- at which time I realized it was vodka and --
Q Can you describe the glass from which he is drinking?
A It was a clear glass from what I remember.
Q Do you recall if it's a large tumbler? If it's a small shot glass?
A From what I remember, it's just a little bitty glass, like maybe bigger than a shot glass but not a large tumbler by any means.
Q You made a gesture with your hand that obviously we can't

get on the record. Are you familiar with like a rocks glass?
A I would describe it like that, yes, sir.
Q How many glasses did he drink?
A He didn't drink a full glass. He took several drinks. I'm not sure how much he drank. When I realized what he was doing, I stopped it.
Q When you say he took several drinks, you mean from that one pour?
A Yes.
Q If in the defendant's motion to suppress they allege that Beckman was given a large amount of alcohol by officers, would you characterize what you just testified to, to be a large amount of alcohol?
A No, sir.
Q Would you characterize it that you gave it to him?
A I did not give him any alcohol.
Q Did you or anyone else in your presence ever give Mr. Beckman alcohol other than this occasion where you saw him consume it?
A No, sir.
Q They also allege that officers arranged and allowed Beckman to become seriously intoxicated. In your 20 years of experience as a city police officer, were you ever on the road?
A Yes, sir.

Q You make driving under the influence arrests or investigations?
A I've made a few.
Q You've been trained in signs of intoxication as a police officer, yes?
A Yes, sir.
Q Did Mr. Beckman appear intoxicated to you at any point during your experience that day?
A No, sir. He did not.
MR. DAVIS: If I may have a minute, Your Honor. Sorry.
Q (BY MR. DAVIS) If that was Thursday, December 1, let's jump the next day, Friday, December 2. Did you have an occasion to be at the United States Marshal Service?
A Yes, sir.
Q For what reason?
A That following morning members from my DEA group -- we had roundups on a completely different case where we arrested several individuals, one being a female that was relative to our murder for hire. So we took her into custody and interviewed her, and then she was subsequently brought to the United States Marshals here at this building.
Q Do you have a memory of approximately what time you would have conveyed that prisoner to the marshals?
A At least 1:00 in the after -- I don't know the exact

time, but it was later than when we normally bring someone to the marshals, especially on a Friday. I would say 1:00, 1:30-ish.

Q I mean this with the upmost respect, but the marshals prefer that if a prisoner's going to brought into their custody, that it's done earlier in the day than later; correct?

A That's correct.

Q If you do it later in the day, you're going to have a memory of that because of the marshal's preference; correct?

A That's correct.

Q So it's earlier in the day or later in the day?

A It was later in the day.

Q Did you see Mr. Beckman?

A Yes, I did.

Q Can you describe for the Court that encounter?

A So it was myself and Task Force Officer Anthony Boettigheimer, who was also a city police officer. We attempted to bring this female prisoner into the marshal service, but we weren't allowed in because there was an ambulance that was blocking the sallyport doors.

Q What happened?

A So after about waiting for 5 or 10 minutes, at which time I observed EMS medics conveying Mr. Beckman outside the marshal service into the back of the ambulance. He was on a

stretcher.
Q Was he conscious?
A Yes.
Q How do you know?
A Because I actually talked to him.
Q What did you say?
A Having had a good rapport with him the day before, I actually just got out of my car, approached him, and asked how he was doing, at which time he stated to me that he didn't want to talk to me.
Q What else did he say to you? I don't want to --
A I'm sorry. He called me a liar.
Q The three-hour portion of the video that shows you obtaining consent forms from Mr. Beckman is a three-hour interview involving Maplewood police; true?
A That's correct.
Q Have you seen the whole thing?
A No, sir.
Q Okay. You and I have looked at portions of it, mostly that involve you?
A That's correct.
Q Is it true to say you were not involved in the interrogation of Mr. Beckman? That was Maplewood police?
A That's correct.
MR. DAVIS: I have nothing further. Thank you, Your

Honor.

THE COURT: Okay. Mr. Noble?

MR. DAVIS: Your Honor, I'm told that I probably did not move for the admission of Exhibit 5, the consent form for the Econoline van. Move for the admission of that.

THE COURT: Any objection?

MR. NOBLE: No objection.

THE COURT: It's admitted.

MR. DAVIS: Thank you.

**CROSS-EXAMINATION**

**BY MR. NOBLE:**

Q Officer Somogye -- am I saying that right now?

A Yes, Somogye. Yes, sir.

Q All right. Sorry.

A That's okay.

Q Officer Somogye, you're a St. Louis city police officer?

A Yes, sir.

Q And you worked the road for some time prior to being dispatched to DEA?

A Yes.

Q Were you ever a Type II or Type III permit holder?

A No, sir.

Q No. Okay. Were you trained at the academy about alcohol in terms of DWIs, things of that nature?

A Yes. We had to write a couple DUI reports in the academy

21 years ago, but that was about the extent of it.
Q Okay. But they trained you about if you drink a drink and it goes down the stomach, small intestines, alcohol is absorbed in the bloodstream. Did they teach you that at the academy?
A I'm sure they did.
Q Okay. And that did they teach you that the average person will absorb alcohol at a rate of about .018, .02 per hour?
A I don't recall that, sir.
Q Okay. Do you remember being trained it takes about an hour, 50 minutes, for that one drink to be absorbed in the bloodstream?
A I'm not aware of that, sir.
Q All right. Were you trained that it takes about 50 minutes for that one drink to be eliminated from the body: Enzymatic process to the liver, sweating it out, urination?
A I'm not aware of that, but I take your word for it.
Q Were you trained that the elimination rate for alcohol is approximately .018 to .02 per hour?
A I was never trained in that, sir.
Q Never trained in any of that, all right. Have you ever been -- had any training as a police officer about alcohol absorption, elimination, things like that?
A I have not.

Q No, okay. All right. You do know that alcohol travels through the body; right? It takes some time to be absorbed and then eliminated; right?
A I assume so.
Q And, now, you all took Mr. Beckman into custody at what time and on what date?
A He was taken into custody Thursday, December 1, I believe. And then I wasn't the one that actually initially took him into custody but approximately 8:00 or 8:30 in the morning.
Q Okay. What time was it the first time you saw him?
A At probably 8:30, 9:00 in the morning.
Q And that was on what day?
A Thursday, December, I believe, the 1st.
Q December the 1st?
A Yes, sir.
Q So at 8:30 AM, December 1, Mr. Beckman -- did he appear to be intoxicated to you at that time?
A No, he did not.
Q All right. And your testimony is, is that sometime that evening or afternoon Mr. Beckman had a small amount of vodka to drink in your presence before you were able to stop him?
A Yes, sir. And also in your presence.
Q Right. We were all standing there; right?
A Yes, sir. Correct.

Q And that that was the only alcohol that Mr. Beckman had while in your custody that day; is that right?
A Yes, sir.
Q All right. Do you know whether or not Mr. Beckman still had alcohol in his system, based on the hospital reports, 24 hours later?
A I'm not aware of that, sir.
Q Not aware. Would that be -- based on your testimony, that wouldn't even be possible, would it?
A Sir, I'm not an expert in that field; so I can't testify to that.
Q Okay. So you're saying that just a very small amount of alcohol that day before, you're telling me that there would or would not be alcohol the next day? You don't know?
MR. DAVIS: Your Honor, I'm going to object again to the relevance to this on a motion to suppress whether he invoked --
MR. NOBLE: Well, it goes to --
THE COURT: Well, I'm not so sure there's a relevance objection, but there certainly is a lack of foundation here; so . . .
MR. NOBLE: I'll move on. I'll move on, Judge.
Q (BY MR. NOBLE) Detective, let's back up, then. When you first take him into custody, i.e., he's turned over to you to transport; correct?

A That's correct.
Q Do you know whether or not the initial detective he had told them that he did not consent to any search?
A Yes. He told me that he did not consent.
Q He told you that?
A Yes.
Q Okay. And then based on your conversation with him in the car back to DEA headquarters, you had built a rapport with him?
A Yes, sir.
Q And at that time he had advised you that, go ahead, you can search?
A He admitted -- or he verbally told me that he would sign consent to search forms, yes, sir.
Q All right. And, now, when you get him back into the room and you initially come in the interview room, you're trying to get him to sign the waivers?
A At some point in time, he was presented DEA consent to search forms, yes, sir.
Q Okay. But it's almost three hours later that you come back and have him sign them; right?
A Yes.
Q All right. And you indicated the reason is because he initially couldn't remember his address; is that right?
A I believe so, yes, sir.

Q All right. And you didn't believe that that would be a sign of intoxication?
A No, sir, I don't.
Q No?
A No.
Q Okay. Now, I'm curious. You also said that you in the car, in the Escalade on the way to DEA, you gave him his *Miranda* warnings from the top of your head; is that right?
A Yes, sir.
Q And what was it specifically you said to him?
A Do you want me to recite them, *Miranda* rights?
Q Yeah.
A You have the right to remain silent. Anything you say can and will be used you in a court of law. You have the right to an attorney and to have him here while you're being questioned, and if you can't afford to hire an attorney, one can be appointed to you. And I asked Mr. Beckman if he understood what I just told him.
Q Okay. And was that recorded in any way?
A No, sir.
Q Did you ever provide him a written waiver of *Miranda*?
A I did not.
Q Okay. Now, you provide a consent to search but not a written waiver of *Miranda*. Why memorialize it in writing in one instance but not the other?

A Sir, I was not the one conducting the interview; so I did not present him his warning or waiver rights forms.

Q No, no.

A Me personally, I did not do that.

Q No. You just testified that you gave him *Miranda* and then spoke with him and asked him questions. I'm asking you why not provide him a written *Miranda* waiver during that interview on the way to DEA, but yet you memorialized the waiver to search? Why have it in writing in one but not the other?

A He was not presented it, a waiver form, sir. I did not present that to him.

Q I thought you were on the video providing him a waiver to search.

A Yes, sir.

Q That's what I'm asking you. You don't provide a written waiver for *Miranda*, but you provide a written waiver for the search; correct?

A That's correct.

Q Why provide -- why memorialize one but not the other?

A I don't have an answer for that. He advised me that he understood his rights, and that was it.

Q Did you audiotape or videotape this conversation or this waiver of *Miranda* within the car?

A No, sir, I did not.

Q So you take him back to DEA headquarters, he does the three-hour interview, and then you take him back to his condominium; is that right?
A That's correct.
Q Is it policy to bring defendants back to the scene so they can be present and witness the searches?
A It goes both ways, and he asked that that happen. And I told Mr. Beckman "I'm a man of my word"; so that's why we waited the three hours until the interview was done, so he could accompany us back to 1164 Stone Bluff.
Q Did you seize any videotapes or video cameras or recordings from inside the condominium?
A No.
Q No? All right. Let me ask you, what time do you get back to the condominium?
A It was early afternoon. I'm not sure exactly what time.
Q Okay. Do you ever memorialize any of this in a report?
A My report reads that we drove from DEA back to 1164 Stone Bluff, yes, sir.
Q Anything about reference to the time?
A No, sir. It does not.
Q All right. So when you get him back to Stone Bluff, when he enters the condominium, is he handcuffed or unhandcuffed?
A He was handcuffed in front.
Q And you take him inside the condo?

A Yes.
Q All right. Let me back up just for a minute. When you took him into custody at Stone Bluff, initially when you're asked to transport him to DEA headquarters before the interview -- are you with me?
A Yes, sir.
Q Your first contact with him that morning around 8:30, 9:00; right?
A Yes, sir.
Q When you and McKinnon are driving with him in the Escalade back to McKinnon's car, does Mr. Beckman drink anything inside the Escalade?
A I don't recall him drinking anything.
Q All right. So Detective McKinnon never provided him, in your memory, a Five-Hour Energy drink?
A Not that I recall.
Q Okay. And because your understanding is he's handcuffed behind his back; right?
A I believe so, yes, sir.
Q Okay. When --
MR. DAVIS: Your Honor, I'm going to object to the mischaracterization of the testimony. I believe he testified that he was handcuffed in the front, but counsel just characterized it as being behind.
THE COURT: Well, the testimony will speak for

itself.

MR. NOBLE: I apologize. I wasn't trying to -- I thought he said that he was behind on the way there but after the interview he was in the front. Sorry. That's what I understood him to say. Well, let's clear that up.

Q (BY MR. NOBLE) When you initially take him into custody from 8:30 -- between 8:30 and 9:00 and you take him to DEA prior to the interview, is he handcuffed in the front or the back?

A I believe I testified that I believed that he was handcuffed in the rear. When we arrived, the handcuffs were applied to the rear. I didn't know Mr. Beckman. At some point in time, I was alone in the car with him from -- so I would have handcuffed him in the back.

Q All right. So that was your characterization. At that point, it was in the back; correct?

A Yes, sir. I believe so.

Q All right. All right. I'm not trying to put words in your mouth. That's what I thought you said.

A Yes, sir.

Q All right. But it was from DEA headquarters back to his house, that's when he's handcuffed in the front; correct?

A That's correct.

Q And, again, you don't remember him ever drinking a Five-Hour -- McKinnon handing him a Five-Hour Energy drink in

the Escalade going from the condo on the way back to DEA headquarters for the interview at 8:30, 9:00 in the morning?
A That's correct, sir.
Q All right. Do you remember who was in control of the backpack when you get back to DEA and take Mr. Beckman out of your Escalade?
A At that -- initially, I was given the backpack by the FBI investigators. That backpack was then brought inside DEA and brought inside the booking area.
Q Did you ever look inside the backpack and look into its contents?
A Eventually I did, yes, sir.
Q All right. And what was in there?
A A bunch of personal items -- medications, United States currency, his passport. And there were several Five-Hour Energy drinks in there, a bunch of personal belongings.
Q Any liquor?
A I don't recall there being liquor.
Q Okay. You don't remember there being a vodka bottle in the backpack?
A There may have been a bottle of vodka. There was a bunch of stuff in there. I just don't recall everything that was in there.
Q All right. The Five-Hour Energy drinks, did -- well, let me back up. When you first get to the condominium that

morning to transport Mr. Beckman, who has control of him?
A FBI investigators do.
Q And who -- you take control of him and put him into your Escalade; correct?
A That's correct.
Q And who takes -- who gives you the backpack?
A I don't remember who gave me the backpack. At some point in time, I was handed the backpack, and it was placed in my Escalade.
Q And you placed it in the Escalade?
A I believe I did, yes.
Q The front or the back seat?
A I would assume in the back seat. I don't remember.
Q Okay. Do you or McKinnon ever search the backpack, look through it on the way to DEA?
A I personally did not.
Q All right.
A I was driving.
Q Did you ever check the Five-Hour Energy drinks to see their contents?
A No, sir. I did not.
Q All right. Now, when you -- taking from the interview back to his house for this consent search, where's the backpack?
A Remained at DEA, I believe.

Q Okay. And when you get inside the residence, do you ever handcuff Mr. Beckman?
A I don't believe he was ever unhandcuffed. The handcuffs were applied to the front because he allowed us into the condo, but I don't believe the handcuffs were ever removed, sir.
Q Okay. Is it possible he was unhandcuffed inside the condo?
A I don't believe so.
Q Once you're inside the condo, where does Mr. Beckman stay when you conduct the search?
A Well, initially, he directs me to the bedroom closet where he points out this personal use marijuana that he admitted to, and at that point in time he was seated, like, in the living room area.
Q Okay. And anything in connection to this case, this investigation, found inside the condo?
A I did not locate anything inside that condo relative to this case, that's correct.
Q And when Mr. Beckman is inside the condo, he goes into the kitchen at some point, doesn't he?
A He possibly did. I'm not sure.
Q Do you remember Mr. Beckman going into the freezer in that kitchen?
A No, sir.

Q No, it didn't happen; or, no, you don't remember?
A No, it did not happen.
Q Did not happen. Okay. Did Mr. Beckman ever have anything to drink while inside that condo?
A No, sir.
Q So at no point will we ever see Mr. Beckman put a glass to his mouth in that condo?
A That's correct.
Q Okay. Now, once you take Mr. Beckman from the condo, where do you take him?
A From there we drive to 11 Champion.
Q How long are you at 11 Champion with Mr. Beckman before Mr. Boyd and myself arrive?
A Fifteen minutes maybe, maybe a little longer, 20 minutes approximately.
Q Okay. And we have a conversation at that point?
A Well, I spoke with you when you came over to the Escalade briefly.
Q Okay. And you guys had advised that Mr. Beckman had already given consent to retrieve some monies that were inside a safe under his desk; is that right?
A That's correct.
Q And that you indicated at that time he had already consented to that search, didn't you?
A Yes. He signed the consent to search form.

Q All right. And so that was signed before I ever arrived; correct?
A Yes, sir.
Q And based on that, we advise you that you could retrieve the money in the safe; right?
A Yes.
Q And that we would accompany you; correct?
A That's correct.
Q And that -- and that would be the search; correct?
A Yes.
Q You were not given a free rein to search 11 Champion; correct?
A That's correct.
Q All right. Now, you indicated that you oftentimes will ask people in a consent if there's large sums of cash at the property; correct?
A That's correct.
Q Do you remember saying that?
A Yes, I do.
Q All right. So it's possible that you told Mr. -- asked Mr. Beckman if there's any large sums of cash on the property; isn't that correct?
A That was at 1164 Stone Bluff, yes, sir.
Q Okay. But what about at 11 Champion?
A Well, it was when he admitted to me that he had money

inside his safe at 11 Champion. He brought that up.

Q All right. And didn't he reference it as indicating that he had $5,000 of Blake Laubinger's money in his safe?

A No, sir. He admitted that he had $5,000 of money that was given to him by the victim's family, but he also stated there was additional currency inside that safe that was not involved in this incident.

Q All right. The statement where he admitted to you that he had $5,000 of this -- the family's money, was that recorded or memorialized in any way?

A No, sir. It was not.

Q All right. Did you have Mr. Beckman write that down at any point?

A I did not.

Q And when you provided Mr. Beckman with the consent, he's the one who wrote specifically that you could look in the safe under his desk; correct?

A Well, yes, sir. It's his handwriting, and it says "11 Champion save [sic] under my desk."

Q Now, did Mr. Beckman ever in your presence request an attorney?

A No, sir, he did not.

Q Did not, all right. Now, did Mr. Beckman ever receive a phone call from Nicole Beckman in your presence?

A No. The only phone call in my presence was when he

called his wife, and it was concerning the gentleman that was coming in on a flight.

Q Okay. Now, Mr. Beckman's phone, who had control of the phone while he was in your custody at 11 Champion?

A Well, initially, I believe the phones were in the bag. They were conveyed to DEA. After that, I'm not sure.

Q All right. Didn't Mr. Beckman speak on his phone while you were back at 11 Champion?

A Very well could have, yes, sir.

Q Did Nicole Beckman call and you answer the phone, introduce yourself as one of the officers in the case and that you had Mr. Beckman at his office and that he -- you all would call her when you got back to DEA headquarters?

A I don't recall if she called us or we called her.

Q Okay. So it's possible that Nicole Beckman contacted Mr. Beckman's phone; that she called him. Correct?

A Very possible, yes, sir.

Q Do you remember answering the phone and identifying yourself as the officer involved in this case?

A I very well could have. I don't remember that, but it very well could have happened.

Q All right. And where is Mr. Beckman when that phone call took place?

A He was seated right next to me.

Q Seated right next to you.

A Yes, sir.
Q Do you remember if Mr. Beckman ever said anything to you or into the phone during that conversation?
A I don't remember that.
Q Do you ever remember Mr. Beckman screaming into the phone "Call Travis, get Travis"?
A No, sir. I don't remember that.
Q Is it possible that that occurred?
A No, sir.
Q Not possible?
A I don't remember him saying that, that's correct.
Q Was there anyone else ever had Mr. Beckman and his phone while at 11 Champion?
A Can you repeat that question?
Q Sure. Was there anyone else that had possession of Mr. Beckman and his phone while at 11 Champion other than yourself?
A That's correct, no one else but myself.
Q You were it; right?
A Yes, sir.
Q Now, it's my understanding that, when he uses the restroom, he comes out of the restroom; is that right?
A Yes, sir.
Q And where are you standing when Mr. Beckman comes out of the restroom?

A I don't recall exactly where I was standing. I think I was standing near you. I don't remember exactly how far I was away from him but in that little area.

Q Right. All right. And Mr. Beckman goes over to the freezer?

A To the refrigerator, yes, sir.

Q And he reaches into the freezer, not the refrigerator; correct? Do you remember?

A I don't remember which one, but one or the other.

Q All right. And who are the other officers there on scene at that point; do you remember?

A There were several of us inside that shop area. Exactly who was there I don't remember, but there were several investigators there.

Q Okay. And who was it that was in control of Mr. Beckman at that time?

A I was.

Q And you said Mr. Beckman took something or poured a drink; correct?

A Yes, sir.

Q And you held up earlier your fingers and thumb about, I would say, 4 or 5 inches apart; correct?

A Approximately, yes, sir.

Q Okay. Looking like a standard tumbler; right?

A Yes, sir.

Q And Mr. Beckman filled that, or a least a glass was almost full of liquid at one point, wasn't it?
A I can't testify that the glass was full because I didn't see how much he poured, sir.
Q Okay. And he was drinking out of the glass; correct?
A He did take several drinks from that glass.
Q Do you remember me saying something to him about not drinking alcohol and having to appear in front of a judge?
A Absolutely.
Q Okay. What did I tell him?
A Well, when I think we both realized what he was doing, I said "Absolutely not," at which time the drinking stopped. And yourself, you said that "If I was going to attempt to get you before a judge this afternoon, I don't need you to be smelling like alcohol."
Q Right. Okay. And what did you say to him? Do you remember if you said anything?
A I don't remember saying anything. I assume or I believe I placed handcuffs back on him and at which point in time we left shortly after that.
Q How long was he drinking out of that drink; do you remember?
A Very short period of time.
Q All right. And do you remember how much was left in the glass when he finished?

A I don't remember that, sir.
Q And you said that you don't remember if you saw him pour it; is that right? Wouldn't that be kind of something that you would remember?
A Well, yeah. I mean, I knew that he poured something. I was flabbergasted when I realized that he was actually pouring a drink of vodka because I didn't think that someone would actually do that.
Q How is it that you realized he was pouring a drink of vodka if you don't remember him pouring it?
A I do remember him pouring it.
Q You do remember him pouring it?
A Yes, sir.
Q All right. Because earlier you testified "I don't know if I saw him pour it." Do you remember that?
A Yes, sir.
Q But now, some 15 minutes later, you do remember him pouring it; right?
A Sure. Yes, sir.
Q All right. He walked over to the freezer, took off the top, poured a glass of vodka, put the cap back on, stuck it in the freezer, picked up the glass, and started walking around and drinking that drink, didn't he?
A Well, that happened, yes, sir. It happened very quickly. When I realized what was happening, we stopped it.

Q Well, you stopped it after I spoke up and said, "Hey, I don't need you smelling like alcohol if you're going to be in front of a judge later." That was actually me who stopped it, wasn't it?
A I don't think that's correct, sir. I think I was the one who approached him and at the same time you were saying, "We don't need you drinking."
Q Okay.
A Simultaneously.
Q What did you say to him, if anything?
A I said, "This is not going to happen."
Q I thought you just said you didn't think you said anything to him; I was the only one that said something to him. Which is it?
A I didn't -- I know I would have said something to him. When I realized he was drinking vodka, I put an end to it.
MR. NOBLE: I have no further questions. Thank you.

**REDIRECT EXAMINATION**

**BY MR. DAVIS:**
Q Officer Somogye, you were asked about not having presented a written waiver form for *Miranda* when you advised the defendant of his *Miranda* rights. Do you recall that?
A Yes, sir.
Q What were you doing while you advised the defendant of his *Miranda* rights? Physically what were you doing?

A I was driving.
Q Driving a car?
A Yes.
Q Did you have a *Miranda* form in your coat pocket?
A No, sir.
Q Do you recall Mr. Noble asking you if the fact that the defendant could not remember his address at Stone Bluff could be a sign of his intoxication at 8:30-ish in the morning?
A That's correct.
Q Let's talk about Stone Bluff. Did Mr. Beckman explain to you where he lives?
A I never asked Mr. Beckman where he actually lived.
Q Are you aware of an address on Romaine?
A I wasn't then, but I am now, yes, sir.
Q What is it that you learned about Romaine?
A That it was where he actually lives with his family.
Q Let's talk about his family. Are you aware if he is married or divorced or single?
A I believe he's married.
Q And when you say family, then that would be the Romaine residence?
A Yes, sir.
Q Did he explain to you why he has a condo on Stone Bluff?
A He admitted to me that he was going to Stone Bluff to meet a female that morning.

Q Did it appear to you that he resides, lives, at Stone Bluff?
A I don't know if he lives there or not. There was furniture there. I don't know if he actually lives there.
Q Based upon what he admitted to you about his use of Stone Bluff -- I withdraw the question.
MR. DAVIS: I have nothing further. Thank you.

**RECROSS-EXAMINATION**

**BY MR. NOBLE:**

Q So, Detective, you didn't know that he -- did you just testify that you didn't know if he lived at Stone Bluff?
A Well, initially, I did not know where exactly he lived.
Q All right. But yet you were seeking consent from him to search Stone Bluff?
A Initially, I was -- he was angry that he was asked by FBI investigators for them to consent. He was angry about that. On the way back to DEA after he was advised of his *Miranda* rights, I asked him why he didn't want to consent to search and if he had anything illegal in his condo, which at that time he admitted to me he had marijuana.
Q I thought you just said you didn't know if that was his condo or not.
A I didn't testify that I didn't know that that was his condo. I don't know exactly where he sleeps every night.
Q All right. Now, you just testified you believed he's

married; is that right?
A I believe he is, yes, sir.
Q Well, so you don't know that he's divorced?
A That's correct.
Q Okay. So why do you say he's married? You don't know if he's married, do you?
A I was just told that he was married, that's correct.
Q Who told you that?
A Other investigators that are involved in this investigation.
Q Okay. The State of Missouri would have records, though, showing whether he's divorced, wouldn't they?
MR. DAVIS: Objection.
MR. NOBLE: I'll withdraw. I'll withdraw.
Q (BY MR. NOBLE) Let me ask you, Detective, when -- Mr. Davis just asked you if it wasn't possible for you to provide a written waiver for *Miranda* because you were in the process of driving; correct?
A Excuse me. Yes, sir.
Q Okay. Anything preventing you from giving the *Miranda* and having him sign a waiver before you started driving?
A No, it didn't. Nothing.
Q Anything preventing you from stopping and having him sign a written waiver of *Miranda* allowing evidence that he was willing to speak with you after being advised of counsel?

A That's correct.

MR. NOBLE: No further questions.

MR. DAVIS: No further evidence either.

THE COURT: Pardon me?

MR. DAVIS: No further evidence on behalf of the Government.

THE COURT: Okay. Mr. Noble, are you going to call anybody?

MR. NOBLE: One person, Your Honor.

THE COURT: Okay.

MR. NOBLE: I will call Mr. Boyd.

**(WITNESS SWORN BY THE CLERK.)**

MR. NOBLE: I've been waiting for this day, Your Honor: Him under oath.

**GRANT BOYD,**

**HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

**DIRECT EXAMINATION**

**BY MR. NOBLE:**

Q State your name for the record.

A Grant Boyd.

Q All right. And what do you do for work, sir?

A I work for you at Sindel Noble.

Q All right. And taking you back December 1, 2016, were you at Nicole Beckman's residence?

A Yes.
Q And do you remember what residence that is?
A I believe it's off Romaine.
Q That's the Romaine address that we've been talking about here today?
A That's correct.
Q And as far as you know, Mr. Beckman and Nicole Beckman -- are they married?
A No.
Q And was Nicole Beckman instructed to call Todd Beckman's cell phone by you or me?
A Yes, to the best of my recollection.
Q All right. And was a phone call placed to Todd Beckman's cell phone?
A Yes. And it was put on speaker phone.
Q All right. And you were present during the phone call?
A Yes.
Q And Nicole Beckman and myself; correct?
A Yes.
Q And when did -- did Todd Beckman answer the phone?
A No.
Q Did the person identify themselves who answered the phone?
A The person identified themselves as an officer. I forget if they said they were associated with the DEA, but as a

police officer, and they said that they were with Todd.

Q Okay. And did they advise where they were holding Todd?

A At the business, at Champion.

Q 11 Champion?

A Yes.

Q All right. And did they advise that they would have him call her later?

A Yes.

MR. DAVIS: I'm going to object to the leading form of these questions, Your Honor. This is direct exam.

THE COURT: That's sustained.

Q (BY MR. NOBLE) Could you tell the Court what, if anything, Todd Beckman said into the phone?

A Todd was yelling for Nicole to call his attorney, Travis, Travis Noble, call Travis, get him over there, something along those lines.

Q Okay. And could you clearly hear Mr. Beckman -- was he screaming?

A Yes.

Q And once Mr. Beckman started screaming into the phone, what happened?

A At that point in time, I remember --

MR. DAVIS: Your Honor, I'm going to object. May we approach, please?

THE COURT: Yeah.

**(A BENCH CONFERENCE WAS HELD ON THE RECORD AS FOLLOWS:)**

MR. DAVIS: This is out of an abundance of caution. I don't know if the Court's aware of my *Anderson* case that is pending, but isn't this attorney-client privilege? Is your client waiving privilege?

MR. NOBLE: Well, no. I think he's testifying -- unfortunately, I think that him screaming into a phone that the detective is holding and other people being present, I don't believe that that's privileged. I don't think that I can argue that anything he said to me, with the detective holding a phone with the detective present, I don't think I can ever argue that that's privileged and that it couldn't come in. I mean, it's not privileged if there's a third party there listening to it.

THE COURT: I think, arguably, there's some elements of what you just asked him that could be privileged. The two live a life together and --

MR. NOBLE: There's no privilege with the ex-wife. He's got no privilege with the ex-wife.

THE COURT: I don't know what the relationship is between -- at this point between you and if she retained you on his behalf.

MR. NOBLE: I don't represent her. I can assert to the Court that nothing I've asked so far, conversations with his ex-wife would be privileged and the fact that he screamed

into a phone with the detective holding the phone "Call my lawyer" as being privileged.

MR. DAVIS: I'm not worried about this counsel.

THE COURT: You're placing -- you are turning him into a witness and potentially yourself into a witness in this case. That can raise some issues.

MR. NOBLE: Unfortunately, I have a detective who's just testified that Mr. Beckman never asked for a lawyer. Myself and Mr. Boyd are the only two who are standing there when he starts screaming into the phone "Call my lawyer; call Travis; get Travis over here," which is a complete contradiction to what the detective just said.

So my problem is what do I do with that? Do I call Mr. Boyd to express what it is he heard and that he heard the defendant specifically asking for his lawyer?

THE COURT: I'm not saying that you cannot use him as a witness or even yourself, but what it does possibly implicate is some issues with respect to your remaining as his counsel when you're a witness in the case. And that's a potential issue.

MR. DAVIS: Can I make a suggestion that could clear this up? Call Nicole. Where's Nicole?

MR. NOBLE: I guess I could have called Nicole.

MR. DAVIS: You could have called Nicole?

MR. NOBLE: No question. Part of me was I didn't

believe this detective would say that that didn't happen, I'll be honest with you.

MR. DAVIS: Come on, Travis.

MR. NOBLE: I know this detective. I never in a million years thought he would say that that happened. He absolutely started screaming -- he was screaming into the phone "Call my" -- "Call Travis; get him over here." I never thought in a million years that that detective would say that.

THE COURT: Well, you know, by the time this has happened, a lot has happened up to that point.

MR. NOBLE: I understand.

THE COURT: So I'm not sure in terms of, you know, what you're trying to prove here, that he sought a lawyer prior to making statements, he's already made a bunch of statements before this is the evidence.

So the question of -- the significance of the testimony, you know, maybe it is; maybe it isn't. From the standpoint of whether counsel who has relevant information and becomes a witness in a case could then still be representing the defendant, I think there's some possible issues here. But I'm not the one who raises the issues.

So I'm just telling you that your -- I assume that your raising this *Anderson* issue I'm not sure is exactly what's going on here, but you are turning him into a witness in the case.

MR. NOBLE: For the purposes of this. Obviously in terms of his request for counsel, that I think it goes to -- although I do believe the Court is right. This happens towards the end the day. He's already made the three-hour statement, but it goes to where -- the Court is in the position of saying, all right, who do I believe? The detective who's just testified that didn't happen? An attorney who just testified that he did ask for a lawyer?

And I think it goes to overall and you assessing -- now, maybe you don't believe Mr. Boyd, you believe the officer, or maybe you don't the officer but Mr. Boyd, I don't know. My point is it goes to credibility in terms of when they're asking -- when he does ask for a lawyer earlier and they say they thought he was joking.

THE COURT: Okay. If you want to try and undercut someone's credibility, you're entitled to do it however you want. And I'm not saying that you can't undercut his credibility with Boyd. What I'm saying is potentially, if you think that this is very significant testimony in this case, you're turning your associate and possibly yourself into a witness, and that could have implications for your overall representation in the case, I think.

Now, the issue that you're raising is slightly, slightly different, I think.

MR. DAVIS: Well, that's my initial one, but now

thinking about it, listening to the Court --

THE COURT: I'm just --

MR. DAVIS: Yours is worse.

THE COURT: I'm just saying, guys.

MR. DAVIS: That's exactly right, because he's going to be --

THE COURT: So here's the deal. I don't think that this testimony is particularly -- it could go to the credibility of the officer, but it's a little bit peripheral to the entire matter at this point because he's already given his statement for three hours. He's already said "go and search." He's already signed the search warrant. And you've already given him permission. You're on the scene. You already tell him --

MR. NOBLE: For the cash. No, no, no. I told him --

THE COURT: The cash is the big issue.

MR. NOBLE: Absolutely. Here's what happens. We get there, and they said, "Travis, he already signed a consent to get the cash for us to get the money that's in the safe."

MR. DAVIS: Well, now this counsel is testifying.

MR. NOBLE: I understand. No, no. In response, she said I gave him consent. I'm trying to explain.

THE COURT: You know, at the end of the day -- at the end of the day here, you all are going to get to give me some stuff in writing, and you can do what you want with the

information we all churned up today. But I think there's always risk when lawyers insert themselves into a case.

MR. NOBLE: I agree. I agree.

THE COURT: So what difference does it make?

MR. NOBLE: So I guess the only other thing I was going to have him testify to -- the only other thing was going to be describing the consumption of alcohol and that he smelled like alcohol, and that was it. But I guess I don't need to get into that.

MR. DAVIS: I still am concerned with the Court's concern that this is counsel who's privy to private conversations with a --

MR. NOBLE: No, no. He's only going to describe -- the police make it --

THE COURT: Travis, from the standpoint of --

MR. NOBLE: I won't ask him those questions. I -- just -- part of, Your Honor, with the vague -- with the terms of our motions, that the police describe the only time there was alcohol was when he gets it inside 11 Champion. Mr. Boyd would testify that, when they opened the Escalade, he smelled like alcohol. And that was -- and so that Mr. Davis doesn't think that our motion saying that they gave him alcohol prior, earlier, that there wasn't justification for that. That was part of it, but --

THE COURT: I'm not saying that having Boyd

testifying or even you testify to what the guy's condition was at the time he's interacting with the police. I think it could be relevant. But the question is, then, are you still in a position where you can represent him? Because, theoretically, your testimony could be adverse to him even.

I mean, you're telling me that, you know, your testimony is in support of him, but from his point of view, my lawyers are now witnesses. Are my lawyers witnesses in the case, or are my lawyers my lawyers? Are my lawyers in an advocacy position, or are my lawyers supposed to be telling the truth under oath in a way that might undermine my case? Because he gets up there and cross-examines Boyd or you or he calls you as a witness --

MR. DAVIS: Oh, I'd love to do that.

MR. NOBLE: As long as you keep him to the relevant issues in this case.

THE COURT: Right. That's the road we're traveling here, and that's my concern.

MR. NOBLE: Okay, okay. I have no further questions.

THE COURT: Okay.

MR. NOBLE: Okay.

**(THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT:)**

MR. NOBLE: I have no further questions.

Hold on. He may have a question for you.

MR. DAVIS: No.

MR. NOBLE: Nothing further.

THE COURT: Okay. All right. So it's been a long day of testimony. I think -- Mr. Noble, Mr. Boyd, sit down.

MR. NOBLE: Judge, we did have one thing. We had -- I believe the Government stipulated to the medical records in this case being offered.

THE COURT: Yeah, you should offer them in your case, though.

MR. BOYD: That's what we would -- yeah. At this time, we would offer Exhibit -- what would be Defense Exhibit A. However, we're requesting leave to file them under seal considering they contain a lot of medical information about Mr. Beckman.

THE COURT: Okay. Do you have them?

MR. BOYD: Yes. We have certified copies.

THE COURT: Okay. All right.

MR. BOYD: And I'll represent on the record with the affidavits, 94 pages. It's 93 pages of medical records.

THE COURT: Okay. Mr. Davis, do you have any objection to them filing that?

MR. DAVIS: I have no objection to the admission of Defendant's Exhibit A, as it has an affidavit making it self-authenticating. However, I would note for the record and the Court, obviously, there is no expert here to testify as to what medical records convey. I'm assuming nobody in here is

medically trained. So the relevance of them without that expert I question.

MR. BOYD: May I?

THE COURT: If he has no objection to the admission of the records, the Court will admit the records.

MR. BOYD: Yes, Your Honor.

THE COURT: Okay. So, Mr. Noble and Mr. Davis, I'm assuming that you want a transcript of today; correct?

MR. NOBLE: Probably. Yes, Your Honor.

THE COURT: Okay.

MR. DAVIS: I only do if he does.

THE COURT: I think he does.

MR. NOBLE: Yes.

THE COURT: I'm going to give you 14 days from the filing of the transcript to file a post-hearing brief in support of your case, and I'm going to give you another seven days after you get his, okay, to file anything in response that you wish to file.

You're giving me that look like "Why does he get 14 and I only get seven"; is that right?

MR. DAVIS: Yes.

THE COURT: Do you want 14?

MR. DAVIS: Ten?

THE COURT: Ten? Do we hear eight? No. Okay. If you want 14, you can have 14.

MR. DAVIS: Please.

THE COURT: Okay. So I'm not sure when we'll get the transcript, but then the time will start to run and I'll issue an order to that effect.

MR. DAVIS: Very well.

THE COURT: Okay? Now, do either one of you wish to put anything else on the record at this time?

MR. DAVIS: Again, I have no summation unless Mr. Noble does. Otherwise, no.

MR. NOBLE: We'll go ahead and submit on --

THE COURT: All right. Thank you, counsel. And Court will be in recess.

**(OFF THE RECORD.)**

THE COURT: We need to make a quick record on this video. The clerk has brought to my attention that the press has been asking to look at the video, the three-hour-long video. So I want to get the attorneys' view on that.

MR. DAVIS: Your Honor, I was approached by a reporter in the hallway -- I felt compelled to report it to the Court -- asking if, in fact, now that they are admitted exhibits, if they are public records and whether the press would be allowed to obtain copies of them. I went upstairs, I got legal advice, and was told they are, in fact, public records but that --

THE COURT: I would agree with that.

MR. DAVIS: -- the U.S. Attorney's office will not be handing them over. And so I advised the reporter that he should approach the Court. That's why I felt compelled to advise the Court that you may be approached regarding that.

THE COURT: My view of it is that if it's admitted as a exhibit for this hearing, it does become a public record.

MR. DAVIS: I agree.

THE COURT: And, therefore, if it's a public record, then the press has access to it unless it's sealed, and it isn't sealed to my knowledge. So I just want to make sure that everybody's aware of this.

Mr. Noble, do you have any comment on this?

MR. NOBLE: Judge, I guess I would ask that the video be filed under seal as well. I'm not sure what benefit having this played on the evening news in terms of helping us if we try this case to try and find a jury here in the Eastern District. I'm not sure what -- there's only a small portion played in open court. The entire video wasn't played. I guess I would ask that the video be admitted under seal much like the other records.

THE COURT: Well, the entire video wasn't played in court, but the entire video was admitted as an exhibit, and that means everyone has access to it.

If you want to file a motion for it to be sealed, you're going to have to do that in writing and provide some

basis for it. I don't see a basis right at the moment to seal it, but I'll give you, you know, five days to file a motion to seal it if you so choose, and then I will let the Government respond. Okay?

MR. NOBLE: Okay. Thank you, Judge.

MR. DAVIS: Thank you.

**(PROCEEDINGS CONCLUDED AT 2:51 PM.)**

CERTIFICATE

I, Shannon L. White, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 170 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 5th day of April, 2017.

/s/Shannon L White
/s/Shannon L. White
Shannon L. White, CRR, RMR, CCR, CSR
Official Court Reporter