UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION, ST. LOUIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:16-CR-528-AGF |
| | ) | |
| TODD BECKMAN, | ) | |
| | ) | |
| Defendant. | ) | |

SENTENCING HEARING

BEFORE THE HONORABLE AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE
FEBRUARY 9, 2018

APPEARANCES:

For Plaintiff: John T Davis
Stephen R. Casey
OFFICE OF U.S. ATTORNEY
111 S. Tenth St.
St. Louis, MO 63102

For Defendant: Travis L. Noble, Jr.
Grant C. Boyd
SINDEL NOBLE
8000 Maryland Ave., Ste. 350
Clayton, MO 63105

Also present: Marc Johnson
ROSENBLUM SCHWARTZ, P.C.
120 S. Central Ave., Ste. 130
Clayton, MO 63105

REPORTED BY: PATTI DUNN WECKE, RMR, CRR, CMRS
Official Court Reporter
United States District Court
111 S. Tenth Street
St. Louis, MO 63102
314-244-7984

PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

(THE FOLLOWING PROCEEDINGS WERE HAD ON FEBRUARY 9, 2018, AT APPROXIMATELY 9:15 A.M., IN OPEN COURT, WITH DEFENDANT PRESENT:)

THE COURT: We are here in the matter of the United States of America v. Todd Beckman. It is case number 4:16CR528-AGF. The United States is represented by Assistant United States Attorneys John Davis and Stephen Casey. And Mr. Beckman is present and represented by his attorneys Mr. Travis Noble and Grant Boyd. This matter is scheduled before the Court today for sentencing following the defendant's plea of guilty to Count One of the indictment. Are the parties ready to proceed?

MR. DAVIS: Government's ready, Your Honor.

MR. NOBLE: Defendant's ready, Your Honor.

THE COURT: Are the parties still planning to present testimony here today?

MR. DAVIS: Your Honor, the Government is going to introduce three witnesses, codefendant Blake Laubinger, codefendant Caleb Laubinger and the victim Ellis Athanas, III. I anticipate just hitting the bullet points of their testimony and taking 90 minutes total.

THE COURT: And does this testimony pertain to the guidelines calculations and the objections that the defendant filed in any manner?

MR. DAVIS: From the victim's testimony that

information can come out during his testimony as to the physical injury that he suffered, perhaps some of the restitution that he seeks to recover. The other two, the codefendants, without being cumulative, is to hit the points. If you recall during the guilty verdict, defendant Beckman, we changed some of the facts where witnesses would testify that because he couldn't recall those events.

THE COURT: Some of that information is contained in the presentence report which there has been no objection.

MR. DAVIS: Concerning that information, that's true.

THE COURT: All right. And from the defendant's standpoint are the defendants still planning to call witnesses with respect to this matter?

MR. NOBLE: We have two people. We intend, I believe, we are just merely going to read a letter to the Court. I spoke to Mr. Davis, I don't believe that they are required for them to be sworn. I think they are just, one is his daughter and one is his neighbor.

THE COURT: Is that acceptable, Mr. Davis?

MR. DAVIS: Yes, Your Honor.

THE COURT: Okay. Then we will begin and just get started with these proceedings and then I will hear the testimony that the Government has to produce. I assume we

will present -- Mr. Noble, am I correct that those letters will be read in conjunction with allocution and the guidelines and statutory factors?

MR. NOBLE: Yes, Your Honor.

THE COURT: All right. Thank you. And, Mr. Davis, have any victims who are required to be notified of these proceedings in fact been notified?

MR. DAVIS: That is Ellis Athanas, III, who will testify. His father also, Ellis Athanas, Jr., filed a victim impact statement with the Court. It is my understanding that he is not present here today.

THE COURT: But they have been notified of the sentencing?

MR. DAVIS: Yes.

THE COURT: All right. Thank you. Mr. Noble, if you and Mr. Beckman would come forward for just a moment please. Mr. Beckman, you may recall my name is Audrey Fleissig. I'm the District Judge to whom your case has been assigned. I'm going to tell you a little bit about how we are going to proceed here today. Obviously you know you are here for your sentencing?

THE DEFENDANT: Yes.

THE COURT: I know I discussed this with you somewhat at the time of your plea as well. Under the Sentencing Reform Act of 1984 the United States Sentencing

Commission issued guidelines for judges to consider in sentencing someone in a criminal case. The sentencing guidelines are applied in an advisory manner. They are not binding on the Court, but I am still required to arrive at a sentencing guideline range and to consider that range along with other factors at the time of sentencing.

So today I will be making calculations under the sentencing guidelines, arrive at a guideline range and consider that range. I will consider the impact of the parties' plea agreement and any other sentencing agreements on any sentencing issues.

Inasmuch as there have been objections filed by you by your attorney, I will hear evidence that the Government is presenting with respect to those objections and any cross-examination by your counsel and any evidence that you care to present prior to making my final guidelines calculations. I will consider statements by the Assistant United States Attorney, by your attorney, sir, and I will also hear any statements that you care to make.

I have also received the letters that have been submitted both by victims as well as the many letters that have been submitted on your behalf, sir, but I will also hear the further letters that your attorney has stated will be presented here today. I will consider whether a guideline sentence is appropriate after determining whether

a departure up or down under the guidelines themselves is appropriate, and then I will consider all of the factors in 18 United States Code Section 3553(a) to decide whether to impose a guideline sentence or a nonguideline sentence.

Now, those factors include the nature and circumstances of the offense and the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to provide adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant, to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner. The factors also include the kinds of sentences available, the need to avoid unwarranted differences between similarly situated defendants who are facing similarly situated offenses, and the need to provide restitution to the victims.

Now, have both parties received and had an opportunity to review the final presentence report?

MR. DAVIS: Yes, Your Honor.

MR. NOBLE: Yes, Your Honor.

THE COURT: Mr. Noble, have you reviewed that with your client?

MR. NOBLE: Yes, Your Honor.

THE COURT: All right. Now, as set forth in the final presentence report the guidelines calculations set forth in that report are that we begin with a Base Offense Level of 32. That is looking at the cross reference for kidnapping under 2A4.1, to that six levels are added because the offense involved ransom demands, three levels are added because of the level of injuries sustained by the victim which is per the presentence report, damage between serious bodily injury and permanent injury. Two levels are added because the offense involved dangerous weapons, taking us to level 43, and then three levels are added for Mr. Beckman's acceptance of responsibility and timely notifying the Government of his intent to enter into a plea, taking us to a Total Offense Level of 40.

Mr. Beckman does have two prior criminal convictions, but because of the age of the first, there are no criminal history points assigned to those convictions, so he has zero criminal history points placing him in Criminal History Category I, which is the lowest Criminal History Category.

As set forth in the presentence report at a Total Offense Level of 40 and a Criminal History Category of one, the sentencing guideline range would be 292 to 365 months. However, I am aware of the parties' plea agreement entered

into in this matter in which the Government agreed that it would recommend a sentence of 240 months and not more than 240 months. And I understand that the defendant has in fact filed objections to the presentence report, including some objections that impact those guidelines calculations. And so what we will do now is, Mr. Beckman, I'm going to have you go ahead and sit back at the table and I think this is an appropriate time for us to hear the evidence that the Government wishes to enter at this time related to sentencing. You may call your first witness

MR. DAVIS: Blake Laubinger, please.

MR. NOBLE: May we approach Your Honor?

(A BENCH CONFERENCE WAS HELD ON THE RECORD AS FOLLOWS:)

MR. NOBLE: Just so the Court's aware, Blake Laubinger, I represented previously in a DWI case from the time of this incident. I withdrew from the case, had no conversation with him about this case or any connection with it. Withdrew from the DWI case and then Scott Rosenblum's office, I believe, took that case in conjunction with the representation in this case. I've had no conversations with him about this case. I haven't had a conversation with him since this case transpired or any information related it.

THE COURT: So he -- you have not discussed with

him whether he waives any conflict of interest?

MR. NOBLE: I didn't have any conversation with him at all. Once I entered in Mr. Beckman, I withdrew from his representation.

THE COURT: Well, I understand, but I don't know what conversations you had with him prior to the time you withdrew and if, in fact ---

MR. NOBLE: I didn't have any conversation with him. I made it a point not to talk to him. I talked to Scott.

THE COURT: Let me just make sure I understand the facts here. What I'm trying to determine is what, if any, conversations you had with Mr. Laubinger when you were representing him on the DWI. Did you meet with him in connection with that matter, did you have conversations with him in connection that matter?

MR. NOBLE: With the DWI, yes.

THE COURT: My concern with respect to that is that you may well have gained confidences of Blake Laubinger in connection with that representation that could conceivably enter into your cross-examination of this witness and I think that it is incumbent upon this witness to have those conflicts disclosed, and make sure that he is waiving them because I'm assuming that you are planning to cross-examine this witness. And if you are cross-examining

this witness and using confidences that you gained in connection with his DWI, that is a problem under the code of professional responsibility. Likewise, if you gained confidences with respect to Mr. Laubinger that you know about and you are not using in cross-examination of this witness, that poses problems with respect to your representation of Mr. Beckman. And I need to know whether you have discussed with Mr. Beckman and obtained from him -- whether you have disclosed this potential conflict of interest with him, and disclosed that with him and obtained in writing his consent to have you continue to represent him, notwithstanding the fact that it could result in some hypothetical limitations on the cross-examination of this witness. Yes?

MR. NOBLE: Yes. I don't know of any conversation I've had with Mr. Laubinger that would relate to or that I would be able to use in cross-examination in this case. When we first came in it was because he got arrested for another DWI. I said I'd look into it. Haven't done anything on it yet. I've had extensive conversations with Mr. Beckman about the fact that I had been retained by Mr. Laubinger on the DWI, but I hadn't done anything on it yet and I transferred the money directly back to his mother. I don't know that we gave it to Scott and I don't know of any communications that I

would use, utilize, get into or that would be called a conflict for me to cross-examine him on this case.

THE COURT: It's very unfortunate given how long this case has been pending. I would have anticipated that you would have had that conversation with Mr. Beckman, gotten his approval in writing to permit you to represent him, notwithstanding your prior representation of Mr. Laubinger, which could conceivably limit your ability to cross-examine Mr. Laubinger and, of course, you need the approval of Mr. Laubinger as well as I understand the federal -- as I understand the Missouri Rules of Professional Responsibility.

MR. NOBLE: Mr. Beckman would have no issue. We talked to Mr. Davis early on about the fact that I have represented him in the past about the previous DWI, but I didn't speak with, I didn't contact Mr. Laubinger because I didn't think it was appropriate at that time for me to have contact with him when he was represented by Mr. Rosenblum. I guess I could have spoken to Mr. Rosenblum and asked him to sign the waiver.

THE COURT: You could have -- honestly folks these are issues that are very easily dealt with while the case is pending before the magistrate judge. All you have to do is when you are there with the defendants in front of the magistrate judge, make sure you disclose these matters

with the party there, so that very early at the pretrial stage of the case we can determine whether there is any conflict of interest, and if not get the appropriate waivers from the parties.

These are things that should be explored at the very outset of the case when the parties are there before the magistrate judge. That would have been a very easy time for you to do it and I hope that you will think about that and do that in the future, because this is a very awkward time for us to be exploring this conflict of interest at sentencing.

MR. NOBLE: I completely understand, Judge. I think early on because I hadn't done anything, and then transferred to Scott, he and I talked about it.

THE COURT: I understand that from your standpoint you hadn't done anything in the case, but you had already spoken to him. He may have discussed with you his personal situation. He may have discussed his background. He may have discussed other things that conceivably an attorney could use or be unable to use in cross-examination. So we need to get those waivers now.

MR. NOBLE: Okay.

MR. DAVIS: I'm sorry to interrupt. Mr. Johnson is here, who represents this witness. Should he be here?

MR. BOYD: On the potential waiver for

Mr. Laubinger, I believe the rule is conflict of interests and duties to prior, previous clients, in representation in same or substantially related matter. That is the necessity of a waiver. This is not a same or substantially similar matter.

THE COURT: Have you looked at the Missouri Rules of Professional Responsibility with respect to confidences gained from a client?

MR. BOYD: Yes, and we are not allowed to use those in cross-examination and that was disclosed to Mr. Beckman.

THE COURT: Mr. Beckman then ought to be agreeing to that in writing. Have you looked at the Missouri rules?

MR. BOYD: I was speaking strictly through Mr. Laubinger and talking about a waiver from him. I was not talking about Mr. Beckman. I apologize for not making that clear, but I was speaking regarding confidences from prior representation and duties to former clients, under that rule 12.07.

THE COURT: I'm sorry, I just -- I do not agree with your reading of the rules. I believe that if in fact you have gained confidences from a client, even though the matter is unrelated, if that could impact your representation of another client in a case in which they are involved, that you must get a waiver from them.

MR. BOYD: From the former client or the current client or both?

THE COURT: Both. Are you telling me that your understanding of the Missouri Rules of Professional conduct tell you that if you gain confidences from this client that you might conceivably use in cross-examining that client in another matter that the Missouri rules tell you that's okay?

MR. BOYD: No, absolutely. We're absolutely not allowed to use those.

MR. NOBLE: I understand what you're saying, Judge, there's a distinction between the two. There's both the situation where I have confidences say, and I'm not going to use them against him, so it's a two-part thing, I understand. I explained to Mr. Beckman, we have had lengthy conversations about this, he's fully aware that I don't have any problems, that I'm not going to use against him. It was a standard DWI case where he says that I got arrested by the police for DWI.

THE COURT: I understand, but I don't know what else you discussed with him in the context of that representation. For all I know in the context of that, he could also turn around to you and say, and by the way you know I do deal marijuana and, you know, XYZ. I don't know what else you were told.

MR. NOBLE: I understand and that's why what I'm saying is from that, that that's something that occurred, that I thought I had to disclose that, I would say for Mr. Beckman, but what I'm expressing is I didn't receive any of that information.

THE COURT: But you understand that sometimes the attorney's perspective of what they gained ends up being different than the client's. I am not going to be pursuing this matter on the 2255 a year and a half from now.

MR. NOBLE: I understand. So, I guess I would ask the Court then, can we have Mr. Beckman sign a written waiver now, and ask Mr. Johnson to come up and him speak to his client?

THE COURT: So, let me -- I mean, you all are going to have to have these discussions with your clients. I'm going to need to confirm those waivers on the open record here today. We need to get Mr. Johnson up here.

MR. DAVIS: I will.

THE COURT: Mr. Johnson, this is painfully ironic. Apparently Mr. Noble previously represented Mr. Laubinger in connection with a DWI and that representation was ongoing when this matter took place, or when the representation with respect to this matter began.

It's my understanding that at that time Mr. Noble withdrew from representing Mr. Beckman -- Mr. Laubinger, in

order to represent Mr. Beckman.

MR. JOHNSON: That is my understanding, Your Honor.

THE COURT: It is also my understanding that there have been no waivers on the open record and no written waivers obtained with respect to any potential conflicts of interest that may exist with respect to Mr. Noble now being in the position to cross-examine his former client.

I do not know. I am obviously in no position to know whether Mr. Noble gained confidences of Mr. Laubinger that he might now use in cross-examination of Mr. Laubinger in violation of Mr. Laubinger's rights, or whether he is refraining from cross-examining Mr. Laubinger in a manner that might impact his representation of Mr. Beckman. So, the question is, have you discussed these matters with Mr. Laubinger and have you discussed with Mr. Laubinger, Mr. Nobles's prior representation of him, and whether he has any issues with respect to that; and if you have not, then we need to have those discussions now.

I need to determine whether this gives rise to any objections by either of these individuals; and if not, I need to confirm the waivers on the written record. And that will require, of course, that you have a full discussion with Mr. Laubinger about any potential conflicts

that exist by virtue of this prior representation.

I understand that representation didn't go very far. I understand it was on an unrelated matter, but I am not privy to what if any confidences were gained in connection with the representation, and Mr. Nobles' view of that may differ from Mr. Laubinger's view of that.

MR. JOHNSON: Your Honor, Mr. Rosenblum handled almost every proffer, every meeting with Mr. Laubinger. So, I wasn't privy to any conversation that he had with Mr. Laubinger. So, I can't assist the Court in that. I know that Mr. Laubinger is aware that Mr. Noble now represents Mr. Beckman, and is aware that Mr. Noble would be cross-examining him today, but I have never had any direct personal conversations related to a conflict of interest with Mr. Laubinger, but I don't know what Mr. Rosenblum did at the beginning, because I had almost no involvement in the case at that time.

THE COURT: So, I need you to have this discussion now with each of your clients, please. And then I'm going to want to hear the results of that conversation on the open record here.

MR. JOHNSON: You want me to approach Mr. Laubinger now?

THE COURT: Yes, please. Why don't you see if the Marshals will let him sit in the jury box with

Mr. Laubinger. That would be I think be the easiest way to proceed, if they are comfortable proceeding in that fashion. So, would you please ask the Marshals that?

MR. BOYD: I apologize if I didn't make that clear.

(A SHORT BREAK IN THE PROCEEDINGS WAS HAD, AFTER WHICH THE FOLLOWING CONTINUED AT THE BENCH:)

MR. NOBLE: We figured out what that was. Apparently that John Rogers left their office in the middle of all this. Mark has talked to him apparently and told me he will waive a conflict. He said that he has no problem, he would waive a conflict, and Mr. Beckman said the same, so we can write something right now.

THE COURT: It's not necessary that he do it in writing if we do it in open court. But I think that the Missouri Rules of Professional Conduct require you get that waiver in writing.

MR. JOHNSON: Mr. Laubinger recalls meeting with Mr. Noble briefly on the DWI, but nothing related to this case was ever discussed, and Mr. Noble has confirmed to me that he doesn't recall much with the DWI, and certainly is not going to bring it up in cross-examination, and he met with him one time and then he turned over all the materials to us when all this started and our office took over the DWI. I don't know the status of that case. I never

touched it or seen it, but Mr. Laubinger has absolutely no problems moving forward today.

THE COURT: Is he prepared to waive any conflict of interest?

MR. JOHNSON: Absolutely.

THE COURT: Let's do that first and then we will get going.

(THE FOLLOWING PROCEEDINGS CONTINUED IN OPEN COURT:)

THE COURT: Mr. Beckman, can I get you back up here at the stand, please. Mr. Beckman, it is my understanding from discussions with counsel that prior to the time, but continuing through the time this matter was indicted, that your attorney Mr. Noble had represented Mr. Laubinger, Mr. Blake Laubinger, with respect to an unrelated criminal matter, and that when he began working with you he withdrew from that representation and the representation with respect to that matter was taken over by the Rosenblum law firm.

The fact that Mr. Noble previously represented Mr. Laubinger at a time that would include the time period of these events, even though unrelated, could potentially give rise to a conflict of interest. So, for instance Mr. Noble could have gained confidences and information about Mr. Laubinger that the Rules of Professional

Responsibility would prevent him from now using to cross-examine Mr. Laubinger, which arguably then could impact the representation that he is providing to you.

And I don't know what. Arguments could be made but arguments can be made that conceivably the fact that he was providing representation to a codefendant in this case, could impact his ability to represent you and represent you as vigorously as he might otherwise represent you if he hadn't previously been representing Mr. Laubinger. Do you understand what I'm saying, sir?

THE DEFENDANT: Yes.

THE COURT: And were you aware that Mr. Noble had had some representation of Mr. Laubinger at the time that he began representing you?

THE DEFENDANT: Yes.

THE COURT: And have you had an opportunity to now discuss with your attorney the possible implications and affect on his representation of you that that prior representation might have?

THE DEFENDANT: Yes, I have.

THE COURT: Are you satisfied with Mr. Nobles' representation of you, sir?

THE DEFENDANT: Yes, I am.

THE COURT: Do you have any questions at all about the possible impact of any such conflict of interest?

THE DEFENDANT: No, I don't.

THE COURT: So, you understand that arguably, and I've just given you one example, it could limit the type of cross-examination that Mr. Noble might otherwise do with respect to Mr. Laubinger or even the type of investigation that he might have done with respect to Mr. Laubinger to prepare for cross-examination, had he not previously represented him; does that make sense to you?

THE DEFENDANT: Yes, it does.

THE COURT: Do you have any questions at all about that?

THE DEFENDANT: No, I don't.

THE COURT: Is there any further information you would like to obtain from your counsel on this matter?

THE DEFENDANT: No.

THE COURT: Have you had all the time that you need to discuss this matter?

THE DEFENDANT: Yes, I have.

THE COURT: All right. And to the extent that any conflict of interest may exist, do you wish to assert that conflict of interest or do you wish to waive that conflict of interest?

THE DEFENDANT: Waive it.

THE COURT: Do you have any reservations about that whatsoever?

THE DEFENDANT: No, I don't.

THE COURT: Mr. Davis, is there anything further that the United States wishes to place on the record or inquire about with respect to the prior representation and, Mr. Noble, is it -- are you confirming to me that that prior representation was very limited in time and totally unrelated to the current matter?

MR. NOBLE: Yes, Your Honor.

THE COURT: How many times did you meet with Mr. Laubinger in connection with that approximately?

MR. NOBLE: I'd be guessing but maybe a couple times we met, and then we had an unrelated matter. We had no discussion about this issue, this case.

THE COURT: No discussions whatsoever about this case?

MR. NOBLE: No.

THE COURT: Mr. Davis, is there anything further that the United States wishes to place on the record with respect to the representation of Mr. Beckman?

MR. DAVIS: No, Your Honor, other than it's my belief, my memory, as I stand here right now that I just learned about this this morning.

THE COURT: All right. So, now we need to have the same discussion with Mr. Laubinger, Mr. Beckman. So, I'm going to ask you to go back and have a seat and I'm

going to have Mr. Laubinger and his attorney, Mr. Johnson, come forward.

And Mr. Laubinger, I assume that you've been listening to the discussion that we just had?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Have you also had an opportunity to discuss with Mr. Johnson here today any potential issues that may be raised with respect to your representation, by the fact that Mr. Noble previously represented you and is now about to cross-examine you?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Have you had all the time that you need to discuss that with your attorney?

THE DEFENDANT: Yes, I have.

THE COURT: And obviously, Mr. Laubinger, I don't know what conversations you might have had with Mr. Noble during the time period that he represented you. Do you recall approximately how many conversations you had with him?

THE DEFENDANT: One, maybe two.

THE COURT: Any did you have any discussions with him related to this matter?

THE DEFENDANT: Absolutely not.

THE COURT: And I have no idea, Mr. Laubinger, whether you shared any confidences with Mr. Noble that he

might conceivably use to cross-examine you in connection with this matter, he has represented that he does not intend to cross-examine you with respect to matters related to that prior representation, but you understand that I cannot know what confidences about you he might have gained during that representation?

THE DEFENDANT: Yes, ma'am.

THE COURT: Were you aware that Mr. Noble was in fact going to be representing Mr. Beckman in this matter early on in the case?

THE DEFENDANT: Yes, I was.

THE COURT: And that your interests and Mr. Beckman's interests might well diverge during the course of the progress of this case?

THE DEFENDANT: Yeah.

THE COURT: And do you wish to assert any conflict of interest that might exist by virtue of Mr. Nobles' prior representation to you or do you wish to waive that conflict?

THE DEFENDANT: I wish to waive it, Your Honor.

THE COURT: Are you satisfied with the representation that has been provided to you by the Rosenblum firm throughout these court proceedings?

THE DEFENDANT: Yes, I am.

THE COURT: I take it that Mr. Noble did not

provide any representation to you whatsoever with respect to the matters set forth in this indictment?

THE DEFENDANT: Yes, none at all.

THE COURT: Any questions at all for me with respect to the decision that you are making whether or not to waive any conflict of interest, sir?

THE DEFENDANT: No, Your Honor.

THE COURT: Are you comfortable that you have all the information that you need to make that decision?

THE DEFENDANT: Yes.

THE COURT: As I said, are you satisfied with the representation that has been provided to you from the outset of this matter?

THE DEFENDANT: Yes, I am.

THE COURT: Are you also satisfied with the representation provided to you in that other criminal matter?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Anything further from the United States with respect to this matter?

MR. DAVIS: No, Your Honor.

THE COURT: All right. Then I will in fact accept the waiver of any conflict of interest in this matter both by Mr. Beckman and with respect to Mr. Laubinger that might otherwise arise by virtue of

Mr. Noble's representation of Mr. Laubinger on an unrelated criminal matter. All right. And I'm going to let you go back and take the witness stand now, Mr. Laubinger.

THE DEFENDANT: Thank you, Your Honor.

BLAKE LAUBINGER,

HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. DAVIS:

Q. Mr. Laubinger, in the matter that we're here today, the kidnapping case, you were indicted in this matter as a codefendant along with Mr. Beckman; is that true?

A. That's true.

Q. You were represented by the Rosenblum law firm, specifically, Mark Johnson from that firm is here today; is that true?

A. That's true.

Q. Have you spoken to Mr. Johnson, Mr. Rosenblum, anyone in that firm regarding your appearance here today to testify as a codefendant on behalf of the Government?

A. Yes, I have.

Q. You understand that you have certain rights, that you don't have to testify if you don't want to?

A. I understand that.

Q. It's with the advise of counsel and your own decision that you are here to testify?
A. That's correct.
Q. You and I have met before to discuss your testimony; is that true?
A. That's true.
Q. Several times maybe?
A. Yes.
Q. You are currently being housed at the St. Genevieve County Jail; is that true?
A. That's true.
Q. And you came to an agreement with counsel and the Government regarding this case, that if you provide substantial assistance to the Government -- and the Government will make that decision -- we'll file the motion with the Court that would allow the Court to possibly sentence you to something less than you would have received otherwise; is that your understanding?
A. That's my understanding.
Q. You've discussed that with your attorney?
A. I have.
Q. Can you explain -- what I want to do is quickly set up the scene that takes us to November 21 of 2016, okay?
A. Okay.
Q. Could you explain for the Court how you know

Mr. Beckman?
A. We met around 2011 through some mutual friends and had a quick business interaction with a gym investment and started dealing marijuana shortly after.
Q. Before you met Mr. Beckman in 2011, were you involved in the marijuana trade?
A. Yes.
Q. How many years prior to 2011 were you involved in the marijuana trade?
A. Four.
Q. Were you producing income from that business?
A. Yes.
Q. Were you employed legitimately at that time?
A. No, I was not.
Q. So your sole income was from marijuana sales and distribution?
A. Correct.
Q. You live at 410 Cypress; is that true?
A. That's true.
Q. Is that in Fenton?
A. Pacific.
Q. You purchased that house yourself?
A. No. Help with my father.
Q. When was that purchase made?
A. I guess three and a half years ago now.

Q. Okay. During the time of your marijuana distribution and trade, correct?
A. Correct.
Q. Was Mr. Beckman when you met him involved in the marijuana trade?
A. From what I understood, yes.
Q. Did you come to get a better understanding as your relationship with Mr. Beckman progressed?
A. Correct.
Q. Can you explain for the Court how that happened, what happened in that progression of the relationship?
A. The same mutual friends that introduced us had brought it up to me that he was receiving shipments of marijuana from California.
Q. Were you able to independently confirm that other than just have people tell you that?
A. Yeah, I seen them come in.
Q. You what?
A. I seen the loads like he received there.
Q. When they arrived, how did they arrive?
A. 18-wheeler they were unloaded at his loading dock at his Fenton Drive.
Q. Is that on Champion -- 11 Champion Drive, I think it is?
A. Correct.

Q. And that's in Fenton?
A. Yes.
Q. Did you help unload those?
A. No.
Q. Were you ever present when they were unloaded?
A. I was present while they were opened up.
Q. And quickly if you can, how much approximately was brought in each time?
A. Anywhere from 50 to 80 pounds.
Q. How many times did you see that happen?
A. Quite a few. Seven, eight.
Q. Over the course of -- you say you met Mr. Beckman in 2011?
A. Correct.
Q. Up to 2016 did that happen consistently during that time period?
A. Monthly.
Q. Monthly?
A. Yes.
Q. In an effort to speed it up, Mr. Laubinger, you became a distributor, a seller of marijuana that Mr. Beckman was bringing in to St. Louis from California; is that true?
A. That's true.
Q. When the loads would come in, did you take a portion

of it for you to distribute?
A. At first it was just a portion and then it proceeded and I took all of it.
Q. So, in November of 2016, what was your role as far as taking portions of marijuana?
A. I was taking all the marijuana, selling it and bringing back the money that was owed.
Q. When you would take it from where it was shipped at 11 Champion Drive, where did you go?
A. Back to my house.
Q. Is it true that in late October, I believe, your house was burglarized?
A. That's correct.
Q. What happened?
A. From my understanding, Ellis Athanas broke into my home and stole a safe with money in it and a crate full of marijuana.
Q. Was that marijuana that you received from Mr. Beckman's source of supply at the 11 Champion facility?
A. That's correct.
Q. How much money was it?
A. Approximately 15,000 or more.
Q. Was that your money?
A. It was my money in my possession, but it wasn't for

me. It was money that I owed to Mr. Beckman for the marijuana.
Q. Okay. Can you briefly explain for me, you would receive the marijuana obviously from Mr. Beckman, you would sell it, what would happen to the proceeds?
A. The proceeds would go to him and I would take a cut.
Q. So you sold it for more than you purchased if from Mr. Beckman; is that true?
A. That's correct.
Q. You said to the best of your understanding, when you are found out your house had been burglarized and those things were gone, that Ellis Athanas, III was responsible for it?
A. That's correct.
Q. Why did you think it was Ellis Athanas, III?
A. I didn't think anybody else would do that to me.
Q. Was he aware of the fact that there was marijuana in your house?
A. Yes, he was aware of when the loads were getting in there and where I put it in my home.
Q. Was he aware that Mr. Beckman was the source of supply?
A. Yes, he was.
Q. It's true, isn't it, Mr. Laubinger, that you and Mr.

Athanas have burglarized other drug dealers?
A. That's correct.
Q. That goes into your reckoning that it was probably Ellis that did this to you, correct?
A. That's correct.
Q. Did you speak to Mr. Beckman about the loss of the marijuana and the money?
A. Immediately.
Q. How did that conversation go?
A. Not very well.
Q. How do you mean?
A. I mean it wasn't a good situation. There was a lot of money lost and I had no way of paying it.
Q. What was your mental physical feeling at that point?
A. Scared.
Q. Of?
A. What could happen.
Q. Are you talking about retribution by Mr. Beckman or somebody else?
A. Yeah, I mean Beckman and/or his supplier.
Q. So, was a plan arrived at to abduct Mr. Athanas in an effort to get the stolen items and money back?
A. Yeah, that's correct.
Q. Was Mr. Beckman aware of that?

A. Yes, he was.
Q. Now I want to take you to November 21st of 2016. You have a brother named Caleb; is that true?
A. That's true.
Q. Did you and Caleb hide inside Ellis Athanas' house and wait for him to come home that evening?
A. Yes, we did.
Q. You abducted him and took him to your residence on Cypress; is that true?
A. That's true.
Q. If Mr. Beckman found out about that, how did he find out?
A. I called him.
Q. Where were you when you called him initially to say we've done it?
A. I had just left Ellis' home.
Q. And you are in a vehicle?
A. Correct.
Q. Is Ellis with you?
A. Correct.
Q. What physical condition is he in?
A. He is tied by his ankles and hands and he's on the floor of the truck.
Q. Is your brother Caleb with you?
A. Yes, he is.

Q. What you get to Cypress what happens to Mr. Athanas?
A. He's tied to a beam downstairs in my basement.
Q. Does Mr. Beckman arrive?
A. Yes, he does.
Q. How much later after you arrived with Mr. Athanas?
A. Thirty minutes.
Q. Do you recall roughly what time of day it is on Monday November 21st?
A. It was nighttime. It was probably around 11:00 maybe twelve.
Q. P.M.
A. P.M.
Q. When Mr. Beckman arrived did you notice anything in his possession?
A. Not at first, he just had a backpack with him.
Q. Was he alone?
A. No, he was not. He was with Kerry Roades.
Q. Pardon?
A. He was with Kerry Roades.
Q. Did you see Mr. Beckman and or Mr. Roades take anything out of the backpack?
A. I seen Beckman pull out a two-toned handgun.
Q. I'm going to mark this as Government's Exhibit 1 and ask if you recognize that. Can you see that on the display

in front of you?
A. I can.
Q. What do you recognize that as?
A. As the pistol that Mr. Beckman had pulled out.
Q. The one you saw looked very similar to that one?
A. Very similar, it's two-toned.
Q. What did you see Mr. Beckman do with it after he took it from the backpack?
A. He immediately grabbed it and started jabbing it into Ellis Athanas the third's head, very forcefully, screaming bang, bang, bang.
Q. When you say jabbing it, just for the record, I've got my eye glass case and I'm jabbing myself with it; was it like that or was it harder than that?
A. It was a little bit harder.
Q. Where was he jabbing Mr. Athanas with the gun?
A. In the forehead.
Q. Yelling bang, bang, bang?
A. Correct.
Q. You have a dog?
A. Yes.
Q. What kind of dog?
A. French bulldog.
Q. Was the scene in your basement with the victim tied to the pole and the gun play going on chaotic?

A. It was very violent.
Q. Can you describe for the Court the dog's reaction?
A. The dog jumped up and bit Mr. Beckman in the face.
Q. Because of the chaoticness of the scene?
A. Yes.
Q. Is your dog aggressive otherwise?
A. No.
Q. Did you see Mr. Beckman strike Mr. Athanas with anything other than that handgun?
A. Other than his hands and jumped on top of him.
Q. So, he struck him with his fists, with his hands somehow?
A. Yeah, hands and feet.
Q. And kicked him?
A. Yes.
Q. Aggressively?
A. Yes.
Q. Is Mr. Athanas wounded at all at this point?
A. Yes, he was wounded already.
Q. And that would have been from the assault when you and your brother took him from the house, correct?
A. That's correct.
Q. So, this is assault on top of previous injuries?
A. Correct.
Q. Did you ever see Mr. Beckman use the -- we use the

term "dry fire" a handgun; are you familiar enough with handguns to know what that means?
A. Yes.
Q. Did you ever see that?
A. He chambered rounds. He would cock the pistol back and stuff to let him know that it was loaded and bullets were flying out of the gun.
Q. Live bullets, not spent shells?
A. Live rounds, yes.
Q. Which means to you, if it's a semi-automatic handgun that there's a magazine in the handle and he's just chambering rounds, letting live bullets fly?
A. Correct.
Q. So that indicates to you the gun is loaded, correct?
A. Yes.
Q. Is it in that condition when you see him jamming it into his head?
A. Yes.
Q. Were you able to see his trigger finger?
A. It was on there.
Q. It was on the trigger?
A. Yes.
Q. Did Mr. Beckman eventually leave the house that night of November 21st that probably bled over into

November 22nd after midnight?
A. Yes, he did.
Q. Did you go with him?
A. No, I did not, I stayed back.
Q. Did Caleb go?
A. Yes, he did.
Q. Did Mr. Roades go?
A. Yes, he did.
Q. Do you know where they were going?
A. They were going to round up Ellis' vehicles.
Q. Do you know why they were going to do that?
A. For payment.
Q. The next day, which would have been Tuesday, sunrise the next day, November 22nd of 2016, did you see Mr. Beckman again?
A. Yes, I did.
Q. Prior to seeing him, did you have a telephone conversation with him?
A. Yes, I did.
Q. What was the conversation about?
A. He was on his way over and asked me if I wanted anything to eat.
Q. Did he bring you something to eat?
A. Yeah.
Q. Did he bring Ellis anything to eat?

A. I don't recall.
Q. Let's talk about this. Is Ellis still secured to the pole?
A. Yes, he is.
Q. The basement you're in, is it finished?
A. Yes.
Q. Is he on carpet then?
A. Hardwood floor.
Q. Is there plastic down?
A. Yes, there is.
Q. What was the reason for the plastic to be beneath Mr. Athanas?
A. Blood stains or anything like that from the victim.
Q. What if he has to go to the bathroom?
A. We took him once or twice but he eventually ended up urinating on himself.
Q. When Mr. Beckman called you about breakfast he eventually brought it over?
A. Correct.
Q. Did he have anything else with him besides breakfast?
A. He did. He had a heat gun and shrink-wrap plastic.
Q. Did you know he was going to show up with a heat gun

and plastic?
A. No, I did not.
Q. Do you know where it came from?
A. He had a receipt from Lowe's and he told me he went to Lowe's and got it.
Q. Did he announce in your presence and Mr. Athanas' presence what the purpose of the shrink wrap and heat gun was for?
A. Yes. It was the first thing he did. He said he was going to wrap him up and shrink wrap him with the heat gun and ship him to California as payment.
Q. Did he mention shooting him?
A. I don't recall if he did that instance.
Q. Do you ever recall him saying he was going to shoot him?
A. Yes.
Q. The heat gun, did you see Mr. Beckman assault the victim with the heat gun?
A. Yes, I did.
Q. What kind of piece of equipment is this? What does a heat gun look like?
A. It looks like a real small hair dryer in an instance.
Q. And he struck the victim with it?
A. Yes, he did the same motion that he was doing with

the pistol.
Q. Same thing just with the heat gun?
A. Yes.
Q. During that day, now the shrink wrap is there, the heat wrap is there, is Mr. Roades there with Mr. Beckman?
A. The first day, yes.
Q. The second day after sunrise?
A. I don't recall seeing him in the basement.
Q. Is there a phone call made to the victim's mom and/or dad?
A. Yes.
Q. Were you present for that?
A. Yes, I was.
Q. Whose phone was used initially?
A. Ellis' was used initially.
Q. Do you know who was called, mom or dad?
A. Mom I think was called first, but I don't recall if it was dad or mom, I'm not sure.
Q. Who dialed the number?
A. I think I dialed the number at first.
Q. Who did the talking?
A. Ellis did the talking.
Q. So you let the victim talk to his parent, one of the parents?
A. We briefly talked to him about not saying certain

things like calling the police or telling them he was in bad, you know, condition.

Q. Or giving up your location?

A. Yes.

Q. He was warned not to do that?

A. Yes, he was.

Q. Did Mr. Beckman take place in that conversation with him?

A. Yes.

Q. And then what is it that Ellis is going to talk to his mother or father about?

A. About the money that was stolen from the home.

Q. Were they asked to bring money to you or to Mr. Beckman?

A. Yes.

Q. Did Mr. Beckman speak to whoever was on that phone?

A. Yes, he did.

Q. Do you recall what he said?

A. He was just screaming and kind of talking about how their son had screwed up really bad and that if they wanted to see him again they would have to pay the money.

Q. Do you ever talk to mom or dad on the phone?

A. No, I did not.

Q. During the course of this, the first or second day,

do you recall Mr. Beckman saying anything along the lines of I haven't done this since the 1980s?
A. He had mentioned something saying that he hadn't done this in over twenty years.
Q. Do you know what the "this" is?
A. I have no idea.
Q. So the night of the 22nd, the second day, when nighttime comes around, do you want Mr. Athanas in your house anymore?
A. No.
Q. Did you ever want him there?
A. No.
Q. Is there a plan made to move him?
A. Yes.
Q. Does Mr. Beckman participate in that plan?
A. Yes, he does.
Q. What do you say to Mr. Beckman and what's his reply; how does that work?
A. I was just completely over the whole situation and wanted him out of my house, and he just brought up, well, we could take him somewhere different, and I said, well, I don't want to take him anywhere that belongs to me. I just want this completely out of my life.
Q. Does Mr. Beckman want you to take him somewhere that belongs to you?

A. Yeah.
Q. Where?
A. We have property in Pacific.
Q. And you said that's not an option?
A. Not an option.
Q. What is the option that you come up with?
A. We came up with a plan to take him to Mr. Beckman's property. He had a storage container there.
Q. If I say 905 Gregory; does that sound like the address for that property?
A. Yeah, it does.
Q. Is there a house on it?
A. No.
Q. So the container is a shipping container; is that true?
A. That's true.
Q. Metal?
A. Yes.
Q. When you arrive at that plan, how do you get Mr. Athanas from your basement to that property?
A. Same scenario, we just restrained him.
Q. Who is we?
A. Me and my brother did.
Q. Okay. You've restrained him off the pole now?
A. Yeah, we unhooked him from the pole and let him

relax a minute and then we put him in the truck and drove him all the way up to Fenton where I met Mr. Beckman in a McDonald's parking lot.
Q. What happened in the McDonald's parking lot in Fenton?
A. Mr. Beckman got in my truck and showed us how to get to his property.
Q. You didn't know how to get there?
A. No, I had never been there.
Q. It's now the day before Thanksgiving; does that sound right to you?
A. That sounds right.
Q. Did Mr. Beckman mention anything about the fact that it's the day before Thanksgiving?
A. Yeah. He said it was crazy that we're doing this the day before Thanksgiving.
Q. At any point did he say let's call the police, let's go to the sheriff's department, let's call the FBI, anything like that?
A. No. In the beginning he kept going on and on about how we were going to citizen arrest him.
Q. When was the beginning that you're talking about?
A. Before it even had happened, before the abduction happened or anything.
Q. It's true that you hunted for Mr. Athanas for a

while before you finally found him on the 21st, true?
A. That's true.
Q. Traveled all the way to Springfield at least a couple of times looking for him?
A. That's correct.
Q. Was Mr. Beckman aware of those travels?
A. Every time.
Q. Those attempts to abduct him?
A. Yes.
Q. Do you recall Mr. Beckman telling Mr. Athanas where they were going when you got in the truck?
A. Could you repeat that?
Q. When Mr. Beckman gets in the truck at the McDonald's in Fenton, does he say anything to Mr. Athanas about where we're going?
A. Yeah, he did. He had mentioned that we were going to a property that was like thousands of acres and no one would ever find him there.
Q. Was Mr. Athanas able to see where he was going?
A. No, after we got off the highway 44, at 141, we had put a blanket over his head so he couldn't see.
Q. When you got to the property there's a storage shed there and he's secured inside the storage shed; is that true?
A. That's true.

Q. Mr. Beckman is there for that?
A. Yes, he is.
Q. Does he assist in the securing of the victim to the storage shed?
A. Yes, he did.
Q. Can you describe for the Court how it is he is secured?
A. There was cables that were hooked on the bottoms of the storage container, and we had laid a bunch of blankets down and put Ellis on top of the blankets and hooked the cables to handcuffs and underneath zip ties so that he couldn't move.
Q. Is he able to stand up?
A. No.
Q. Is there enough slack that he can sit down?
A. Yes, he can sit up and roll a little bit side to side.
Q. So could lay down if necessary?
A. Correct.
Q. The storage shed itself, heating, air conditioning, ventilation, I'm assuming in a storage shed that doesn't exist?
A. Absolutely not. There were holes in it.
Q. There were holes in it?
A. Yes.

Q. And this was late November of 2016?
A. Correct.
Q. Do you recall the weather conditions when you dropped him off?
A. The weather was rainy and it was real cold.
Q. After you left the storage shed, where did you go?
A. I think we all split up at that point. I remember taking the truck back to the rental spot.
Q. The truck that you were transporting him in?
A. Correct.
Q. Did you meet with Mr. Beckman again after that?
A. Yes.
Q. Do you recall an incident involving documents called powers of attorney?
A. I do.
Q. Explain for the Court what that was about and what you did with Mr. Beckman?
A. Yeah, we -- I had pulled up to Champion Drive again, and was looking for Beckman and had some previous conversations with him, and he said he was with Athanas' dad having a beer at the bar and discussing everything and that he needed me to bring a document up there. And when I pulled up I had asked Roades and he provided me with a document saying that he couldn't do it and so I had to. So, I went to Joey B's, right there in Xist Fitness in

South County, that's where they were at at the bar. And I brought a power of attorney document inside the bar where they were sitting, drinking a beer, and handed it to Beckman which slid it over to Athanas' dad, and his dad just left and went to go get everything squared away, and me and Beckman just finished a beer.
Q. Based on your conversations with Beckman and what you knew from your personal involvement in this, is it true that the powers of attorney was to sign the title of those vehicles over that Mr. Beckman wanted from the victim Ellis Athanas?
A. That's correct.
Q. Ellis Athanas' father is Ellis Athanas, Jr., and the victim is the third; is that your understanding?
A. That is my understanding.
Q. Did it seem odd to you that Junior and Mr. Beckman were sitting at Joey B's having a beer?
A. Weirdest thing I had ever seen.
Q. While his son is secured in a storage shed on some acreage?
A. Yes.
Q. The fact that they shared the same name, was it your understanding they were going to try to have Junior sign the powers of attorney, go to the car dealership and secure the titles?

A. Yes, that was my understanding.
Q. Do you know if it worked?
A. I don't think it did.
Q. When was the last time you saw Mr. Athanas involved in this incident? Was it when you left the storage shed or did you ever go back?
A. I went back once.
Q. Why did you go back?
A. It was cold. It was cold and wet and I was checking on him.
Q. You were checking on him. Did you take him anything?
A. Food.
Q. What did you get him?
A. Double cheese burger and stuff from McDonald's.
Q. Have you look at Government's Exhibit No. 2; was that the last time you saw him then?
A. No, last time was when we dropped him off.
Q. Oh, that's right. Explain to me what happened there. The ransom money is delivered; is that true?
A. That's true.
Q. Then what happened?
A. And then we went back to Champion Drive and counted the money and we counted $27,000.
Q. When you say "we," who is we?

A. Me and Beckman.
Q. Just you two?
A. Yes.
Q. Do you know where the money came from?
A. It came from Athanas' dad, Junior.
Q. Were you there when he handed it over?
A. Yes.
Q. Was Mr. Beckman there?
A. Yes.
Q. Where was that?
A. That was in a parking lot in Fenton.
Q. This was after the beers at Joey B's?
A. Yes.
Q. You and Mr. Beckman went back to Beckman's property, counted the money and it was how much?
A. $27,000.
Q. Now what's the plan? What are we going to do?
A. We were going to go pick Ellis back up from the storage container and drop him off somewhere so his dad could pick him up.
Q. Did Mr. Beckman assist in that endeavor?
A. We used his Tan Co van.
Q. Is Tan Co van his business van?
A. Correct.
Q. Was your brother involved in that also?

A. No.
Q. It was just you and Mr. Beckman?
A. That's correct.
Q. You took him from the storage shed, put him in the Tan Co van and did what?
A. Well, before we left the storage container he actually forced him to sign a power of attorney document as well.
Q. He, is that Mr. Beckman?
A. Correct.
Q. So, now Ellis Athanas, III, has signed the power of attorney?
A. That's correct.
Q. At Mr. Beckman's direction?
A. Yes.
Q. Then that happens to Mr. Athanas?
A. He's loaded into the van and we left and dropped him off in Fenton.
Q. And what is to happen to him after that?
A. He's just supposed to stay away from us and --
Q. I mean, is someone supposed to come get him?
A. Oh, yes, yes.
Q. How?
A. His father. We were going to tell his father where he was at and he was going to pick him up.

Q. Did you give him his cell phone back?
A. We did.
Q. Did Mr. Beckman make any threats to Mr. Athanas at that point, if you call the police?
A. Yes, he did.
Q. What was the threat?
A. We would kill you.
Q. What about his family?
A. Same.
Q. Mr. Beckman threatened that if he called the police, the authorities or anything, I'm going to kill you and your family?
A. Yes.
Q. When you left him off at that Gravois Bluff location, is that roughly the physical condition Mr. Athanas was in?
A. Yes.
Q. Tasers, were they used?
THE COURT: For the record you are showing Exhibit 2?
MR. DAVIS: I'm sorry, Government's Exhibit No. 2 is on the display, that is true.
Q. Looking at Exhibit 2, that represents that day, the last you last saw Mr. Athanas?
A. Yes, it does.

Q. Were there tasers present throughout this?
A. Yes, there was.
Q. Were they used on Mr. Athanas?
A. Yes.
Q. Do you know if these marks on his forehead had anything to do with the tasers?
A. I do not.
MR. DAVIS: One minute please, Your Honor?
THE COURT: You may.
Q. The threats that Mr. Beckman was making on Mr. Athanas while he was secured, do you recall any conversation about once you're shrink wrapped in the plastic, that he was going to be cut up and mailed in different directions?
A. No, just that he was going to be shipped to California.
Q. In whole?
A. Correct.
Q. Okay. Did you hear Mr. Beckman make any reference to angels during this chaotic experience in your basement?
A. Yes, I did, the Hell's Angels.
Q. He was referring to the Hell's Angels, an outlaw motorcycle gang?
A. Correct, yes.

Q. Did Mr. Beckman have any affiliations with the Angels that you are aware of?
A. Not that I'm aware of.
Q. Was he making representations that the Angels were involved in this somehow?
A. He was making representation that, you know, we are real gangsters, you don't fuck with us, you know, we're Hell's Angels.
MR. DAVIS: I don't have anything further. Thank you, Judge.

CROSS-EXAMINATION

BY MR. NOBLE:
Q. Mr. Laubinger, how long have you been in custody now?
A. Fourteen months.
Q. So, you've had the opportunity to see what long-term jail is?
A. Yes, I have.
Q. At some point you and your attorney met with the federal prosecutors in this case?
A. Yes.
Q. That was within the last two weeks?
A. Yeah, we had met within the last two weeks.
Q. And you entered into an agreement with the Government that if you came in and testified that you may

get a reduction in your sentence, right?
A. If I gave the full truth, yes.
Q. All right. And did they tell you what you potentially could be sentenced to?
A. Yes, they did.
Q. And they told you that if you came in and you told what they believed to be the truth and help their case that you could get a reduction in that sentence?
A. No, I had to come in and tell the whole truth and nothing but.
Q. The full truth and nothing but the truth?
A. Correct.
Q. And they also told you that the people that would be making that decision about whether they thought it was truthful, was the people you were talking to, right?
A. Yes, their evidence.
Q. And their intention was to find out and have you testify against Todd Beckman, right?
A. Correct.
Q. And so then you made the determination that you would speak to the Government and tell them a story or tell them things that would then help your case?
A. Yes, the truth.
Q. Okay. You keep saying that. Has anybody told you that you need to keep saying the truth over and over

again?
A. No.
Q. You are just doing that on your own?
A. Yes.
Q. So when you first met Mr. Beckman was that relationship surrounding the sale of marijuana?
A. Not at first. It was a business venture.
Q. What was that business?
A. It was a gym investment.
Q. With regard to Ellis Athanas, III, that's the victim in this case, right?
A. Correct.
Q. You had been friends with him for some time; is that right?
A. Yes, I was.
Q. And you were in the marijuana business prior to meeting with and then joining up with Mr. Beckman, correct?
A. Correct.
Q. Mr. Athanas, III, was in the marijuana business, right?
A. Yes, he was.
Q. Did you know whether or not back before this incident, did Mr. Athanas have a job?
A. No, he did not.

Q. He was able -- making money though, right?
A. Yes, he was.
Q. He was in the business of being a drug dealer, right?
A. Correct.
Q. Okay, and you were in the business of being a drug dealer, right?
A. Correct.
Q. Did you have a job back then?
A. No, not at the time.
Q. And when you and Mr. Athanas back then had been hooked up in terms of being mutually agreeable in terms of helping each other and sharing sources and things of that nature in terms of the marijuana trade, right?
A. Yes.
Q. I believe you testified earlier that you and Mr. Athanas had broken into other people's homes, committed burglaries in order to steal monies and drugs, right?
A. Not homes, but in a little lot we had set up a scenario where he was going to take the marijuana into a truck, and I would block the road with another vehicle so they couldn't chase after him.
Q. So, you were going to pull a ripoff on some other drug dealers?
A. Correct.

Q. So Mr. Athanas was going to pull up, retrieve the drugs, and without paying for it just take off and then you would be in a position of using your vehicle then to block the potentially pursuing drug dealers?
A. Correct.
Q. Mr. Beckman had no connection with this whatsoever, did he?
A. No, he did not.
Q. You and Mr. Athanas were not in business with Mr. Beckman when this incident occurred, right?
A. I was.
Q. Now, had you discussed this plot with Mr. Beckman?
A. No.
Q. And now Mr. Davis with the U.S. Attorneys office asked you specifically about what are the ways you knew that it was Athanas, III, that broke into your house, you said that's because you two had broken into people's houses and stole money and drugs before and you said, yes; do you remember that?
A. I don't remember saying breaking into houses, but, yes, I remember the conversation we had.
Q. I'm talking about just today, he asked you that you knew he broke into your house, you suspected that he was the one that broke into your house because you two had broken into other drug dealers' homes and stole money and

drugs, and you said, yes; do you remember that?
A. Yes.
Q. So when you answered that question was that truthful?
A. Yes, it was.
Q. So then what I just asked you, you and Mr. Athanas, III, had broken into other drug dealers' homes and stole money and drugs that you had testified to earlier, right?
A. Right, it wasn't homes.
Q. How many different drug dealers had you and Ellis Athanas, III, broken into?
A. Two.
Q. Two homes, right?
A. Two vehicle situations, the same as the first.
Q. All right. So, you all kind of had this kind of planned, and what you would do, that you would set up drug deals with the intention of ripping off the drug dealer and one of you would then block them with the car or prevent them from being able to give chase?
A. Correct.
Q. At any point in time was that retaliated against? Did any of those people come after you guys?
A. No.
Q. So at least the drug dealers that you all had ripped off, did you know those people prior?

A. I didn't know any of them.
Q. Did you know whether or not Athanas knew them?
A. Yes, he said he did.
Q. All right. So, Mr. Athanas was in the business of robbing drug dealers?
A. Correct.
Q. Those drug dealers who then would be stolen from apparently were afraid enough of Athanas, III, that they never attempted to retaliate. They just said part of doing business, they stole our stuff, right?
A. Yes.
Q. Did Mr. Athanas have a reputation in the drug world of being someone that you don't want to mess with and that if he steals from you, you don't retaliate?
A. You could say that.
Q. So Mr. Athanas, III, the victim in this case, was a pretty notorious drug dealer, right?
A. Yes, he was.
Q. And a pretty notorious drug dealer from the sense that even within the drug world you just don't mess with him, right?
A. You could say that.
Q. And so now on this particular occasion you were apparently obtaining marijuana from Mr. Beckman and then he wasn't selling to anyone, he was just providing it to you

and then you would be the person selling it, right?
A. Correct.
Q. So Mr. Beckman was kind of the middle man between the person who would provide you the marijuana, right?
A. Yes.
Q. And so Mr. Beckman said he knew a source of somebody in California who could ship marijuana, he would then take receipt of it, but then he would just provide it to you to then go and sell within your network -- I'm sorry. So, Mr. Beckman would take receipt of it, it would be shipped to him, he had the means to be able to accept it and then he would provide it to you, and then you would then distribute that marijuana through your network, correct?
A. Correct.
Q. And you were the only person at that time that Mr. Beckman was being a middle man to, you were getting all the marijuana to sell, right?
A. At that time, yes.
Q. And so then you then had people that work for you that were distributors, that you would provide, break it up and have them then sell it out for you, correct?
A. Correct.
Q. Then they would bring that money back to you. Would you front it?
A. Yes, I would.

Q. You know what I mean by that?
A. Yes, I do.
Q. So then what they would do is they would bring you back the money and then you would pay Mr. Beckman for the marijuana, and he would then send it on back to the people in California, correct?
A. Yes.
Q. All right. And in terms of the bulk of the money, Mr. Beckman would tell you what the people in California wanted for it, correct?
A. Correct.
Q. Then he would tell you what you need to sell it for in order for you to make a profit, correct?
A. For us to make a profit, yes.
Q. He would tell you this is what the people in California are charging for it, that's what you're going to need to pay it back, right?
A. Correct.
Q. You don't know how much or if any Mr. Beckman took a cut out of that before it went back to California, do you?
A. Four hundred dollars is what we agreed upon, we would get it for $2,000 and we would split it and I would try to sell it for $2800 or 3,000.
Q. So Mr. Beckman would make $400 off that and then you

would be able to sell it for whatever you chose to sell it to for the drug dealers around, and if you wanted to make more money you could charge more money, right?
A. Yeah, I could have.
Q. It was up to you, right?
A. Yes, it was.
Q. Okay. Now let me back up. Now, on this occasion you're saying that -- were you ever afraid of any of those other people that you had ripped off or did you feel as though because of your protection from Athanas, III, that you were safe?
A. They didn't know who I was. I was in a vehicle, so they never seen me, so I felt pretty safe.
Q. You felt pretty safe. Okay. And so then when you obtained -- Mr. Beckman receives a shipment of marijuana from California, he contacts you, now would you pay him the $400 up front or would you wait until you sold it?
A. I would have to wait until I sold it.
Q. Okay. And then you picked up that marijuana at that time, and you had stored it at your house, and you had some cash and marijuana at your house, right?
A. Correct.
Q. At that point you were kind of like your own little distributor, it's up to you to decide who you are going to sell it to and how much you are going to charge and how

much you will make on it, right?
A. Correct.
Q. That would then determine your profit, right?
A. Yes, it would.
Q. And so as far as Mr. Beckman was concerned, if the money is stolen and he's not getting paid, for him he is out $400 as you testified to, right?
A. Yeah, that's his profit that he would be out.
Q. On this -- but you would be out, if we're talking fifty pounds you could be out thousands of dollars, right?
A. Hundreds of thousands.
Q. Hundreds of thousands of dollars you would be out?
A. Yeah, because it falls to me.
Q. Right. Okay. So in this particular shipment that was taken by Mr. Ellis Athanas, III, the victim in this case, that money that was lost or at least that was owed back to California was approximately $75,000, wasn't it?
A. A little bit more than that, but.
Q. Okay. And you were able to make good on that, weren't you? You borrowed that money from Caleb and provided that to Mr. Beckman, right?
A. Correct.
Q. That money was then sent back to California as far as you know, right?

A. As far as I know.
Q. And so the only thing Mr. Beckman was out was 400. The people in California were satisfied they got their money and Mr. Beckman apparently -- well, did he get the 400 or did you just provide the money to send back to California?
A. I just provided whatever I could to try to ease the tension.
Q. Pay back those people so that Mr. Beckman, as being the middle man, could make sure those people got paid, right?
A. Correct.
Q. Now, you're now potentially out as you just said hundreds of thousands of dollars, Mr. Beckman is out $400 and the people back in California are made whole, correct?
A. In a way. I mean he is out just as much as I am because that's what I owed him, so whatever he owes them is what I owe him and vice versa.
Q. But you paid that back, and they were able to send that chunk of money back to California, right?
A. Yes.
Q. And you borrowed that from your brother Caleb?
A. Correct.
Q. What did Caleb do for work at that time?

A. He was doing the same thing I was doing.
Q. Caleb was a drug dealer as well, right?
A. Correct.
Q. Had enough money when you went to him and said Athanas stole my supply, right now I'm short, and I have to pay these people in California, he was able to hand you $75,000 in cash, right?
A. Yeah, but it was everything he had and I had to pay Mr. Beckman.
Q. Everything he had. How old was Caleb at that time?
A. Twenty-seven.
Q. A 27 year old unemployed kid, he was able to put his hands on $75,000 in cash, right?
A. Correct.
Q. So you and Caleb were making a pretty decent living working as drug dealers, right?
A. Yes.
Q. This wasn't something that you were being threatened to do, right?
A. No.
Q. You were doing this because you were making lots of money, right?
A. Correct.
Q. And so then once that money, once the drugs and

money in this particular case were stolen from your residence, you immediately know it's Ellis Athanas, III, correct?
A. Correct, Ellis Athanas.
Q. Now Ellis Athanas, III, right?
A. Correct.
Q. Do you call the police at that time?
A. I did.
Q. You reported -- what police department did you call?
A. Pacific Police Department.
Q. You called the Pacific Police Department and said, hey, somebody just stole my marijuana and my drug proceeds for that marijuana?
A. Absolutely not.
Q. All right. So then that's what was stolen, right?
A. That's what was stolen.
Q. Apparently there were some other items stolen too, weren't there?
A. There was.
Q. Okay. Guns?
A. There was.
Q. So, when you called the police what were you reporting was stolen if not the drugs and the money?
A. Money, a safe that was missing, and everything else,

and there's damages.
Q. So you called the Pacific Police Department and said my safe is missing and it had a bunch of money in it, right?
A. It had money in it, yes.
Q. Did you tell the police how much money was in it?
A. I don't recall.
Q. Did they ever ask you where did you get this money from?
A. No, they did not.
Q. Did they take a written statement from you?
A. Yes, they did.
Q. Did the police indicate to you -- did you tell them that you believed it was Mr. Athanas, III?
A. Yes, I did.
Q. Did you tell the police that he was a drug dealer and that he rips off people?
A. I did not.
Q. Did they ask you how you knew it was him?
A. They did. I just said it was an assumption and I thought that he would be the only one who would do that.
Q. You certainly didn't tell him that because the two of you had a business of ripping off drug dealers and now he turned on you?
A. Right.

Q. So you left that part out?
A. Definitely, I did.
Q. And so then the first time -- how long after you discover the safe is missing, the cash is missing, the drugs are missing, that you contact your brother and say, hey, we have to go get Mr. Athanas, III? Immediately? That day?
A. Pretty much immediately, yeah.
Q. So you called Caleb and you say we need to go get this guy, he's got our money and drugs?
A. No, I called him and told him my suspicions that it was him.
Q. You all went looking for him, didn't you?
A. I did the first day.
Q. What's the point you first saw him in Steak 'n Shake?
A. That was a couple weeks after.
Q. So you didn't find him on that first day?
A. No, I didn't find him until we really started to get involved with everybody.
Q. And when you started hearing that all of a sudden Athanas is flushed with cash, marijuana, and couple new cars, right?
A. Correct.
Q. He went out and bought apparently a BMW and a

Mercedes with your money?
A. Yeah, with the money that was stolen.
Q. So then you intensified your search, if you will?
A. Yes.
Q. And again, this is you and Caleb, and you two are out looking for Mr. Athanas, III, because you want your money and your drugs back, right?
A. We were all looking. Beckman was looking as well.
Q. Did Mr. Beckman ever say to you -- did he ever have any interaction with Mr. Athanas prior to when you guys were finally able to capture him? He never had any interactions or encounters with him like you guys did, right?
A. Not until at my house.
Q. Okay. Now, let's back up. At one point you saw Mr. Athanas, III, he saw you and kind of a high speed chase ensued, right?
A. Yes at Steak 'n Shake.
Q. So when he saw you, he knew you were looking for him?
A. Correct.
Q. He was scared of you, wasn't he?
A. Yeah.
Q. And so we now have the notorious drug dealer that everybody else is afraid of, who is now afraid of you and

your brother, right?
A. Correct.
Q. So would that also make you a pretty notorious drug dealer as well?
A. You could say that.
Q. And so then at that point, you give chase and he goes the wrong way up Highway 44, doesn't he?
A. Correct.
Q. As you guys were chasing him?
A. Correct.
Q. Luckily nobody was killed though in this high-speed chase, right?
A. Right.
Q. Mr. Beckman was not there at that time, was he?
A. No, he was not present.
Q. And so then you all decide you can't catch him, so you and your brother decide to go and break into his home and wait for him, correct?
A. Correct.
Q. You were there at first to try and break in to see if he had anything to steal back?
A. When we first got there we did look for the marijuana and the money.
Q. Had you found the marijuana and cash, you would have just taken that and left, right?

A. Yes.
Q. And so there would have been no kidnapping, there wouldn't have been any abduction, anything, you would have been made whole, right?
A. Yes, I would have been able to pay back everything.
Q. Right and that's what you were looking to do, you were looking to become whole again, right?
A. I was looking to -- yeah.
Q. To get paid back, right?
A. Yes.
Q. So then while you guys wait there in the dark, at some point then Mr. Athanas comes home and you all jump out, right?
A. Correct.
Q. And Mr. Athanas fights back though, doesn't he?
A. Yes, he does.
Q. At one point Caleb has to punch him in the face, right?
A. I did.
Q. You punched him in the face?
A. Correct.
Q. All right. Did you hit him pretty hard?
A. Yeah.
Q. Hard enough to give somebody a black eye?

A. Definitely.
Q. Hard enough to cut their face?
A. Probably did scratch his face, yes.
Q. Okay. You've seen the pictures in this case, right?
A. Yes.
Q. So the initial beating comes from you, right?
A. Yes.
Q. And so he at one point starts to try and hit back, right?
A. Yes.
Q. You continue to punch him, don't you?
A. Yeah, he was put unconscious.
Q. Well, he was unconscious. Was it Caleb or you that did that?
A. Caleb.
Q. So Caleb then -- as you are punching him in the face and he is focused fighting on you, Caleb gets behind him and puts him in a headlock and chokes him out, correct?
A. Correct.
Q. Chokes him to the point he becomes unconscious, right?
A. Correct.
Q. After you have just beat him in the face, right?
A. Correct.

Q. Okay. And would cause things like that physical altercation there -- was it in his kitchen?
A. Yes.
Q. All right. That would cause things like a black eye, right?
A. Yes.
Q. Cause things like a busted lip?
A. Yes.
Q. Okay. And so then very similar to -- do you have that picture up there with you?
A. Yes, I do.
Q. Take a look at that picture. Now, all the things that we've just described, injuries we've just described are what we see in that picture, isn't it?
A. Yes.
Q. Okay. And so it's fair to say that the Government's number 1 is a reflection of the same types of injuries that you've just testified that you performed --
THE COURT: You mean Exhibit 2?
MR. NOBLE: I'm sorry, Exhibit 2. Sorry, Judge. That Exhibit 2, the picture there would be the exact same types of injuries that you've just described that you would have meted out onto Mr. Athanas in that kitchen, right?
A. Yes.
Q. Okay. And so once you having choked him out, it's

just you and Caleb there in the kitchen, right?
A. Yes, it is.
Q. Mr. Beckman is not there, is he?
A. No.
Q. And you all then, you take it upon yourself to zip tie him up, carry him out of house and throw him in the back of a truck?
A. Yes.
Q. You don't take him to Mr. Beckman's house, do you?
A. No.
Q. You don't take him to the storage locker, do you?
A. No.
Q. You took him to your house?
A. Correct.
Q. At any point in time do you call the police, say, I've got the robber?
A. Only at Steak 'n Shake did I ever call the police. After that I never did.
Q. So when you started chasing him the wrong way on Highway 44, you called the police and you said he's running?
A. I called the police and said that Ellis is at Steak 'n Shake and trying to give them the hint to come pick him up.
Q. Were you ever concerned when you were contacting the

police at that time that Ellis Athanas would tell the police, hey, this is all about drugs and money?
A. I thought that would kind of be counter -- you know, I think it would kind of make him look just as bad, so I didn't think that he would.
Q. So, you were just relying on the fact that maybe they would charge him with a burglary for your guns and items and that he would leave out the part about what it was really about, the money and drugs, right?
A. Correct.
Q. And was part of that because you thought he wouldn't dare tell on you and Caleb?
A. No, I just thought he wouldn't tell on himself either.
Q. He ultimately did though, didn't he?
A. He did.
Q. So, when you take him back to your basement, you take him back to your house and tie him up, chain him up in the basement, right?
A. Correct.
Q. And you put a piece of plastic down and told him he had to go to the bathroom on the plastic tarp in the basement, right?
A. I didn't tell him he had to, but he eventually did.

Q. You put a piece of plastic down for that purpose though, right?
A. Yes.
Q. Cause you didn't want to untie him to be able to let him use the bathroom, right?
A. We did once.
Q. You did once, but the purpose for the plastic was so that he could go to the bathroom, so if he went to the bathroom on himself, it wouldn't get all over your floor, right?
A. Yeah, blood stains or anything like that because his lip was bleeding and everything.
Q. Because he was bleeding at that point from your beating, right?
A. Yes.
Q. Okay. So then this occurs, the plastic and beating occurred before Mr. Beckman ever arrives, correct?
A. Correct.
Q. And so then when Mr. Beckman finally arrives, these injuries that we see here have already taken place?
A. Yes.
Q. But now you tell the story that Mr. Beckman and Mr. Roades then show up and that they start beating him as well, right?
A. They did.

Q. And they're hitting him or kicking him or what have you, right?
A. Yes.
Q. And with regard to the gun, you say that Todd Beckman pulled a gun out of a backpack?
A. Yes.
Q. What color was the backpack?
A. Orange.
Q. Where was it? In a main pocket, side pocket?
A. I don't recall which pocket he pulled it out of.
Q. How long had Mr. Beckman been there before a gun was pulled out?
A. Maybe like five or ten minutes. He shaved his head was the first thing he did when he got there.
Q. The first thing he did was shave his head?
A. Yes.
Q. This taser that you talk about, that was your taser right?
A. Yes, it was a flashlight taser.
Q. And so then Mr. Beckman never shot Mr. Athanas, did he?
A. No.
Q. Never discharged the weapon?
A. No.
Q. You guys were trying to scare this notorious drug

dealer into giving the money and the marijuana back for you?
A. For us.
Q. So, you participated in the screaming, yelling, we want our money, you better figure out a way to get it, right?
A. Yeah, I made comments.
Q. And so at no point in time did you ever say, hey, we've got to stop this, we need to call the police, this has gotten out of hand, that never occurs?
A. Not to call the police, but I did make reference that we should probably just let this thing go, and just, you know, part our ways with it because it was getting very out of hand.
Q. I understand that's what you said earlier on the stand. And so your position is, look, I got to a point where I'm thinking this is ridiculous, I want out, this is no longer my plan even though I'm the one that chased this guy for weeks and then finally captured him, you decided about half way through you want out of this thing, right?
A. Yes.
Q. You are not the one pushing it, right?
A. No.
Q. You described on I think at least two different times today where you were alone with Mr. Athanas, III,

haven't you?
A. Yes.
Q. Did you ever decide to let him go, cut him loose?
A. Crossed my mind, but I never did.
Q. So you weren't trying to get out of it that bad or you could have, right?
A. I could have.
Q. And the choice to continue on was yours, right?
A. Right, out of fear.
Q. Out of fear. Okay. At this point in time you hadn't been threatened by anybody?
A. Not directly, more indirectly.
Q. Indirectly, well you had already paid back the money. They were made whole, they didn't care what happened. This money and drugs was your money and drugs at this point for profit, you testified to that, right?
A. Yes, it was my money.
Q. So, you are saying that the people who have already been paid back and made whole, that they are the ones driving this and that you, who are out the hundreds of thousands of dollars, you and your brother. Your brother we know is at least out 75,000 because he loaned it to you to pay back the people in California and you two now are just the ones that are kind of caught up in this thing and it's Mr. Roades and it's Mr. Beckman that are pushing this

along, even though they've been made whole and you and your poor brother are just now kind of going along, thinking we need to somehow get out of this, it's gone too far even though it's our drugs and money; is that kind of where we are right now?

MR. DAVIS: Object to the compound form of the question.

MR. NOBLE: I'll withdraw.

Q. When you take Mr. Athanas from your house and you then take him up to the storage locker, right?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. And you all are giving him hamburgers, things like that, right, power aids I guess you said, right?

A. Yes.

Q. Then you all negotiate, trying to negotiate with his parents so that you can get paid back your money, right?

A. So, that we can all get paid back money.

Q. So, you and Caleb get your money back. You were at the meeting with Mr. Beckman and Mr. Athanas, Jr., the dad; is that right?

A. I showed up briefly, but I didn't have a meeting with either one of them.

Q. All right.

A. I brought a document.
Q. You show up to the restaurant?
A. Yes.
Q. Mr. Beckman and Mr. Athanas, Jr., the father of the victim are sitting there actually drinking a beer together, aren't they?
A. Yes.
Q. And they are chatting?
A. From my understanding, yeah, they were there for a while.
Q. Did you find that to be odd?
A. Very.
Q. So the victim's father is actually meeting Mr. Beckman, sharing a beer, and discussing how to resolve this thing, right?
A. Correct.
Q. Do you know -- weren't you privy to the conversation where Mr. Beckman was explaining to Mr. Athanas that as a father he was trying to stop this thing, resolve this thing, because you and Caleb had chased this kid, finally caught him, took him to your basement, tied him up to a pole and wanted that money back and that he was trying to facilitate that, so this thing had a resolution at the end; is that not the conversation that took place while you were sitting there?

MR. DAVIS: Your Honor, I'm going to object. This is borderline contrary to the very facts this defendant pled guilty to.

THE COURT: I'll allow it.

BY MR. NOBLE:

Q. I'm not saying Mr. Beckman wasn't there, that he wasn't involved, that he wasn't the victim, I understand all of that. But they were having kind of an odd conversation in the restaurant, weren't they?

A. Yes.

Q. Do you remember Mr. Athanas, Jr., talking about his son and about how violent he was, the fact that he had punched him in the face just prior to that at some time?

A. Yeah, I recall that.

Q. So Mr. Athanas, Jr., the dad, was now explaining to the kidnappers, if you will, that his son was pretty violent and had just assaulted him several weeks prior, right?

A. Yes.

Q. He's -- at one point he called his son an asshole, didn't he?

A. I don't recall that.

Q. You don't recall that. Was the tenor and tone of Mr. Athanas, Jr., kind of talking about his son in kind of what a bad person he was, wasn't very sympathetic, was

he?
A. I was only there for a brief moment.
Q. Based on the time you were there, it was a little odd, wasn't it?
A. It was a little while there.
Q. It seemed to not appear as though it was a father who is talking to and negotiating with kidnappers, was it?
A. No.
Q. It wasn't like that?
A. No.
Q. And I suppose you know Mr. Athanas, Jr., never called the police, did he?
A. Not that I know of.
Q. He was meeting with you all, talking to you, right?
A. He was meeting with Beckman.
Q. He met with you as well? You were there?
A. Yeah.
Q. At some point he goes, when you find out that Mr. Athanas, III, used your money that he stole from your house to buy a Mercedes Benz and a BMW, correct?
A. Correct.
Q. And you all at that point were trying to negotiate to get Mr. Athanas, Jr., the dad of the victim, to get the cars signed over to you all, so that they could then be

sold to recoup the money, right?
A. Yeah.
Q. That's the reason why this power of attorney came into play, and the father, Mr. Athanas, Jr., the father of the victim, helped do that, didn't he?
A. He was.
Q. So he was agreeing to meet with you and he was trying to -- he actually at one point took the powers of attorney and went and had them notarized, didn't he?
A. Yes, he did.
Q. And then actually brought them back to you guys, didn't he?
A. Yeah, he brought them back.
Q. So, then it wasn't until -- and then they provided I believe it was $27,000 between Mr. Athanas' mother and father, provided $27,000 in cash. That's all they could come up with, right?
A. Yes.
Q. And they then decided that they would provide that to you all, right, to try and make you whole, right?
A. Yes.
Q. And so his mother actually drove up from Florida with some of the cash, didn't she, as far as you know?
A. As far as I know.
Q. As far as you know at no point in time did they ever

call the police, did they?
A. Not that I know of, no.
Q. Once they've paid this $27,000 in cash, you all dropped Mr. Athanas, III, off at the Gravois Bluff's parking lot, right?
A. Correct.
Q. Then his father takes him to the hospital; is that right?
A. That's my understanding.
Q. And it's about four days before he tells the story; is that right, initially he wouldn't tell, right?
A. Correct.
Q. He hung in there. All right. Now in terms of your statement to the Government, you indicated that Mr. Beckman had taken the two cars, one at TJ Max and then he sold the other one for parts; did you tell them that?
A. Yeah.
Q. Didn't the Government get the cars back?
A. Not that I know of.
Q. Not that I know of. As far as you know -- you guys never got the cars because they refused to provide the cars based on the power of attorney; isn't that right?
A. Mr. Beckman had the cars at one point, so I don't know.
Q. You saw the cars with Mr. Beckman at one point?

A. Yes.
Q. When was that?
A. A few days after, one was the BMW, was actually parked in his garage.
Q. And do you know whether the police recovered that from the garage?
A. I don't think they did.
Q. Were you present when they were able to get the cars?
A. When they were getting the cars? No.
Q. Weren't you present when they went and provided the powers of attorney to the dealerships and they were told no, Mr. Beckman and Mr. Athanas, Jr., the dad?
A. I wasn't there for that.
Q. Now, did you ever -- did Mr. Athanas, Jr. -- I'm sorry, Mr. Athanas, III, the victim, from your home did he steal guns from you?
A. Yes.
Q. Did he steal all of your guns?
A. No.
Q. So you still had some guns left; is that right?
A. That's right.
Q. Did you ever display a weapon in connection with this case?
A. No, I did not.

Q. So prior to Mr. Beckman arriving, you never pulled out a gun, you never pointed a gun at Mr. Athanas?
A. No, the only thing I ever had in my possession was flashlight taser.
Q. And you had tased Mr. Athanas; is that right?
A. Yes, I had.
Q. So the marks on his back would have come from the taser as far as you know, right?
A. Could have, yes.
Q. And any injuries to his hands from the zip ties, you are the one that zip tied him up, correct?
A. Yes.
Q. So all of the injuries that we see in Government's Exhibits 2, injuries to the hands and the tasing to the back those all came from you, correct?
A. Mr. Beckman did jump on top of the victim as well, so I don't know. The only exhibit I see is his face.
Q. But we have already established that the face comes from you, right?
A. Yes.
Q. The damage to being zip tied that's the cause of injuries to the hand, that came from you, not being jumped on, right?
A. You could say that, yes.
Q. And taser marks to the back, that would come from

your taser, not being jumped on the back, right?
A. Yes.
Q. When you say Mr. Beckman jumped on Mr. Athanas, was he still chained up, tied up to the pole where you had put him?
A. Yes, he was.
Q. All right. And so when you say Mr. Beckman jumped on him, like how high was Mr. Beckman's vertical leap to get up to the point where he's five feet eight, five nine I think, maybe he was able to get that high to jump on him or did he stand on a chair or something?
A. Ellis was sitting on the ground on his butt and Beckman had grabbed the top of the pole in my basement and used that as balance and jumped on top of Athanas.
Q. And where did he hit Mr. Athanas, when he jumped on him as you described?
A. On the back and shoulders and stuff like that.
Q. Back and shoulders, things like that. When was the first time you told that story to the Government?
A. Probably almost immediately after sitting down.
Q. So when you got arrested, immediately you told your story, right?
A. Yes, I started telling it.
Q. The day you were arrested?
A. Not the day of, it might have been a few days

after.
Q. Did you have conversations with the Government at that time about your participation in this case?
A. Yes, I did.
Q. And when you initially told the story, it's a little different than what you told us today; is that fair to say?
A. Yeah.
Q. You downplayed it a little bit?
A. Yeah, I did.
Q. You tried to minimize, if you will, your participation in this case, correct?
A. Yeah, I did.
Q. Trying to make yourself sound better than you really were in this case, right?
A. Yes.
Q. You denied some things that you had done that was not true; is that fair to say?
A. Yeah, at first.
Q. Okay. So, initially when you gave your statement to the police you lied to them, didn't you?
A. I held back.
Q. Well, you say I didn't lie, I held back. In other words, if they asked you did you do this, you said no, even though you had, right?

A. You could say that, yes.
Q. Then some would call that a lie, right?
A. Yes.
Q. So at least initially then when you speak with law enforcement, your initial statement, you do not give a complete and factual accounting of what happened, you minimize to protect yourself and in fact you lie, right?
A. Yes.
Q. Now, here we are today and you've been told within the last two weeks that if you come in and tell a story truthful, that you will get a reduction in your sentence potentially, right?
A. Potentially, yes.
Q. Now, when you told the original story, when you lied, you had not been promised anything at that point, had you?
A. No, I had not.
MR. NOBLE: I have no further questions.
THE COURT: Cross-examination -- I mean redirect, excuse me.
MR. DAVIS: Briefly, please.

REDIRECT EXAMINATION

BY MR. DAVIS:
Q. Mr. Laubinger, Mr. Noble just described a pretty sophisticated drug enterprise that you were involved in;

would you agree with that?
A. I would.
Q. If that drug enterprise, that marijuana being shipped in from California to 11 Champion was a company and not a drug trafficking organization, who would be the president of that company?
A. Mr. Beckman.
Q. Did Mr. Beckman know if that was a company that the notorious drug dealer, Ellis Athanas, III, was an employee of his company?
A. No.
Q. He didn't realize that he was receiving marijuana and distributing it as well?
A. Not at first.
Q. Did he later?
A. Yes.
Q. Did he have any objection to hanging out with that kind of character?
A. No, he did not.
Q. The shipments that came in, did you see anything other than marijuana?
A. There was cocaine in one of them.
Q. Mr. Noble correctly pointed out that I asked you had other homes been burglarized. If I misspoke, let me ask it again. Did you ever burglarize a home?

A. No, I did not.
Q. They were the cars that you talked about?
A. Correct.
Q. The picture of Government's Exhibit 2 that's in front of you, did you agree that you're entirely responsible for all those injuries and that Mr. Beckman didn't contribute anything at all to it?
A. I don't agree to all of it, no, but most of those injuries could have been caused from what I had done.
Q. And Mr. Beckman saw Mr. Athanas in this condition; is that true?
A. Yes, he did.
Q. On day one, day two, or day three, did Mr. Beckman, observing him like that, ever offer him any mercy?
A. No.
Q. Cut the zip ties off?
A. No.
Q. To loosen them?
A. No.
Q. Was Ellis Athanas begging them to be loosened?
A. Yes.
Q. The idea of abducting this victim to get the stolen material back, whose idea was it?
A. It was supposed to be a citizen's arrest and that's what we had come up with. Mr. Beckman told me we could

just citizen arrest him and take him to the police department and this would all be cleared up.
Q. Who mentioned the term "citizen's arrest" first?
A. Beckman.
Q. And what was the plan that he came up with for a citizen's arrest?
A. Since my house had been burglarized and I filled out a police report, I was under the assumption and I could citizen's arrest him and take him to the police department and they would book him in I guess for that.
Q. When you and Caleb were waiting, lying in wait in Ellis' house for him to come home, is that what you thought you were doing at that point was a citizen's arrest?
A. Yes.
Q. You called Mr. Beckman once you had the victim in the truck, correct?
A. Correct.
Q. Did he mention citizen's arrest at that point?
A. Not anymore.
Q. Or calling police?
A. He had mentioned it at one time, but then he said we should just get back everything.
Q. Get back everything?
A. Yeah, everything that was stolen.
Q. And regarding that abduction and the meeting with

Mr. Athanas, Jr. and Mr. Beckman, did you hear Mr. Beckman tell a parent on that cell phone that if they want to see their son alive again, they needed to bring this money to him?

A. Yes.

Q. Did in fact Mr. Beckman receive that money from that gentleman?

A. Yes, he did.

Q. Under the threat of his own son's death?

A. Correct.

Q. And finally what I want to talk to you about is the profit that is derived from this drug trafficking organization. Mr. Noble characterizes it as you receiving hundreds of thousands of dollars?

MR. NOBLE: I object. That was his testimony.

THE COURT: Overruled.

BY MR. DAVIS:

Q. Mr. Beckman receiving $400?

A. Correct, that's what he said.

Q. Is that how it worked?

A. Actually kind of the opposite. I get $400 and the rest of the money goes to him to pay off the debt that he owes as well.

Q. Explain to me how it works so that we are all on the same page.

A. We got the marijuana for approximately $2,000.
Q. We?
A. It was delivered to Mr. Beckman's business and it would cost us, he said $2,000. I would sell it.
Q. Per pound?
A. Per pound. I would sell it for about $2,800 and we would split whatever I could make off of it.
Q. So Mr. Beckman would have owed the source of supply $2,000 per pound?
A. Correct.
Q. You sold it for 2800, that leaves $800 in surplus, correct?
A. Correct.
Q. Did you and Mr. Beckman split that profit?
A. Yes, always.
Q. So you got 400 and he got 400?
A. Correct.
Q. And he never got his hands dirty distributing it out on the streets?
A. No, he didn't.
Q. So, when that money went missing, a source of supply in California was owed a whole lot of money for a shipment that came in on a semitruck?
A. Correct.
Q. I don't have anything further. Thank you.

THE COURT: Anything further?
MR. NOBLE: Just briefly.

RECROSS-EXAMINATION

BY MR. NOBLE:
Q. When you say you suffered $2800 a pound, that was up to you to determine how much to sell it for though, right, you were the one saying that price, right?
A. However much we could get for it and we would split it.
Q. And you've seen marijuana as high as sometimes when things are scarce on the streets, 3500 to 4000 a pound, right?
A. That's a little high, but yeah.
Q. You've seen it that high, haven't you?
A. Yeah, I've seen it that high.
Q. And so if Mr. Beckman told you it's $2,000 for that pound, he would take 400, if you were then able to sell it for 3500 you actually make $1100, right?
A. We would split it?
Q. Split it.
A. It was always fifty/fifty.
Q. Listen to what I asked you. You said Mr. Beckman got $400 per shipment?
A. That was on average, yeah.
Q. Why didn't you say that then? I asked you how much

he got and you said we paid him 400, we got to sell it for what we wanted to and we kept the profit, that's what you originally said, right?
A. We split it, yes.
Q. Now, I understand. So now it's different than what you testified to earlier, right?
A. We usually sell it for $2800, so 400 is right. We don't normally sell anything for 3800 or 4000.
Q. Now, Mr. Davis asked you if Mr. Athanas -- well, let me ask you, did you ever sell marijuana for more than $2800 a pound?
A. Yes.
Q. So then you would make more than 400, wouldn't you?
A. Yes.
Q. And then apparently Mr. Athanas if he was your end user, if you sold it to him, he was making even less profit apparently, right?
A. Correct.
Q. You would assume?
A. Yes.
Q. But you all are talking about, you're the one who said you were out hundreds of thousands of dollars, that's what you said, right?
A. I said we were out.

Q. Hundreds of thousands of dollars, right?
A. Correct.
Q. If based on the original testimony that you would make hundreds of thousands of dollars and Mr. Beckman was making $400 a pound, then, and Mr. Davis asked you, he's the president of the company, it would be a pretty unusual company when the president makes less than employees, wouldn't you agree?
A. I assumed that because it was stolen from my home.
Q. You what?
A. I took the debt because it was stolen from my home.
Q. You took the debt?
A. I lost it, so there was no more giving him the hundreds of thousands of dollars, it was I had to come up with it. The 400, that was gone.
Q. Because it was fronted to you?
A. It was fronted to me.
Q. And it was your business at that point and your responsibility, right?
A. It was my responsibility to get the money, yes.
Q. So now when Mr. Davis first stood up, he said to you that I asked about -- you said that you had broken into other people's homes and stole drugs and money with Mr. Athanas; do you remember that when he just stood up and

asked you that?
A. Yes, I do.
Q. And he said if he misspoke then he was wrong; did you hear him say that?
A. No.
Q. He just said that to you?
A. Yes.
Q. If I misspoke I was wrong, and then he asked you had you ever broken into anybody's home and then you changed your answer and said no; is that right?
A. That was never my answer that I had broke into homes. The only thing I ever done was block vehicles off.
Q. No, my point is originally when he asked, said you and Mr. Athanas, III, had broken into other drug dealers' homes and stole money and drugs, and you said, yes, and then I questioned you about it and you then denied it and then he just said that he's the one who inserted that and you agreed with him, then that was his fault and not yours; do you remember that?
A. Yes.
Q. And so, you would agree though that Mr. Davis was able to get you to admit to something that wasn't necessarily true?
MR. DAVIS: Object to that question.

MR. NOBLE: I'll rephrase -- I'll withdraw.

Q. This money, the $27,000, when that portion of that money was recovered, there was 5000 in Mr. Beckman's possession and you retained the other 22,000, correct?

MR. DAVIS: Object. Beyond the scope of redirect.

THE COURT: And it is.

MR. NOBLE: Nothing further.

MR. DAVIS: Nothing further.

THE COURT: May this witness be excused?

MR. DAVIS: Yes, Your Honor.

THE COURT: So, why don't we go ahead and take a very brief lunch break at this time. If we broke for -- until 12:15 would that give everybody the time that they need?

MR. DAVIS: Government, yes.

MR. NOBLE: Yes, Your Honor.

THE COURT: And how about you guys? I just want to remind you all, we've got things scheduled this afternoon as well. All right. So, let's take a break until 12:15 and then Mr. Davis, you may call your next witness.

(A LUNCH RECESS WAS TAKEN, AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD:)

THE COURT: Do we need to take up anything before

we call your next witness?

MR. DAVIS: Nothing on behalf of the Government, thank you.

THE COURT: You may call your next witness, please.

MR. DAVIS: Caleb Laubinger, please.

CALEB LAUBINGER,

HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. DAVIS:

Q. Mr. Laubinger, you are a codefendant in the matter that you are testifying about here today charged with kidnapping; is that correct?

A. Yes, it is.

Q. You have previously entered a plea of guilty to that offense to Count One?

A. Yes, I have.

Q. You are represented by an attorney who is here today named Patrick Kilgore; is that correct?

A. Yes, sir.

Q. Have you had time and have you discussed with Mr. Kilgore your coming here today to testify on behalf of the Government?

A. I have.

Q. In fact, is it true that through the counsel of Mr. Kilgore, the Government and you through counsel have reached an agreement whereby if you provide substantial assistance to the Government in this entire case, the Government will file a motion with the Court that will allow the Court to give you a lesser sentence than perhaps you might have received otherwise?
A. Yes.
Q. That's your understanding?
A. Yes.
Q. You and I have met to discuss the purpose of your testimony here today; is that true?
A. Yes.
Q. You are the brother of the other codefendant, Blake Laubinger; is that correct?
A. It is.
Q. I want to take you to November 21st of 2016, right before Thanksgiving, a year and a half ago or so. Did you have an occasion to be inside Ellis Athanas, III's house.
A. Yes.
Q. What was your purpose for being there?
A. To talk to him about what had happened in my brother's residence.
Q. Regarding a burglary?
A. Yes, sir.

Q. And in fact you and your brother ended up abducting him that night and taking him to your brother's house on Cypress; is that true?
A. Yes, it is.
Q. Did you see him secured with zip ties and then ultimately secured to a pole in your brother's basement?
A. Yes.
Q. Was Mr. Beckman involved in any of that at all?
A. Yes.
Q. When did Mr. Beckman first become involved on November the 21st?
A. As soon as we picked him up from his house and sent him to my brothers in Cypress.
Q. How did he know?
A. He was communicating with my brother over the telephone.
Q. Once you got to the house on Cypress, did Mr. Beckman arrive?
A. Yes, after about five minutes.
Q. About five minutes after you got there?
A. Yes, sir.
Q. Was he alone?
A. No, he was with Kerry Roades.
Q. Who is another codefendant in this case; is that true?

A. Yes, sir.
Q. Did you see Mr. Beckman in possession of anything when he got there?
A. He had a firearm and a few other items like zip ties and whatnot.
Q. Do you see him carrying it in anything when he got there?
A. A backpack.
Q. There's a monitor up there I believe. Can you see that and I want to show you what has previously been marked as Government's Exhibit No. 1; do you recognize that?
A. Yes.
Q. What does it appear to be?
A. A firearm.
Q. Is it similar to the one you saw in Mr. Beckman's possession that day?
A. Yes, it is.
Q. Can you describe for the Court what you saw Mr. Beckman do with that firearm with regards to the victim, Mr. Athanas?
A. Just hitting him, pushing the barrel into him, into his chest and head, and he was threatening his life and all of that.
Q. When you say threatening his life, do you recall exactly what he said?

A. He was just saying that you really messed up. He was just making it clear that if you didn't return what was his that he would shoot and kill you or something.
Q. Were there profanities being used?
A. Yeah.
Q. And you're in a courtroom now and do you feel uncomfortable with that?
A. Yeah.
Q. I want you to understand that we all understand that, okay? We're trying to get a picture of what happened that night. What is it Mr. Beckman said?
A. He was just saying, you know, just threatening his life basically, just threatening to kill him and said he better come up with that fucking money and just a bunch of slurs, and just saying he's going to wrap his body up and ship him to California.
Q. Did he say what he was going to wrap his body up in?
A. Plastic.
Q. The next day did you see any plastic that would be used for that kind of purpose?
A. Yes.
Q. Who brought that to the house?
A. Beckman.
Q. Do you know where he got it?

A. I don't recall.
Q. Do you know how he was going to wrap a body up in plastic?
A. He had a bunch of sheets and he had a heat gun.
Q. What's the purpose of the heat gun, did Mr. Beckman say?
A. I guess to wrap him up in it and I have no idea.
Q. And at any time did you see Mr. Beckman strike the victim with that heat gun?
A. Yes.
Q. Do you recall where on the victims's body he was struck?
A. His head and chest.
Q. Do you ever see Mr. Beckman strike the victim with his own hand?
A. Yes.
Q. Do you ever see him kick him?
A. Yes.
Q. If I described the scene as chaotic, would you agree with that?
A. Yes, sir.
Q. To be very brief and very specific, did you see Mr. Roades and Mr. Beckman physically strike Ellis Athanas several times?
A. I did.

Q. Did you see him strike him several times in the head with the handgun?
A. Yes.
Q. Did you ever see the gun -- do you know the term dry fired, what that means?
A. I do.
Q. Do you ever see Mr. Beckman dry fire the gun?
A. Yes, a couple of times.
Q. Describe for the Court what it is you saw, please?
A. He would just put the gun to his head and, you know, repeatedly pull the trigger.
Q. Was the gun loaded?
A. No.
Q. So, that's a dry fire, just firing on an empty chamber?
A. Yeah.
Q. Do you recall if Mr. Beckman was saying anything while that was occurring?
A. No, I don't remember.
Q. Is it true that several threats were made that Mr. Athanas would be killed if he didn't return the stolen money and the currency?
A. Yes.
Q. The plan to wrap Mr. Athanas in plastic and send him to California, do you know if Mr. Beckman announced that in

the presence of the victim, could he hear it?
A. Yes, he did.
MR. DAVIS: I don't have anything further. Thank you, Judge.
THE COURT: Cross-examination.
BY MR. NOBLE:
Q. Mr. Laubinger, how are you?
A. I'm okay.
Q. You've been locked up in this case since November; is that right?
A. That's right.
Q. You've got an opportunity now to spend a significant amount of time in jail?
A. Yes.
Q. And at some point the Government came to you and said that if you cooperate and tell them your story, that you may be able to get a reduction in your sentence, correct?
A. Yeah, but there's no guarantees.
Q. But based on what you tell them, right, and your cooperation, right? The Government told you that they would make an assessment as to whether or not they believed your cooperation and testimony was useful to them, right?
A. Correct.
Q. And that they would be the ones making the

determination as to whether or not your testimony was useful to them, and whether they would then file the motion, right?
A. Yes, sir.
Q. So you knew you needed to make sure that the Government was happy with your testimony in order to get that reduction, right?
A. I was just being honest.
Q. Is that a yes?
A. Yes.
Q. All right. And now taking you back around this time, what were you doing for work prior to the burglary of your brother's house?
A. I was working for my father.
Q. Working for your father, doing what?
A. Construction and maintaining a trailer park.
Q. Construction and maintaining a trailer park; is that right?
A. Yes, sir.
Q. So you had a real job, right?
A. And also doing some landscaping.
Q. Landscaping. All right. And so you weren't making money being a drug dealer back then?
A. No.
Q. No?

A. No.
Q. The Government advised you though that in order for your testimony to be useful to them, you needed to be honest, didn't they?
A. Yes.
Q. And they told you if you lied that would cause you problems, right?
A. Of course.
Q. I'm sorry?
A. Yes.
Q. And so your testimony today is that back at the time of this abduction, you had two jobs, legitimate jobs, one working for your father at the trailer park and one was doing some landscaping, right?
A. Correct.
Q. And that you were not in the business of selling drugs, correct?
A. Correct.
Q. How much did you make landscaping?
A. I don't quite remember, it's been a while.
Q. Approximately how much?
A. Maybe a thousand a month.
Q. A thousand a month. All right, and how much were you making working at the trailer park with your dad?
A. About the same.

Q. All right. When did you start the job at the trailer park?
A. Since I was a little kid.
Q. Since you were a little kid?
A. Yeah.
Q. Were you paying for your own bills and expenses and things like that?
A. Cell phone, and car, and whatnot, yeah.
Q. So were you kind of just getting by or were you able to bank a lot of money?
A. Basically just getting by.
Q. Basically just getting by. All right, and so you weren't flush with cash back around the time of this incident, fair to say?
A. No.
Q. No, that's not fair to say?
A. No.
Q. So you had lots of money back then?
A. I didn't have lots of money.
Q. That's what I'm asking you, did you have a substantial savings around the time your brother's house was burglarized?
A. Maybe like around 20,000.
Q. Okay. So, you had saved $20,000 by working in the trailer park and doing landscaping?

A. Yes.
Q. No more money than that?
A. No.
Q. Had you taken out any significant loans back then?
A. No.
Q. Had you borrowed any money from banks?
A. No.
Q. How was it you provided your brother with $75,000 shortly after this break-in?
A. I didn't.
Q. You didn't. So, if your brother testified that you gave him the $75,000 to pay off the marijuana that was stolen, that would be not correct; is that right?
A. That's right.
Q. If your brother testified that you and he were dealing marijuana and not working real jobs back then, that would be incorrect; is that right?
A. That's right.
Q. So did you file taxes while working at the trailer park?
A. I filed taxes before, but my parents kind of did it for me.
Q. Did you ever sign any tax forms after the burglary?
A. I can't remember.

Q. So, it's potentially no tax records of your legitimate work that you are now telling us about?
A. No, I can't remember.
Q. So did you ever sell marijuana back around the time of this break-in?
A. I did.
Q. And who were you selling marijuana to?
A. Friends.
Q. Just friends. All right. And what kind of a level dealer would you say you were in terms of amounts?
A. Very little.
Q. Very little. What would be very little?
A. One to two pounds a month.
Q. One to two pounds a month. That was a little dealer, is that what you just said?
A. Yes.
Q. And so how much were you paying for a pound?
A. Approximately 27.
Q. You were paying $2700 a pound. Who were you getting it from?
A. My brother.
Q. From your brother. Then you were turning around and reselling it?
A. For a little bit more, yeah.
Q. How much would you sell a pound for?

A. I would never sell a pound, I would just be like little stuff, but I'd come out to about even.
Q. You'd come out to about even. You wouldn't make any money?
A. Not really.
Q. The two of you were selling marijuana, taking the risk of being convicted of a felony, going to prison to break even?
A. Yeah.
Q. Did you loan your brother any money back shortly after this break in?
A. Yeah, I lent him like $5,000.
Q. You loaned him $5,000?
A. Yeah.
Q. So if your brother testified earlier that you gave him 75,000 that would be incorrect in your mind, right?
A. Yes.
Q. Now, when was it that you first learned that your brother's home was burglarized by Mr. Athanas?
A. I can't exactly remember.
Q. I'm sorry, you can't remember you were notified?
A. It was like five minutes after it happened maybe.
Q. Who called you?
A. My brother.
Q. What did he say to you?

A. He said his house had been robbed and he knew that Ellis did it basically.
Q. What else did he say?
A. That's about all I can remember.
Q. Did he ask you to come over?
A. No.
Q. And did he ever ask you to help him find him?
A. On certain occasions yes, the next day.
Q. The next day. All right. So have you -- so you knew your brother was in the marijuana business prior to the break-in by Mr. Athanas, correct?
A. Yes.
Q. And you earned -- you are selling one to two pounds of marijuana per month back at that time, right?
A. Roughly yes.
Q. Roughly. And then after the break-in were you still selling one to two pounds or did you increase or decrease the amounts?
A. No, I didn't have anything.
Q. When was the next time you sold marijuana after the break-in?
A. Never did.
Q. Never did?
A. No.
Q. And so when your brother called you the day after

the break-in did he ask you to come over and help him find Mr. Athanas?
A. Yes.
Q. Where were you when he called you?
A. I can't remember.
Q. Where did you meet your brother?
A. Probably his house.
Q. At his house. All right. So the day after the burglary you get a call from Blake, he says can you come over to the house, we need to go look for Mr. Athanas, right?
A. Sure, yes.
Q. And then where did you guys go to look for Mr. Athanas?
A. Some places he usually hangs outs.
Q. Such as?
A. His house, the gym, that's all I can remember.
Q. So that next day after the break-in you didn't come up with him, did you?
A. No.
Q. When was the next time you guys went to look for him?
A. I can't remember.
Q. You can't remember. Was it a day later, a week later, two weeks later?

A. I can't remember.
Q. Can't remember. Was it six months later?
A. It wasn't that long of a process. It was a process of two months or something.
Q. The total process from the break-in to the time you grab him?
A. Something like that, yes.
Q. So the next time that your brother contacts you and says let's go look for him, where do you go to look for him?
A. I can't remember besides those two places.
Q. At some point did you drive to Springfield, Missouri?
A. Yes, we did.
Q. How long after the break-in had you guys traveled to Springfield, Missouri?
A. I can't recall.
Q. You don't remember. All right. Who went to Springfield, Missouri?
A. Me and my brother and Zach.
Q. Zach Smith?
A. Yes, sir.
Q. You guys were looking for who?
A. Ellis.
Q. Ellis Athanas, III, right?

A. Yes.
Q. Did you take anything with you?
A. The zip ties and a car boot and --
THE COURT: And a what, I'm sorry.
A. A car boot.
MR. NOBLE: A car boot being so that you could toe a car if you needed to.
A. It would lock a tire in place so you couldn't drive it.
Q. So you couldn't drive it. Okay. Where did you get a tire boot?
A. Todd.
Q. Todd gave you that. All right. When was the first time you met with Todd Beckman?
A. Be at Champion, I guess in Fenton.
Q. What was the first time after the break-in that you met with Todd Beckman?
A. At Champion.
Q. I said when?
A. Couple of days before Ellis actually got picked up.
Q. A couple of days before Ellis actually got picked up. And was your brother at that meeting?
A. Yes.
Q. So, the two of you go to Champion Drive and you

actually meet face-to-face with Mr. Beckman?
A. Not really, I can just kind of see him in the background.
Q. Now, I believe your brother indicated he spoke to Mr. Beckman on the phone. Your memory is that you actually went to 11 Champion, right?
A. Right.
Q. This is back when you weren't dealing drugs, right?
A. Right.
Q. Okay. And that the two of you meet with Todd, or you just stayed back and your brother meets with Todd?
A. I stayed back and he meets with Todd.
Q. Do you know what they said?
A. Just discussing --
Q. No, no, I'm just asking do you know. Were you able to hear?
A. I didn't hear, no?
Q. You didn't hear. Okay. So you don't know what was said?
A. No.
Q. Did you also rent a truck to go down to Missouri State?
A. Yes, Todd provided my brother with a truck.
Q. With a truck. What make and model truck was it?

A. It was a blue Dodge.
Q. Blue Dodge. And when was that provided?
A. The day or day before we went to Springfield.
Q. The day before you went to Springfield?
A. Yeah.
Q. When did you go to Springfield?
A. I don't recall the exact day.
Q. You don't recall the exact day. And then you drive to Springfield in this blue truck -- let me ask you this: Were you with your brother when he picked the blue truck up from Todd?
A. No, we picked it up from the dealership.
Q. Picked it up from the dealership. All right. What dealership did you pick it up from?
A. I can't remember the rental place.
Q. Can't remember the rental place?
A. Yeah, it was my first time being there.
Q. Who signed the paperwork?
A. My brother.
Q. All right. Just so I'm clear, isn't it that you and your brother went to Enterprise Rental Car and your brother rented a car from Enterprise, right?
A. That sounds right.
Q. It wasn't that -- when I asked you how you got down there, you said in a truck that Todd provided; do you

remember just saying that?
A. Yes.
Q. Todd didn't provide that truck to you, did he? You went to the rental car agency and picked it up, correct?
A. Yeah, he --
Q. Your brother is the one that signed --
THE COURT: You need to let him finish.
MR. NOBLE: I'm sorry, Judge. I apologize, sir.
A. He had let -- Todd called ahead of time to provide the truck for my brother, and he went up there and signed the papers, yes.
Q. Okay. Were you on the phone when Todd Beckman called Enterprise Rent a Car?
A. No.
Q. Was your brother on the phone when Mr. Beckman called Enterprise Rental Car?
A. No.
Q. Were you present when Mr. Beckman allegedly called Enterprise Rental Car?
A. No, I wasn't.
Q. No. Did you talk to anybody at Enterprise Rental Car?
A. No.
Q. So, when you say things like Todd called ahead, you don't have any firsthand knowledge about any of that;

that's something that either you are making up or somebody told you, right?
A. That's what my brother told me, yes.
Q. Your brother told you. Okay. Have you not read his statement to the police?
A. No.
Q. No. Have you read his last statement a couple weeks ago to the police?
A. I have not.
Q. Have you read his statement from when he was first arrested by the police?
A. I have not.
Q. No. All right. Now, you indicated when you spoke to the police that you -- someone you didn't know, except a guy from a fraternity called your brother and said that the victim was at Missouri State College in Springfield, Missouri. Do you remember saying that to the police?
A. Yes, something my brother told me.
Q. Something your brother told you?
A. Yeah.
Q. And so it wasn't Todd Beckman that was calling you to tell you where the victim was, it was somebody in a fraternity with the victim, right?
A. Right.
Q. Now, you go on to say, stated that his brother Zach

Smith utilized a rental truck and went to Springfield; is that what you told them?
A. Yes.
Q. And that Carol Laubinger stated that they took a paper ball gun, a boot to put on the victim's vehicle and some zip ties to detain the victim; do you remember telling them that?
A. Yes.
Q. All right. And that Laubinger advised that they found the victim's vehicle at a hotel and kept watch on it for several hours; do you remember telling them that?
A. Yes.
Q. And that they never saw the victim, and you all eventually left and came back to St. Louis, correct?
A. Correct.
Q. And then you went back to Springfield the next day, correct?
A. Correct.
Q. And that Smith wasn't with you on that trip, but a new person was, correct?
A. Correct.
Q. Who was that new person, do you remember who you told them it was?
A. No, I didn't know the guy.
Q. You didn't know the guy. Wasn't Todd Beckman, was

it?
A. No.
Q. And you said the new guy was a person that sold marijuana with your brother, right?
A. I don't remember.
Q. Did you tell them that you traveled to Springfield but found out that once you got there, that the victim was back in St. Louis, so you immediately headed back to St. Louis; is that right?
A. Correct.
Q. You say that once back in St. Louis you continue to try to locate the victim and still didn't find him, right?
A. Correct.
Q. Did you not tell the law enforcement when you were giving this interview, the things you now tell us about Beckman giving you the boot, or Beckman providing the truck, or that Beckman had anything to do with this, you left that out, didn't you?
A. I mean, I thought it was in there.
Q. Not in there. Do you remember whether you told them any of that information when you were giving that accounting of going to Springfield, did you ever even mention Beckman's name?
A. Yes.

Q. You did?
A. Yes.
Q. It was the agents then that inadvertently left it out?
A. I guess so, yes.
Q. Guess so. All right. Then sometime after the trip to Springfield, you were told that he was at Steak 'n Shake, right?
A. Correct.
Q. Did Beckman tell you about that?
A. No, it was one of Ellis' friends.
Q. Did Beckman provide you the car in that case?
A. No.
Q. Did Beckman provide you the zip ties or the other items you took with you on that trip? You don't mention it to the police, do you?
A. No.
Q. No. And so now you go to Stake 'n Shake, you see Athanas and you all give chase, right?
A. Correct.
Q. He's going the wrong way up 44 and you are chasing him?
A. Yeah, my brother was.
Q. Your brother was. Where were you?
A. Couldn't keep up.

Q. Were you in a separate car?
A. Yes.
Q. All right. So, you both were in two separate cars, giving chase going after Athanas; is that right?
A. Yes.
Q. Did you ever participate in the drug rip offs with your brother back around that time?
A. No.
Q. Were you aware your brother was involved in drug rip offs back around that time?
A. No.
Q. How is it you came to know that it was Athanas that broke into your brother's house?
A. He was staying at my brother's house all week, kind of waiting for a shipment to come in.
Q. I'm sorry, did you say Athanas was living at your brother's house all week?
A. He was at his house all week before it happened.
Q. When did Athanas move into your brother's house?
A. He didn't move in. He was just staying there.
Q. When was it he started to stay there?
A. Randomly. I mean, I wasn't always there, so I kind of showed up time to time and seen him there.
Q. So Athanas actually lived there sometimes, stayed there?

A. Yeah, he spent the night some times.
Q. Spent the night some time. All right. Did he have the authority to be in the house at any time he wanted?
A. No.
Q. No. Okay. Do you know over what course of time period Mr. Athanas and Blake Laubinger lived together or spent the night together?
A. They never lived together, but he would occasionally spend the night there.
Q. Over what course of time? Did it go on for months, six months, a year?
A. It was pretty recent.
Q. Pretty recent.
A. Before everything happened.
Q. All right. And so then you never actually had a conversation with Mr. Beckman about the break-in, did you?
A. Not face-to-face, no.
Q. Not face-to-face. All right. And you and Mr. Beckman -- you weren't selling marijuana for Mr. Beckman, were you?
A. I was getting it from my brother.
Q. You were getting it from your brother. Right. You never met with Mr. Beckman, you did everything through your brother, right?

A. Correct.
Q. Most of your knowledge about what you think and what's going on or what you remember, comes from the story that your brother has told you, right?
A. Correct.
Q. Not so much your personal interaction or your personal experiences, but based on what Blake told you, right?
A. Correct.
Q. Now, it's my understanding that you also tell the police that, when you are telling your story to them a couple weeks ago, that it was Kerry Roades that gave your brother the handcuffs, possibly a taser and a pepper gun, right?
A. Correct.
Q. And how is it that you told the police that you believed it was Kerry Roades that gave Blake the taser?
A. I watched him.
Q. You watched him?
A. Yeah.
Q. So if your brother testified previously, in his previous statement that it was his taser, that would be inconsistent with your testimony today, right?
A. Yes.
Q. Had you ever seen your brother with a taser before

that?

A. No.

Q. And so your brother didn't even own a taser back then, that this is Roades and Beckman providing these items to you?

A. Yeah, they provided those and then I don't believe he had his own.

Q. You don't believe he had his own?

A. No.

THE COURT: I'm sorry. I don't know that it's clear who has just said what.

BY MR. NOBLE:

Q. So, it's your understanding that your brother did not have a taser back then, that it was Mr. Roades that provided the taser to you against the victim, that's what you told the police a couple weeks ago, right?

A. Correct.

THE COURT: But that's not the question you just asked him and I'm not sure what the record was with regard to the question. The question was did your brother have his own taser.

THE WITNESS: No.

THE COURT: Okay. Thank you.

BY MR. NOBLE:

Q. Now, the night -- did you participate in any of the

planning of the taking of Mr. Athanas?
A. I did not.
Q. You did not. All right. And so your position is you are just kind of along for the ride, right?
A. Basically.
Q. You're not really a drug dealer, right?
A. No.
Q. And that your brother calls and just kind of asks, can you help me grab Mr. Athanas, right?
A. Correct.
Q. And you didn't want to be part of that, right?
A. Not so much.
Q. Not so much. All right. And that you then watched Mr. Kerry Roades provide the handcuffs, the taser, and the zip ties to you and your brother; is that right, is that what you told the police?
A. Correct.
Q. And now when -- how was it you were notified the night of the kidnapping, how is it you were notified to meet up with your brother?
A. Just through cell phone contact with him.
Q. Talking on your cell phone, about what time did that occur?
A. I can't remember.
Q. Morning, afternoon, or night?

A. Afternoon.
Q. And what did he say?
A. Just said Ellis should be at his house.
Q. Okay.
A. Basically it.
Q. That was basically it. All right. Did he come pick you up or you did you go to his house, or did you meet at Mr. Athanas' house?
A. Met at Mr. Athanas' house.
Q. Where did you guys park?
A. Parked down the street at some store, can't remember.
Q. Kind of conceal your car, right?
A. Sure.
Q. When you arrived at Mr. Athanas' house, did you know you were there to kidnap him?
A. No.
Q. You did not?
A. No.
Q. What was your understanding of the reason for going to Mr. Athanas' house?
A. We were going to just basically talk to him and then do kind of a citizen's arrest.
Q. You were going to do a citizen's arrest. All right. And so that day had you talked to Mr. Beckman?

A. No, just my brother.
Q. Just your brother. All right. So your brother told you that you two were going to do a citizen's arrest on Mr. Athanas, correct?
A. Correct.
Q. Did he explain to you the reason for the citizen's arrest?
A. Just for the stealing from his house.
Q. I'm sorry?
A. Just the stealing and burglarizing of his house.
Q. All right. Did your brother tell you -- did Blake tell you what Mr. Athanas stole from his house?
A. Computers and a safe, and some money, and some of his drugs.
Q. All right. Did he tell how much drugs and what kind?
A. Not so much, no.
Q. So, he just said, we are going to conduct a citizen's arrest, meet me there. We're going to get him because he stole money, guns and drugs from me?
A. Yeah.
Q. And you thought you two were going to take him to the police?
A. That was originally, yes.
Q. And so was it that Blake told you that you were

going to grab him, do a citizen's arrest and then take him to the police department?
A. Yes.
Q. All right. And at any time did you say to him, hey, why don't we just call the police?
A. Crossed my mind, but it didn't come out.
Q. Didn't come out. All right. So you are going all along with this just reluctantly, right?
A. Yes.
Q. So then when you get to the house, Mr. Athanas' house, do you knock on the front door?
A. The back door was open.
Q. So, no you didn't knock on the front door, you went around to the back?
A. Right. He wasn't home.
Q. You didn't knock, you opened the door, right?
A. Right.
Q. Was the door locked?
A. No.
Q. Wasn't locked?
A. No.
Q. And so you don't knock, but you just walk in?
A. He's been friends with my brother for quite some time, so they kind of walk into each others' places every once in a while.

Q. This is because they are kind of friendly, right?
A. Yeah.
Q. Notwithstanding you are now calling this a citizen's arrest though, right?
A. Correct.
Q. And you thought you had permission to go into the house?
MR. DAVIS: Your Honor, I'm going to object to relevance and also it is generous beyond the scope of direct examination.
MR. NOBLE: I'll move on.
BY MR. NOBLE:
Q. Once you got inside the house, do you turn the lights on?
MR. DAVIS: Same objection.
A. I can't remember.
MR. NOBLE: I'm establishing now in terms of injuries, as to who caused the injuries and what happened when they get into the fight, is what I'm asking about.
BY MR. NOBLE:
Q. Did you turn the lights on?
A. I can't remember.
Q. When you get inside the house, what do you do?
A. We were just waiting for Ellis to get home.
Q. Waiting for Ellis to get home. How long did you

wait inside Ellis' home before he got home?
A. I can't remember exactly.
Q. Five minutes, an hour, two hours?
A. I can't remember.
Q. You can't remember any concept of time, how long you waited at Ellis Athanas' house prior for him to arrive; is that right?
MR. DAVIS: Objection to relevance.
MR. NOBLE: I'll move on. I'll withdraw.
BY MR. NOBLE:
Q. Once Ellis comes into the house, what happens?
A. Him and my brother start getting into a physical fight basically.
Q. Okay. Your brother -- who started the fight, do you remember?
A. I didn't see.
Q. You didn't see who started the fight?
A. No.
Q. What room were you all in?
A. The kitchen.
Q. Describe the kitchen?
A. I can't really recall.
Q. Pretty small, wasn't it?
A. I believe so.
Q. So you and your brother are there waiting in the

kitchen, uninvited for this person to come home to effect a citizen's arrest and a fight breaks out and you're not paying attention as to how that happens?
A. Not so much.
Q. Not so much. So then do you know who hits who first?
A. I didn't see.
Q. Didn't see. All right. Did you see your brother punch Mr. Athanas in the face?
A. Somewhat, I got a glimpse, you know, of his hands being thrown.
Q. Once your brother and -- Blake Laubinger and Mr. Athanas, III, start fighting in the kitchen, what do you do?
A. I immediately run over and put him in some kind of a choke hold and pull him back off my brother.
Q. So you grab Mr. Athanas from behind and you put him in a choke hold?
A. Yes.
Q. And you started choking him, correct?
A. Yes.
Q. And your brother is punching him?
A. No, he gets zip ties and while I'm holding him, and puts his hands together and whatnot.
Q. Does Mr. Athanas ever go unconscious?

A. No.
Q. No. And is there -- athanas, it appears though that he suffers any bruises or cuts on his face from your brother hitting him?
A. No, they didn't really fight too long.
Q. Didn't fight too long?
A. No, it was pretty fast.
Q. Pretty fast. So, it was so quick that not really an injury could have occurred on Mr. Athanas based on your brother's punches?
A. Correct.
Q. And you were choking. Did that cause him any injury whatsoever, do you know?
A. I don't believe so.
Q. You don't believe so. All right. And, so then what was the purpose of the zip tying him up?
A. So we didn't have to fight with each other and we could just talk.
Q. All right. So you zip tied up Mr. Athanas so that you three could just have a conversation?
A. Correct.
Q. And what were you going to converse about?
A. What had happened at his place.
Q. Did you have a conversation there?
A. They did. I can't really recall. He just made

phone calls afterwards.
Q. Who made phone calls?
A. My brother.
Q. Before the phone call, you said that you zip tied Mr. Athanas so you and your brother could talk to him. How long did you talk to him for?
A. A brief minute.
Q. Do you remember the conversation?
A. Basically just asking him where everything went and he said it was all gone.
Q. Okay. And so then you and your brother at some point take Mr. Athanas from his home, right?
A. After we get a call or my brother calls Todd and he wants to talk to him and so we then take him to my brother's house.
Q. So it wasn't that your brother called Todd the next day?
A. No, he called him right after that brief minute of the conversation.
Q. Called him that night?
A. Correct.
Q. While still in the kitchen?
A. Yes.
Q. Do you remember what your brother said?
A. He was just telling him that he didn't have any of

the stuff and he didn't know what to do at that point.
Q. So at this point you and your brother, Blake, are there to effect a citizen's arrest for Mr. Beckman and a brief struggle in order to get him into zip ties and you call Mr. Beckman and look for direction; is that your testimony?
A. Yes.
Q. You help your brother -- do you ever talk to Mr. Beckman on the phone?
A. No.
Q. And so you're following your brother's direction, right?
A. Correct.
Q. And when your brother -- what was the last time you've spoken to your brother?
A. Almost a year ago.
Q. Almost a year ago. So you and Blake have not spoken for almost twelve months?
A. Correct.
Q. Have you written each other letters?
A. No.
Q. And now when -- where is it that you take Mr. Ellis once you decided to leave?
A. We went straight to his house, my brother's house.
Q. Did you help your brother carry Mr. Athanas out of

the house while zip tied up and put him in the back of the truck?
A. I did.
Q. Who's driving?
A. My brother.
Q. Where are you?
A. I'm in the back seat with Ellis.
Q. I'm sorry?
A. I'm in the back seat.
Q. Anything unusual happen between Mr. Athanas' house and your brother Blake's house?
A. Nothing besides him jumping in the front seat and kicking my brother while we're on the highway.
Q. At one point you are in the back seat with him, and Mr. Athanas you say jumps into the front seat while zip tied, his hands and feet?
A. Yes.
Q. Okay. So, you are sitting in the back seat with him zip tied, hands and feet, how is it he jumped into the front of the truck?
A. I couldn't tell you.
Q. Couldn't tell us. All right. You said that he then started trying to kick your brother?
A. Yeah, he was kicking my brother repeatedly.
Q. What do you do?

A. I grab him and start pulling him back.
Q. Did you not indicate when you talked to the police that you punched him?
A. No, I never did.
Q. You never punched him?
A. No.
Q. Did your brother ever punch him?
A. No.
Q. Did it ever cause the truck to lose control?
A. No, we just kind of pulled off to the side of the road.
Q. Did you ever tell the police that Mr. Athanas when kicking your brother caused the truck to spin out, do a 360?
A. If it happened, I don't recall it.
Q. I'm sorry?
A. If it happened, I don't recall it.
Q. I'm asking did you ever tell the police that?
A. No.
Q. No. Now, once you get back to your brother's house you help him carry Mr. Athanas downstairs into the basement?
A. That's correct.
Q. At this point, do you call the police?
A. No.

Q. Do you try to notify anybody?
A. No.
Q. Do you ever try to back out of this situation?
A. A little bit, but not really.
Q. How is it that -- what was the little bit you did to try and back out at this point?
MR. DAVIS: Object to relevance. How does it have to do with the calculation of this man's guidelines?
MR. NOBLE: I'll withdraw.
Q. When you get him down to the basement, is he injured in any way when you first get him down to the basement?
A. No.
Q. No. All right. So when you and Blake Laubinger get Mr. Athanas downstairs and tie him to the pole, at this point initially there's no injuries, correct?
A. Correct.
Q. Did you ever see your brother punch Mr. Athanas?
A. No.
Q. No. Did you ever see your brother cause any physical injury to Mr. Athanas whatsoever?
A. No.
Q. No. All right. And had there been that kind of a fight that would cause injuries, you would have seen it, right?
A. I would think so.

Q. You would think so. All right. And so then once he's tied up in the basement, what do you do? Where do you go?
A. We are just waiting upstairs and then Todd walks in with Kerry.
Q. How long was it before Todd and Kerry arrive?
A. Roughly five minutes.
Q. Within five minutes. All right. And then do you go back down into the basement with them?
A. Yes.
Q. Yes. All right. When you get down to the basement does your brother ever tase Mr. Athanas?
A. Not that I've seen.
Q. Did you ever see your brother tase Mr. Athanas at any time?
A. No.
Q. No. Let me ask: The only two people you ever saw touch Mr. Athanas are Mr. Roades and Mr. Beckman, right?
A. Yeah, beginning to strike him.
Q. You never struck Mr. Athanas, right?
A. Never.
Q. And Blake never struck Mr. Athanas, did he?
A. Besides in his house?
Q. Besides in his house, but you said that was very brief with no real contact, right, no injuries, right?

A. Right.
Q. And so all these injuries to Mr. Athanas comes from Mr. Beckman and Mr. Roades; is that your testimony?
A. Correct.
Q. Do you ever attempt to stop anyone from assaulting Mr. Athanas?
A. No.
Q. No. How long are you in the basement that evening, when you first get Mr. Athanas to your brother's house?
A. I spent the night.
Q. You spent the night there?
A. Yeah.
Q. Spent the night. Did you stay downstairs?
A. I believe so.
Q. You believe so. So you were the one that stood guard, if you will, of Mr. Athanas overnight?
A. No, I was in the other room.
Q. Other room. Where was your brother that night once you went into the room?
A. He was outside the room, so I don't really recall where he was at.
Q. How about Mr. Beckman, did he stay the night or did he leave?
A. No, he left.
Q. He left. How long is Mr. Beckman and Mr. Roades

there in the basement?
A. I can't remember, it was a while.
Q. A while. What time did you get back to the house?
A. After what?
Q. After you picked up Mr. Athanas and brought him back to Blake's house, what time was it that you got back to Blake's house?
A. It was night sometime, I don't quite remember.
Q. And do you know what time Mr. Beckman and Mr. Roades arrived?
A. No, I don't know.
Q. Do you know what time Mr. Beckman and Mr. Roades left?
A. I do not.
Q. You don't know. The next morning is it -- who is at the house then while the victim, Mr. Athanas, is chained to the pole?
A. My brother and me and Todd.
Q. All right. So Todd -- so what time did Todd come back?
A. Sometime in the morning.
Q. When you went to bed was Todd Beckman there?
A. No.
Q. No. And what time did you get up the next morning?

A. When Todd walked in the door.
Q. What time was that?
A. I don't recall.
Q. You don't recall. And did Mr. Beckman have anyone with him?
A. Not that I seen.
Q. Okay. And had your -- this is the next morning, correct?
A. Correct.
Q. Up until Mr. Beckman arriving the second time, had anyone tased Mr. Athanas?
A. Not that I seen.
Q. Not that you saw. Had anyone punched Mr. Athanas in the face?
A. Yes.
Q. Who?
A. Todd.
Q. Okay. And can you describe for me, when Todd and Kerry came over the night before, did they have anything with them, any luggage?
A. He had a backpack, plastic and zip ties.
Q. Plastic and zip ties?
A. Yeah, a heat gun and a firearm.
Q. Heat gun and firearm. All right. So when you contacted -- let me just make sure I got the time right.

So you all take Mr. Athanas into custody, zip tie him and take him back to Blake's house, correct?

A. Correct.

Q. And within an hour Mr. Beckman is there and he's got, you said, plastic wrap, heat gun and zip ties, correct?

A. Correct.

Q. Now if the FBI, DEA indicate that the surveillance photos are some days later, that's inconsistent with your memory, your memory is that he had all those items within an hour of you getting back to the house, right, that's what you just testified to, right?

A. I can't remember.

Q. Well, that's what I'm asking. You just told us that when Mr. Beckman showed up within an hour of you all getting back to Blake's house, the initial night you grabbed Mr. Ellis, you said when he arrived he had a backpack, he had a heat gun, he had plastic wrap and zip ties; isn't that what you just said?

A. The heat gun was the next morning and the wrap.

Q. Right now I'm just asking if that's what you just testified to originally, that's what you just told us, right?

A. I can't remember.

Q. You can't remember. Now I understand you are saying

that the heat gun -- what came the next morning?
A. The plastic and the heat gun and zip ties.
Q. Plastic, heat gun and zip ties were there the next morning, right?
A. Right.
Q. Not some days later, right?
A. Right.
Q. And so what time in the morning was it that Mr. Beckman arrived now with the heat gun, the plastic wrap and the zip ties?
A. I can't remember the exact time in the morning.
Q. How big was the roll of plastic?
A. It was like this long, a good size roll.
Q. What did the heat gun look like?
A. It was yellow with a silver tip, about this big.
Q. And so did -- did you see Mr. Beckman with any other items that next morning when he arrived?
A. Yeah, those were just it.
Q. Just those items, right. So the second day after the kidnapping, the only items you see Mr. Beckman with when he's in contact with Mr. Athanas is the plastic, the heat gun and the zip ties and the backpack, correct?
A. And there was a gun too.
Q. And the gun. Could you describe the gun?
A. The picture that was shown.

Q. The one in the picture that you're looking at there. Now, when was the first time you saw that picture?
A. Just today.
Q. Just today. Nobody has ever shown it to you in any meetings previously?
A. I mean, I think I have it in my discovery, but I haven't looked at it.
Q. Were you ever asked to describe the gun?
A. Yes.
Q. Who asked you to describe it?
A. The officers, I guess.
Q. Did they have you write that down or did you just verbally tell them?
A. I verbally told them.
Q. Now did you ever see Mr. Beckman strike Mr. Athanas now the morning of -- the second morning after the kidnapping?
A. Yes.
Q. And how many times did you see Mr. Beckman strike him?
A. I don't recall.
Q. And again Caleb -- I'm sorry, Blake is not striking him, right?
A. No.
Q. You are not striking him, right?

A. No.
Q. So the only people that ever hit or touched Mr. Athanas is either Kerry Roades or Todd Beckman; is that correct?
A. Correct.
MR. NOBLE: Can I have one second, Your Honor?
THE COURT: Yes.
BY MR. NOBLE:
Q. Are you trying to minimize at all your involvement or your brother's involvement in this incident?
A. I don't believe so.
Q. You don't believe so. All right. I have no further questions.
THE COURT: Redirect.

REDIRECT EXAMINATION

BY MR. DAVIS:
Q. Did you ever tell me that you struck Mr. Athanas?
A. No.
Q. You indicated when Mr. Noble asked you that your memory of the marijuana deals and your brother's involvement with Mr. Beckman, and the phone calls and things like that are based upon what Blake told you?
A. Correct.
Q. The handgun that's on the monitor in front of you, the dry firing of that handgun into the victim's head, the

death threats, the heat gun strike to the head, the plan to wrap the victim in plastic and shrink wrap it and send him off; are those based upon what Blake told you or what you saw?

A. What I saw.

Q. Who did those things?

A. Todd.

MR. DAVIS: Nothing further.

THE COURT: May this witness be excused?

MR. DAVIS: On behalf of the Government, yes.

THE COURT: You may be excused, sir.

(WITNESS EXCUSED)

THE COURT: You may call your next witness.

MR. DAVIS: Ellis Athanas III, please. The agent has gone to retrieve him, Your Honor.

ELLIS ATHANAS, III,

HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. DAVIS:

Q. Ellis Athanas, III, are you familiar with a gentleman by the name of Blake Laubinger?

A. Yes, I am.

Q. How do you know Blake?

A. I met him at St. Louis Community College in Wildwood.
Q. How long ago was that?
A. Roughly three or four years ago.
Q. To make a very long, potentially very long story short, were you ever involved in marijuana dealings with Blake Laubinger?
A. Yes, I was.
Q. How did that begin?
A. It started with a few small transactions of purchases of marijuana between the two of us.
Q. Is that a situation where you have a source of supply and you are supplying it to Blake to sell or the reverse?
A. At first, yes. I was supplying Blake and then afterwards we had had a mutual supply, he began supplying.
Q. Do you know who his source of supply was once that changed?
A. Yes.
Q. Who?
A. Todd Beckman.
Q. How did you come to know that it was Todd Beckman that was Blake Laubinger's source of marijuana supply?
A. Blake told me.

Q. Did you ever meet Todd Beckman?
A. Yes, I did.
Q. Do you recall the first time?
A. Meeting Todd for the first time was at Blake's house. It was actually a meeting where I said, hi, my name is Ellis and he said, hi, my name is Todd.
Q. Otherwise had you seen him around town before?
A. I had seen him around town.
Q. But never had any communication with him?
A. No, never said a word to him.
Q. The time where you had communication with him where you said, hi, my name is Ellis, you said was at Blake's house. If this kidnapping incident that brings us here today was November 21st of 2016, how much prior to that was it that you met Mr. Beckman for the first time?
A. I think it was a very short time before.
Q. Close to the incident?
A. Close to the incident, yes.
Q. The occasion for that meeting at Blake's house, why were you there?
A. I was just there hanging out with Blake.
Q. Do did you do that frequently?
A. Yes.
Q. Spend the night there on occasion?
A. Yes.

Q. Did you live there?
A. I never lived there. I'm sure there's times where I stayed there a few nights in a row.
Q. Do you know why Mr. Beckman was there the day you met him at Blake's?
A. Yes.
Q. What did you see them do?
A. I saw them go into Blake's office and have a conversation. I wasn't there for that conversation, but I knew what it was going to be about.
Q. How do you know what it was going to be about?
A. Blake told me.
Q. Was it about the marijuana transactions?
A. It was. It was a negotiation of price.
Q. Is it true that around that time you learned that a shipment was going to come into the St. Louis area and Blake was going to be storing it at his house?
A. That is correct.
Q. You took the opportunity at some point near there to burglarize the house, steal the marijuana, take a safe, some money and some other items; isn't that true?
A. Yes, I did.
Q. That general idea of ripping off a drug dealer is something you've done before?
A. It is.

Q. In fact you've done it before with Blake, but not necessarily involving a house, more involving a drug dealer in a car making a transaction; is that true?
A. That is true.
Q. After you stole the marijuana and the money, what did you do with it?
A. Some of the marijuana I sold.
Q. So you generated a profit from that?
A. Uh-huh, yes.
Q. Pure profit in fact, right?
A. Yes.
Q. And did you stay in town?
A. No.
Q. Where did you go?
A. I went to Florida.
Q. Why did you decide to go to Florida after you burglarized Blake's house?
A. To get out of town.
Q. Did you know it was going to heat up on you pretty quickly?
A. Yes.
Q. Did you subsequently learn that Blake was in fact looking for you?
A. I did.
Q. How did you learn that?

A. Through friends.
Q. Did Blake ever contact you directly?
A. He may have. I had blocked his phone number. I don't know.
Q. Mr. Beckman never contacted you directly, did he?
A. No.
Q. There was an incident prior to the kidnapping where you were in Steak 'n Shake and Blake tried to have communications with you in the Steak 'n Shake; is that true?
A. It is.
Q. And you managed to escape out the back door?
A. I did.
Q. And a high-speed chase followed down the interstate, correct?
A. That is correct.
Q. And you were able to get away?
A. I was.
Q. Then on November 21st of 2016 you came home from an evening out; is that true?
A. Yes.
Q. And Blake and Caleb are inside your house and abduct you and take you to 410 Cypress; is that true?
A. That is true.
Q. Were you physically struck in that abduction?

A. I was.
Q. Was it a violent thing?
A. It was.
Q. Was there blood?
A. There was.
Q. You sustained injuries?
A. Yes.
Q. I want to show you what's on the monitor there as Government's Exhibit No. 2, is that a picture from the day you were released from the kidnappers?
A. It is.
Q. Taken at the hospital, correct?
A. Yes, sir.
Q. Can you discern which injuries in that picture occurred at Blake or CaleB's hands versus anyone else who struck you?
A. It would be difficult. There was just a multiple of --
Q. Beatings?
A. Beatings, yes.
Q. Once you got to 410 Cypress you are secured with zip ties to a pole in the basement; is that true?
A. It is.
Q. Did Mr. Beckman ever arrive at the residence?
A. He did.

Q. Do you recall, if you can, how much time elapsed between being secured to that pole and Mr. Beckman's arrival?
A. It was only 45 minutes.
Q. How were you secured at that time?
A. I was tied to a pole in the basement with zip ties, handcuffs, duck tape around my legs.
Q. And this is after receiving a beating at your house?
A. It is.
Q. When Mr. Beckman got there what happened?
A. Mr. Beckman and another man by the name of Kerry Roades came down the stairs and proceeded to choke me. Todd had a gun and he started hitting me over the top of the head with it.
Q. Can you look at that monitor again. This has been marked as Government's Exhibit 1. Does that look similar to the gun you saw that day or can you recall?
A. It does.
Q. Mr. Beckman brought this gun to the residence?
A. He did.
Q. Did Mr. Laubinger ever strike you with a gun?
A. I can't recall.
Q. Do you recall any other gun besides this one?
A. I believe there's more than one gun.

Q. Very well. Describe for the Court to the best of your memory what Mr. Beckman was saying when he got there and was striking you?
A. To the best of my memory he had told me that I had messed up.
Q. Let me ask you something. Is there vulgarities being used, profanity?
A. Yes, very much.
Q. We're in a court of law right now and that feels uncomfortable, doesn't it?
A. It does.
Q. We have got to let the Court know what actually happened. So, you are excused for right now for using that kind of language, okay?
A. Okay.
Q. What did Mr. Beckman say?
A. He said, you fucked up. You are going to die. You're going to be wrapped in plastic. We're going to shoot you so the blood doesn't get anywhere, then we're going to shrink wrap you and ship you to California cause these guys are coming for us.
Q. Do you remember reference to angels at all?
A. Yes, throughout the course of the beatings, Todd referred to himself as a Hell's Angel or having company with the Hell's Angels and that it was an organization that

he worked for and that's who I was messing with.
Q. The conversation about the shrink wrap, would you agree that that didn't happen until the next day, if we're going in chronological order?
A. It was made prevalent very -- in the beginning there was talk of shooting me on the plastic wrap that was laid out underneath the pole immediately.
Q. Did Mr. Roades participate in those conversations at all?
A. He did.
Q. What was he adding to the mix?
A. He had suggested that they shoot me, chop me up and send me to California in pieces.
Q. Mr. Beckman weigh in on that idea?
A. He did. He said, no, that's not my style, man. Let's just shoot him and ship him off.
Q. When Mr. Beckman was talking about his style, do you remember him saying to the effect he hasn't done anything like this in a while?
A. Yes.
Q. What did he say?
A. He kept referencing I can't believe you're making me do this. I'm a nice guy. I haven't had to do this since the '80s.
Q. Do you have any idea what "that" this is that he was

referring to?
A. I mean --
Q. Personal knowledge of it?
A. Personal knowledge, no.
Q. Did Mr. Beckman ever strike you with his handgun?
A. Yes.
Q. Describe for the Court what he was doing?
A. He was smacking me with the gun, I guess to intimidate and hurt me.
Q. Do you recall him dry firing the gun at any point?
A. Yes, multiple times through the course of the kidnapping.
Q. Where is the barrel of the gun when he is pulling the trigger on an empty chamber?
A. It's on my temple.
Q. Is he saying anything to you?
A. He says, you're going to die, this is where you're going to die. It was a lot.
Q. What's your physical state of mind at that point?
A. I was convinced I was going to die.
Q. So that's the evening of Monday, November 21st. Do Kerry Roades, Todd Beckman, and the brothers Laubinger stay there all night?
A. No.
Q. What happened?

A. Todd, Kerry and Caleb took off to retrieve two vehicles.
Q. Your vehicles?
A. Yes, my father's and my vehicle. So, they devise a plan to go retrieve the vehicles and hide them. And they went back to my house to get other personal items, and eventually Caleb came back that night and spent the night with Blake.
Q. So for the duration of that evening it was Caleb and Blake at the house?
A. Yes.
Q. Did Mr. Beckman come back the next morning?
A. He did.
Q. Do you recall if he was alone or not?
A. He came back alone at first.
Q. Then what happened?
A. Then Kerry Roades showed up later.
Q. When Mr. Beckman first showed up that morning did he have anything with him?
A. He did. He had shrink wrap and a heat gun.
Q. Did he indicate what these things were going to be used for?
A. Yes, he indicated that I was going to be wrapped in the plastic I was sitting on, and they were going to use the heat gun to shrink wrap my body.

Q. Do you remember at any point Mr. Beckman being bit by a dog in the house?
A. I do.
Q. Do you know what it was that got the dog so agitated?
A. Yes. He was hitting me with the gun and kicking me and Blake's dog, Louie, he jumped up and bit Mr. Beckman in the face.
Q. Is it because of what the dog was observing he became that agitated?
A. I'm sure.
Q. Did you know the dog?
A. Yes.
Q. Did you know it to be aggressive?
A. No.
Q. Tasers, did you see any tasers?
A. Yes.
Q. Do you recall how many?
A. I believe just one.
Q. Do you know what a flashlight taser is?
A. Yes, it was a flashlight taser that was used.
Q. Do you have any idea who owned it?
A. I believe it was Blake's.
Q. Were you tased by Mr. Beckman?
A. At times, yes.

Q. Were you tased by Mr. Roades?
A. I can't recall.
Q. What about the Laubingers?
A. Absolutely.
Q. When you were secured to the pole it was with zip ties, correct?
A. Yes.
Q. Were they uncomfortable?
A. Absolutely.
Q. How so?
A. To the point where my hands were turning purple. I couldn't feel them.
Q. Did you ask anyone present in the house for relief, please just loosen these cuffs?
A. Yes.
Q. What was the response?
A. No.
Q. They were never loosened?
A. No. At one point they were moved from the top of my hand to the back or moved behind me at one point.
Q. Did it loosen the restraint on the wrist at all?
A. No, in fact it was tightened.
Q. Hair clippers, do you recall that?
A. I do.
Q. Describe for the Court what happened concerning that

and Mr. Beckman?
A. After Todd and Kerry got down there, down to the basement --
Q. The first night?
A. The first night. I'm a little foggy. I believe it was the first night, but he brought a pair of clippers and shaved my head. My hair used to be 26 inches long.
Q. So it was way down the middle of your back?
A. It was.
Q. A significant feature about Ellis Athanas, III, you had long hair?
A. Yes.
Q. Did Mr. Beckman say anything about that? I mean, what's the idea of shaving your head?
A. He said he was going to take the hair and ship it back to California as proof that they had caught me and done something to me.
Q. Did the Laubingers participate in that at all?
A. They were present.
Q. But who physically shaved your head?
A. Todd Beckman.
Q. Were you restrained at all other than being tied to the pole, but I mean were you able to move your head?
A. I was held by Kerry Roades with Todd Beckman. At one point Kerry was choking me during the ordeal.

Q. The next day when Mr. Beckman showed up, he had plastic wrap, a heat gun and zip ties; is that your memory?
A. Yes.
Q. And announced that this is the plastic you were going to be shrunk up in and shipped off?
A. He did.
Q. Were you allowed to make a phone call to your parents?
A. There was a phone call made to my parents where I was on the phone. It was my father.
Q. How did that go, what was the purpose of that call?
A. To have money collected and --
Q. Ransom?
A. Ransom, yes.
Q. Did you also get to talk to your mother?
A. I did.
Q. During the time that the line was open to your mom or your father, were you ever struck or assaulted in any way?
A. I was.
Q. Do you know what the purpose of that was during those phone calls?
A. It was to let my parents know or to show them that

they had me and that they needed to pay up.
Q. Why didn't you say, oh, my God I'm at 410 Cypress, call the police?
A. They told me that if I said anything --
Q. Can I stop you. "They," can you use names?
A. Todd Beckman and Kerry Roades, Blake, they all said if you say where you are or tell them who we are we're going to kill you right now.
Q. That's the morning of day two, would you agree, that you make the phone call to your folks?
A. Yes.
Q. And they agree that they are going to assist whatever way necessary to secure your ransom; is that true?
A. It is.
Q. The end -- well throughout day two is Mr. Beckman present the entire time?
A. No. After multiple phone calls and he had hung out for a while, he eventually left.
Q. Did he ever explain to you what came from those phone calls, what the next plan was going to be?
A. The next plan was to have me transferred to a metal container in the middle of the woods.
Q. Did that occur the second night of your confinement?

A. It did.
Q. How did you get to this metal container in the woods?
A. Caleb and Blake took me from the pole, upstairs, and loaded me into a Dodge pickup truck, a blue Dodge pickup truck.
Q. Were you able to see at that point?
A. I was.
Q. You got loaded into the truck and drove away I assume?
A. Yes.
Q. Do you know where you went?
A. We got onto Interstate 44 and started heading towards St. Louis city. And then right at about Six Flags they had me drape a blanket over my head, so that I couldn't see where we were going. And after we drove for a little while we pulled up in a parking lot, I assume. We pulled in somewhere and stopped and then Todd Beckman got inside the vehicle.
Q. Did you hear him speaking?
A. Yes.
Q. What did he say?
A. He got in, he had a pistol in his hand and reached back and hit me over the head with it, and he said, now we're taking you to where you're going to die.

Q. Where did you go after you pulled out of the parking lot?
A. There's a short drive for a little while, and then we ended up on what seemed to be some sort of a dirt road or a gravel road, and eventually we had stopped and they got -- Todd and Blake got out of the car while Caleb helped me. They opened up the door and I was bound at the legs, my feet were zip tied together and I was handcuffed also.
Q. Were you able to step?
A. No.
Q. So were you literally being carried?
A. Being carried, you know, one guy on my right harm and one guy on left arm and I was hopping along.
Q. Were you ever able to see where you are?
A. Yes. After I got out of the vehicle, the blanket that was over my head had fallen off and I could see a big metal storage container, looked like the back of a semi truck.
Q. Could you see houses or anything?
A. I could see lights in the distance and what I thought to maybe be roofs.
Q. I realize it's a year and a half later and you're sitting in sort of a sterile environment of a courtroom, but describe to me, when you see that metal container and Mr. Beckman has told you we're taking you where you are

going to die, what did you feel?
A. I was terrified. It was the scariest thing that's ever happened to me in my life. I really thought I was going to die. I didn't think I was going to make it home to see my mom or my dad or anything.
Q. It's a couple days -- it's a day before Thanksgiving; is that true?
A. Yes.
Q. Do you remember what the weather was like?
A. I remember when I was in that storage container it was pouring down rain.
Q. Was it air tight?
A. No, it wasn't air tight.
Q. Did Mr. Beckman assist in securing you to the inside of that storage shed?
A. He did.
Q. Describe to the Court what happened. How were you secured?
A. After we showed up and he opened the container, he said this is the place you are going to die, there was a blanket draped down on the floor and there were steel cables draped from one side to the other, and I had been laid down.
Q. Did it appear to you at that point that somebody must have known you were coming to this place because there

were prearrangements that had been made?
A. Yes. In fact I can recall Todd stating that Kerry Roades had been over there earlier setting it up.
Q. Okay. So when you get there, there's a blanket on the ground inside this storage shed that looks like the back of an eighteen wheeler; is that roughly what it looks like? Is that what you said?
A. Yes.
Q. There are steel cables attached to the walls?
A. There were.
Q. How were you secured to the other end of the steel cables?
A. I was zip tied. My feet were zip tied to the cables and the handcuffs were moved around, so there were cables at both elbows.
Q. Is there enough slack in the cable that you can stand up?
A. No.
Q. Are you able to sit down and/or lay down?
A. I was laying down. I wasn't able to sit up.
Q. Were you struck during this process as well, physically assaulted?
A. I was.
Q. At this point, if we are into day three, do you have swelling, bruising injuries from day one and two?

A. I do.
Q. And you're being struck on top of those existing injuries?
A. That's correct.
Q. What's the degree of pain?
A. Worse pain I have ever felt -- I mean, being scared was the worse, but the physical stuff was terrible.
Q. Did you spend the night in that storage shed?
A. I did.
Q. Did you have any source of light while you were there?
A. There was a small hole in the top of the storage container.
Q. But you don't have a flashlight or your cell phone and there was certainly no light inside the storage container; is that true?
A. Yes.
Q. How were you dressed?
A. I was in khakis and a long sleeve shirt.
Q. I'm assuming it was cold?
A. It was.
Q. Uncomfortable?
A. Yes.
Q. What happened the next day, did you see anyone again?

A. Yes, I saw Blake.
Q. What did Blake do?
A. He had come by.
Q. On his own?
A. On his own at one point.
Q. Do you know why he came by on his own after all this?
A. He came by to tell me that my parents had come through with ransom money.
Q. Did he give you anything?
A. He gave me a hamburger.
Q. Did you see Mr. Beckman again?
A. Later once the sun went down, yes.
Q. Once the sun went down. So now you've spent the night at this shed, you're there all day and now the sun is going down again on day three; is that right?
A. Correct.
Q. What happens when he comes back at the end of day three?
A. Todd Beckman came in, he said I've got to be the luckiest guy in the world because my dad came through, and he came over and he had a handgun, and hit me with it a few more times, kicked me, jammed the barrel of the gun in my head and said, I should still kill you, I should just shoot you right now, and at one point, something I'll never

forget what he said, this is the holy grail of Angels.
Q. Do you have any idea what that means?
A. I have no idea.
Q. But he had previously been referring to angels in reference to Hell's Angels; is that true?
A. It is.
Q. Were you released?
A. I was.
Q. How did you leave from the shed and get moved somewhere else?
A. After the ordeal, they let me up and stopped me to sign some piece of paperwork.
Q. Who made you sign a piece of paperwork?
A. Todd.
Q. Do you know what the paperwork was that you were signing?
A. I believe it was a power of attorney.
Q. To do what, do you know?
A. They mentioned some scheme to get my car transferred to a new title.
Q. You signed it?
A. I did.
Q. Then what happened?
A. And then they loaded me into the back of a Tan Co vehicle.

Q. Who is the "they"?
A. Todd Beckman and Blake Laubinger.
Q. Just those two?
A. Yes.
Q. Do you know Mr. Beckman to be associated with the Tan Co organization?
A. I do.
Q. Did you at that time?
A. No, I knew him to be associated with Xist Fitness.
Q. But you don't have any doubt that the van you were loaded into was a Tan Co company van?
A. None whatsoever.
Q. How do you know that?
A. I saw the label on the side of it.
Q. Where did you go in the van?
A. In the back.
Q. Where did the van go?
A. The van went to a loading dock. At first I didn't know where I was, but once I was able to walk around I could see it was Gravois Bluffs.
Q. Was your face covered during that trip?
A. I don't believe it was.
Q. When you got to the loading dock, did Mr. Beckman give you any instruction, tell you what was going to happen, what you were supposed to do?

A. Said if I went to the police or told anybody about this or if he ever saw me again, that he was going to kill me and he threatened my family.
Q. And then what happened?
A. Blake came around and gave me my cell phone and said that my dad was nearby and to call him.
Q. Did you do that?
A. I did.
Q. Your father came and picked you up?
A. He did.
Q. You ultimately ended up that evening or day at a hospital; is that correct?
A. Yes.
Q. I want to show you Exhibit 2, have I shown you that already?
A. Yes.
Q. I mean today?
A. Isn't that what --
Q. Are these the injuries that resulted from the incident we've just talked about?
A. They are.
Q. Taken at the hospital shortly after you were released?
A. That is correct.
Q. Government's Exhibit 3, is that a different view of

you the same day, same time?
A. It is.
Q. I realize these aren't the most flattering pictures but is Exhibit 4 the same thing?
A. It is.
Q. Injuries sustained to your back from that incident in Exhibit 5?
A. Yes.
Q. Do you recall exactly what it was that happened to your back?
A. Over the course of being held captive, I must have been shocked 50 times with a taser.
Q. Six, is this you holding up your left arm?
A. It is.
Q. And that's your wrist that appears to be a contusion in the middle of the photograph; is that true?
A. It is.
Q. What is that from?
A. From handcuffs that were tightened around my wrists.
Q. When you say handcuffs, zip ties?
A. Handcuffs, zip ties.
Q. Both?
A. Both.
Q. Exhibit 7, that's your forearm as well?

A. It is.

Q. Are those injuries sustained the same way?

A. Yes, sir.

Q. Exhibit 8, is that the top, slash, back of your head?

A. It is.

Q. Do you know how you sustained the injury on the top of your head there, the red mark in the center?

A. It's a gun mark.

Q. You were struck with a gun?

A. I was.

Q. Finally No. 9, that's your feet correct, your ankle anyway?

A. It is.

Q. And the contusions, the abrasions right above your ankle, how are those caused?

A. With zip ties and duct tape. I do believe at one point there were handcuffs draped around my ankles.

Q. You were handcuffed at the ankles as well?

A. Uh-huh.

Q. Any of the injuries depicted in Exhibits 2 through 9, preexisting before any of this happened?

A. No, sir.

Q. You obviously saw a doctor because you are at a hospital, have you received medical attention since then?

A. I have.
Q. Is it ongoing?
A. It is.
Q. What have your doctor or doctors told you is physically wrong with you as a result of this assault?
MR. NOBLE: I object. Hearsay. No foundation as to this witness talking about injuries.
THE COURT: I will sustain the hearsay objection, but you can -- and this is a sentencing, the rules of evidence don't apply. If you want to ask about his understanding is, I will allow it.
MR. DAVIS: Very well. I'm going to rephrase the question.
Q. Do you have any ongoing physical ailments from this?
A. Yes, I do.
Q. What is your understanding of what you have that you still dealing with?
A. I have a torn labrum and I have some pretty serious nerve damage in my hands and feet.
Q. What physically do you feel in your hands and feet to this day?
A. It's a numbness.
Q. Is it constant?
A. It is. I feel it right now.

Q. Does it fluctuate day to day, hour to hour, or is it always the same constant thing?
A. It's pretty constant. There's fluctuation in the cold and in heat.
Q. The torn labrum that you talk about, where is that on your body?
A. My left shoulder.
Q. Do you feel pain from that injury that you understand you have?
A. I do.
Q. Is it constant?
A. It flares up.
Q. Do you have an understanding of how that could be remedied, if it can at all?
A. There's surgery, the option of surgery.
Q. You've been provided the option of surgery and obviously haven't under gone that yet?
A. That is correct.
Q. What is your understanding of the recovery of that following a surgery to repair a torn labrum?
A. It's roughly a minimum of six months.
Q. Do you have any understanding whether there's a remedy to the nerve damage in your hands and feet?
A. There's no remedy.
Q. Other than medical conditions, are there any other

conditions medically, physically?
A. Physically?
Q. As opposed to psychologically that I'm going to ask about next.
A. Those are the main issues.
Q. Okay. Do you have any long lasting psychological issues resulting from this trauma?
A. I've been diagnosed with PTSD from the event.
Q. Post Traumatic Stress?
A. Yes.
Q. Physically how does that manifest, how do you feel?
A. A lot of depression. I guess a large social anxiety. I haven't been out to the public very much.
Q. Has it affected your sleep at all?
A. Yes, I've had a lot of insomnia. I can recall immediately after the event walking around at 3:00 in the morning because I just didn't feel safe being at home.
Q. For fear of what?
A. Fear of retaliation that maybe someone would kill me or try to abduct me from my home again.
Q. So, almost a year and a half later, does any of that still exist?
A. There's a hypervigilance that is ongoing, so, yes.
Q. Have you sought psychological treatment for those

feelings?
A. I have.
Q. How frequently have you received that treatment?
A. I'm seeing a psychologist once a week right now, sometimes two times a week.
Q. Has it been constant since you were released?
A. It has.
Q. The same psychologist?
A. I've had a therapist, who I saw in the beginning and a psychologist.
Q. How are those treatments being paid?
A. Right now through my father and my parents.
Q. Are you employed?
A. Not at the moment.
Q. Do you recall filling out a victim impact statement in this case?
A. Yes, I do.
Q. And in it was a section regarding your financial losses; do you recall that?
A. Yes.
Q. And you provided in that form expenses for medical expenses and lost wages and things of that nature; is that true?
A. Yes.
Q. Do you recall the amount of that?

A. I don't know. I don't recall.
Q. But you included it in that form?
A. That is correct.
Q. Do you have any ongoing financial problems because of this incident as we sit here today?
A. I do.
Q. What are those?
A. I mean ongoing, the payments to the psychologist. I don't really know how I'm going to pay for surgery.
Q. You have no means like health insurance to pay for that surgery on the torn labrum?
A. I do have health insurance, but there are other costs, out of pocket.
MR. DAVIS: I don't have anything further. Thank you.
THE COURT: Cross-examination.

CROSS-EXAMINATION

MR. NOBLE: Thank you, Judge
THE COURT: I will tell you at some point, if you are still examining in about 20 minutes, we're going to take a break?
BY MR. NOBLE:
Q. All right. Good afternoon Mr. Athanas. How are you?

A. I've been better.
Q. All right. Taking you back -- it's my understanding when you filled out your financial form for restitution, you indicated lost wages; is that right?
A. It is.
Q. Back in 2016, the month of November, did you have a job?
A. I worked with my father from time to time, yes.
Q. And so what was it that your father was doing back November 21st, 2016?
A. Rehabilitating homes.
Q. Rehabbing homes?
A. Yes.
Q. And did you receive a paycheck in November 2016 from your father's corporation?
A. I'm sorry?
Q. Did you receive a paycheck from your father's corporation in the month of November 2016?
A. No, sir.
Q. Did you receive a paycheck from your father's corporation in the month of October 2016?
A. No, sir.
Q. Month of September 2016?
A. No, sir.
Q. August of 2016?

A. No, sir.
Q. July 2016?
A. My father doesn't have a corporation.
Q. Did you receive a paycheck from your father during the months prior to November 21st 2016?
A. A payroll paycheck?
Q. Like a paycheck?
A. What type of paycheck?
Q. How were you paid?
A. I was paid in cash.
Q. So didn't matter what kind of a check, the answer was no check; you received cash, right?
A. Yes, no check, so I received cash, correct.
Q. And were you getting paid per hour?
A. Roughly 10 to 20 dollars an hour.
Q. Which is it? Was your father paying you $10 an hour or $20 an hour?
A. Just depends on what I was doing.
Q. What would you do that you got paid $10 an hour?
A. Gather materials, getting tools and such.
Q. And what would you do to get you $20 an hour?
A. Laying floors, painting, carpentry work.
Q. When was the last time you had worked for your father and been paid prior to November 21st 2016?
A. I don't have an exact date. I would say --

Q. The day before, the week before, the month before?
A. Within the month before.
Q. Within the month before. So, this wasn't steady income, something that you went in every day between nine to five, right?
A. No, sir.
Q. He would just occasionally use you to help out with his rehabbing?
A. Correct.
Q. All right. And no taxes were paid by your father on your behalf, right?
A. Not to my knowledge.
Q. You never paid any taxes on this income you were alleging receiving back in 2016, correct?
A. No.
Q. So you were making money working, but just not paying taxes on it, you were just getting cash?
A. I was getting cash, yes.
Q. How much money do you make between January 1st 2016 and November 21st 2016 working at your fathers company?
A. I don't have an exact figure.
Q. How about a guesstimate. More than $5,000, less than $5,000?
A. Maybe $5,000.
Q. Maybe $5,000. So for those 11, almost 11 and a half

months you made less than $5,000, total working for your father that year?
A. Yes.
Q. And did you have any other job during that year of 2016, between January 1st and November 21st 2016?
A. Yes.
Q. What was that job?
A. I was a camp counselor at Lifetime Fitness.
Q. When did you start at Lifetime Fitness?
A. In the summertime.
Q. Do you remember the month?
A. I believe it was May.
Q. And you started at Lifetime Fitness located where?
A. In Ellisville, Missouri.
Q. And when did you quit your employment there at Lifetime Fitness?
A. It was -- I didn't quit, it was just --
Q. A summer job?
A. Yeah, at the end of the summer.
Q. Do you remember when it ended?
A. The end of summer.
Q. But would it have been July, August, September?
A. I would say August probably.
Q. How much were you making at Lifetime Fitness working as a summer counselor?

A. That was $10 an hour.
Q. Ten dollars an hour. How many hours a week were you working?
A. It varied.
Q. What did it vary on -- in other words, how did you work? Five days one week and one day to the next? Was it your choice or theirs?
A. Their choice.
Q. Their choice. Okay. So, it depended on when they scheduled you, right?
A. Correct.
Q. Do you remember on average how many hours a week did you work?
A. I can't recall.
Q. How much did you say you made during the course of that summer job at Lifetime Fitness working the unknown amount of hours at $10 an hour, more than a thousand or less than a thousand?
A. Let's go with right around a thousand.
Q. Okay. Any other -- were taxes taken out in that case?
A. I do believe so.
Q. Okay. And you received an actual check there, right?
A. Yes.

Q. So any other legitimate job or source of income during the year 2016?
A. No, sir.
Q. And then you had a side business, correct?
A. What is that you are referring to?
Q. Selling marijuana.
A. That is correct.
Q. And let me ask you, how long had you known Blake Laubinger prior to November 21st, 2016?
A. Years prior.
Q. Years prior?
A. Yes.
Q. Approximately how many years had you known Blake prior to November 21st, 2016?
A. I can't give you an exact amount of years.
Q. Several years though?
A. Several years, yes.
Q. Had you and Blake been involved in ripping off drug dealers back prior to November 21st, 2016?
A. Seizing drug dealers' assets, yes.
Q. Did you say seizing drug dealers' assets, is that how you put that?
A. Yes.
Q. Did you ever steal -- when you would seize these drug dealers assets, did you turn them over to the

Government?
A. No.
Q. You kept it for yourself, right?
A. That is correct.
Q. In terms of when you seized these drug dealers assets did you seize their drugs on occasion?
A. That has happened on occasion, yes.
Q. And had you and Blake ever been in a position where you would tell drug dealers you were going to come with the money, they were going to bring drugs, that you would meet them, taking the drugs, and then drive off and Blake would try and cut them off so you could escape?
A. Yes.
Q. How many times had you hatched a plan to meet with drug dealers, obtain their drugs, and then flee the scene without paying for it?
A. More than once.
Q. Okay. How many times?
A. I don't know exactly.
Q. More than five?
A. I don't think it was more than five.
Q. You don't think it was more than five. And you were the one who had the contact with the drug dealers, and would set up the arrangement and the meet for the sale and purchase of those drugs, correct?

A. Correct.
Q. So, you were the person who had the connection with the drug dealers and would arrange to meet them to obtain the drugs and Blake would then just kind of be there to run them off the road if need be, if they chased you, right?
A. Yes.
Q. So you were in the business at least back around November 21st of 2016 of lying to drugs dealers, meeting them and then stealing their drugs, correct?
A. Yes.
Q. And you've done that to multiple people, correct?
A. Yes, more than one.
Q. You never got the same person twice, right, they didn't fall for it a second time, right?
A. No.
Q. So they were different drug dealers each time that you were able to rip off, correct?
A. Correct.
Q. So you knew at least then that you had multiple drug dealers that were looking for you, right, that you had ripped off?
A. I mean whether or not they were looking for me is completely up to them. I don't know.
Q. Did you know whether or not any of these people who had made arrangements to buy drugs from and then take the

drugs and leave at a high rate of speed, did you ever know whether or not any of them were looking for you?
A. No, not to my knowledge.
Q. Not to my knowledge. All right. And so you were able to steal the drugs, take off and you had no fear of any repercussions or the fact that any of these drug dealers were looking for you, correct?
A. I mean, was there any fear? Maybe.
Q. What were you afraid of?
A. Retaliation, like you said.
Q. Somebody may grab you, right?
A. Not necessarily grab me.
Q. Okay. Then do what? What were you in fear of back then?
A. Maybe being confronted in public.
Q. Confronted in public. In other words, they may come up to you in public and call you a bad name. What do you mean, confronted in public?
A. I guess that that would be an example.
Q. So your only fear after ripping off drug dealers and fleeing at a high rate of speed and having someone that would block them, was that they may call you a name in public, that was your only fear? That was the most of your fears from them in terms of retaliation?
A. In some cases.

Q. Were you ever afraid that they may beat you up, physically assault you?
A. I'm sure that could have happened.
Q. Were you also in fear that someone may harm you?
A. Perhaps.
Q. Were you also in fear that these drug dealers who you were ripping off, may harm your family?
A. No, I never thought about it that way.
Q. But you definitely did think about the fact that these drug dealers may harm you at some point and you were apprehensive and in fear about that, correct?
A. Correct.
Q. When was the first time you ever ripped off a drug dealer; was it in 2016 or would it have been in 2015?
A. I believe it was in 2016 with Blake.
Q. What was the date; do you remember how soon before you ripped off Blake?
A. I don't know the exact date.
Q. Was it close in time or months ahead?
A. I'd say months before.
Q. And at least -- so this apprehension and this fear that you had of being harmed by drug dealers started coming on, manifesting itself prior to ever having any contact with Mr. Beckman, fair to say, based on what you told us this morning?

A. Sure.
Q. Do you know -- have you ever paid any of those drug dealers back to this day?
A. No.
Q. So as far as you know they still may be looking for you in retaliation, right?
A. I don't know.
Q. Is it fair to say that some of this anxiety and fear and concern may also still come from the fact that there are other drug dealers out there potentially looking for you, right?
A. I don't know.
Q. All right. Now, were you also in the business, other than just stealing money and drugs, were you also in the business of selling marijuana for a profit?
A. At one point.
Q. At what point? When did you start? When did your career as a drug seller begin?
A. I was at a young age.
Q. All right. How old?
A. About sixteen.
Q. How old were you on the date of November 21st, 2016?
A. Twenty-three.
Q. So you had been a drug dealer for seven years prior

to November 21st, 2016, correct?
A. That is correct.
Q. All right. So you'd been in the drug game where you would meet with drug dealers, correct?
A. Correct.
Q. You'd buy drugs, right?
A. Correct.
Q. And then you would sell it for a profit, correct?
A. Yes.
Q. And so did you have any fear of apprehension while operating within the drug gang, being a drug courier and a drug seller, did that also cause you concern and stress and anxiety and fear while you were a drug dealer in that world?
A. Apprehension from law enforcement or --
Q. Well, right now I'm just talking about other drug dealers. I mean, you were aware at that time prior to November 21st, 2016, that people within the drug industry sometimes get harmed, right? They get beat up when they rip off drug dealers?
A. I believe in any industry people can be harmed.
Q. So you didn't think that being a drug dealer --
A. Especially if you're ripping them off.
Q. If you were a drug dealer ripping off drug dealers, right?

A. Right.
Q. You may have more of a heightened fear, anxiety, stress, depression in the area of being a drug dealer and dealing with other drug dealers, right?
A. That could be an opinion.
Q. Well, I'm asking is that your opinion?
A. I don't really know. I don't really have an opinion on the subject.
Q. So while you were a drug dealer you never felt any fear, apprehension, when you were stealing drugs from drug dealers, you never thought I have got anything to worry about here, this is perfectly fine, I'm safe?
A. Not necessarily.
Q. That's what I'm asking. So you didn't feel safe and secure those seven years you were in the drug business?
A. Not necessarily, there was a fear.
Q. Okay. All right. Now, how much marijuana were you selling back around November 21st, 2016?
A. I don't recall.
Q. Were you selling grams, ounces, pounds?
A. What was the date, I'm sorry?
Q. Just prior to November 21st, 2016, before this incident, what level had you reached over the course of seven years in terms of your level of being a drug dealer, where were you grams, ounces, pounds?

A. At that point I wasn't really selling the marijuana. It was more or less the seizing.
Q. The stealing?
A. Correct.
Q. Now, you indicated to Mr. Davis that you stole marijuana from Blake Laubinger, right?
A. Correct.
Q. You sold that marijuana, right?
A. Yes.
Q. So you had a customer base still at that time, didn't you?
A. Yes.
Q. How much marijuana did you sell that you had stole from Mr. Laubinger?
A. I don't recall the exact amount.
Q. Pounds?
A. Pounds.
Q. Okay. And you had no difficulty moving that, right? You had the contacts and the resources able to sell that marijuana, right?
A. Correct.
Q. When had been the last time when you had sold more than a pound of marijuana prior to November 21st, 2016?
A. I'm sure at some point, it was probably relatively close to that time.

Q. Close to that time. Okay. And so around that time prior to November 21st, 2016, safe to say your bulk of income was either from selling marijuana, or ripping off drug dealers, fair to say?
A. Fair to say.
Q. So when you indicate -- in the restitution amount you indicated what comes down to, I think we are talking about what, 11 months, you say $6,000 total over eleven months; is that right? About five hundred dollars a month on average?
A. Roughly.
Q. Your restitution amount though is greater than that, greater than the 500 for loss wages, isn't it? Didn't you fill out the forms?
A. Under the supervision of my attorney.
Q. Under the supervision of your attorney, right. When you say your attorney, you mean your civil lawyer not your criminal lawyer, right?
A. Correct.
Q. Because you have retained a civil lawyer and filed a lawsuit against Mr. Beckman and his companies, haven't you?
A. That is correct.
Q. You just said that under the advice of your civil lawyers that they told you that you needed to fill out a

certain amount for restitution, correct?
A. Yes.
Q. And you certainly aren't asking for the restitution amount to be paid for the income you were receiving from being a drug dealer and drug stealer, are you?
A. No.
Q. Then where is that extra income coming from, relevant to anything over $500 a month as you describe today as your legitimate source of income, if at all?
A. As I said, I don't have exact figures for you.
Q. Is that the advice of your lawyer?
A. You know, we could go back and forth, but I don't know.
Q. Okay. But you would agree the bulk of your income back prior to November 21st, 2016, was from being a drug dealer, not from legitimate employment, correct?
A. Correct.
Q. Now, when this first -- after this happened and you were taken to the hospital, the police came to the hospital immediately, didn't they?
A. They did.
Q. And when they asked you what happened, you refused to tell them what happened, didn't you, initially?
A. I told them what had happened.
Q. The first time the police come to your hospital

room, you tell them exactly what happened and who did it?
A. Not exactly, no.
Q. Not exactly. All right. You were at some point -- several days later you obtained your lawyer, right, Mr. Hogan, to represent you?
A. Yes.
Q. And Mr. Hogan then negotiated the terms for you to then give your story, right?
A. Correct.
Q. So Mr. Hogan negotiated that with the police department and the prosecutor's office as to your telling your story, if you will, correct?
A. Can you repeat that?
Q. It was only after you met with a lawyer that you then -- and he negotiated on your behalf -- that you then decided to tell your story completely, right?
MR. DAVIS: I'm going to object on the grounds the relevance of the calculation of defendant's guideline range, and also that we're straying into attorney-client privilege as to what he communicated to Mr. Hogan.
MR. NOBLE: I didn't ask what he said to Mr. Hogan. What I asked him was in terms of when he told what happened to him, that initially when he met with the police he didn't tell -- it wasn't until after retaining Mr. Hogan and negotiations went on with the prosecutor's office in

terms of benefit to him to then testify and tell his story, took place. It goes to bias as to whether or not he was promised a deal that he wouldn't be charged for stealing drugs and wouldn't be prosecuted for being a drug dealer if he told on Mr. Beckman, Kerry Roades, Blake and Caleb Laubinger.

THE COURT: That's fine. I honestly don't know what most of what I'm hearing has to do with this sentencing proceeding since most of the facts on which I would be relying are contained in Mr. Beckman's own plea agreement or are not objected to in the presentence report.

MR. NOBLE: I understand.

THE COURT: I don't really know if we are defending the civil suit here, or we are trying to do something that pertains to this sentencing, but I will allow you to proceed.

MR. NOBLE: I'll stay with the sentencing, I promise.

Q. When you were first confronted by Blake and Caleb Laubinger on November 21st, 2016, that was in your kitchen, correct?

A. That is correct.

Q. And you came home that day and they were waiting for you in your house?

A. They were.
Q. Were you expecting them?
A. No.
Q. And when you got home they were waiting for you with the lights out?
A. They were.
Q. Were you assaulted by Blake Laubinger when you entered the residence?
A. Yes. I was assaulted by both of them.
Q. I'm sorry?
A. I was assaulted by both of them.
Q. So, Blake and Caleb both assaulted you, correct?
A. Correct.
Q. With regard to Blake first, were you at some point punched in the face in the kitchen on November 21st, 2016 when you first had contact with them?
A. Yes.
Q. How many times did Blake Laubinger punch you in the face there in your kitchen when you first encountered them on November 21, 2016?
A. More than once.
Q. More than three times?
A. Most likely, yes.
Q. Were you punched with a closed fist?
A. Yes.

Q. Was he hitting you hard?
A. He was.
Q. And do you have the copy of the United States Government's No. 2 up there, the picture; is that in front of you?
A. No.
Q. Can you see that, sir?
A. Yes.
Q. What is that? That's the picture of you, is that right, from the hospital?
A. It is.
Q. And it shows there that you have two black eyes and a swollen mouth; is that right? Is that what it appears from the picture?
A. It would appear, yes.
Q. Now, when Mr. Blake Laubinger was punching you in the face, did he strike you in the eyes?
A. He did. I mean it's tough to say exactly where he hit me.
Q. If you indicate that he punched you in the eyes and caused the black eyes, that would be inconsistent with your memory of that evening today?
A. Yes.
Q. That would be inconsistent or that would be consistent?

A. Okay. Could you repeat the question.
Q. Sure. Could Mr. Laubinger cause these two black eyes when he was punching you in the face there in your kitchen on November 21st, 2016?
A. He could have, yes.
Q. In terms of the swollen lip and the bruising, also from Mr. Laubinger when he was punching you in the face in your kitchen on November 21st, 2016?
A. Could have resulted, yes.
Q. And now you were -- so all the injuries within Government's 2, could be consistent with the beating that you received from Blake Laubinger in your kitchen on November 21st, 2016, correct?
A. Can you repeat that?
Q. Sure. All the injuries that we see in Government's Exhibit 2, on your face there, are consistent with the beating that you received from Blake Laubinger in your kitchen on November 21st, 2016, right?
A. Correct.
Q. And then it was at that time in the kitchen on November 21st, 2016, is the only people in there are you Blake and Caleb Laubinger, correct?
A. Correct.
Q. Todd Beckman is not there, right?
A. No.

Q. And that's the first time that you have zip ties placed upon your wrists and feet, correct?
A. Correct.
Q. And when this is when you are initially, you're fighting them initially, aren't you?
A. Yes.
Q. You're throwing punches as well, aren't you?
A. Yes.
Q. And then when they put the zip ties on you they ratcheted them down, didn't they?
A. You could use that word.
Q. Okay. And then they picked you up and they loaded you into the truck, correct?
A. Correct.
Q. On the way to their home at one point you jump, you somehow manage to get into the front seat and started kicking Blake Laubinger as he was driving, correct?
A. Yes.
Q. Caused the vehicle to spin out, correct?
A. Yes.
Q. Then Caleb Laubinger then starts to punch you again or punch you at that point?
A. Yes.
Q. And so then you were being punched again now in the pickup truck while your hands and feet are zip tied,

correct?
A. Correct.
Q. And you are struggling, aren't you, during this time period?
A. I am being laid on top of.
Q. I'm talking about when you somehow get from the back seat to the front seat you are zip tied, right?
A. Yes.
Q. That was causing, as you were getting over the seat while people were trying to hold you, that was causing stress on the zip ties with your hands and feet, correct?
A. Sure.
Q. You could feel that, couldn't you?
A. Feel?
Q. The zip ties cutting into you?
A. I could feel the zip ties on my hands, yes.
Q. And then once they start beating you again, again zip ties cutting into and more strikes to the face, correct?
A. Correct.
Q. Did you indicate earlier that based on the injuries it would be difficult to tell who caused what damage?
A. Did I just say that? Yes.
Q. All right. And so it's possible at least by the Government's Exhibit, you looked like that prior to ever

having contact with Mr. Beckman, correct, other than the hair?
A. Could I have had abrasions and bruises?
Q. Those same injuries had they taken your picture prior to your contact with Mr. Beckman, it could have been completely consistent with the picture we're looking at right here, based on the beating from Caleb and Blake Laubinger, right?
A. Perhaps.
THE COURT: Mr. Noble, I'm going to need from you how much longer do you think you are going to go?
MR. NOBLE: One second. Judge, I have nothing further. Thank you.
THE COURT: Mr. Davis, any redirect?
MR. DAVIS: No, Your Honor, thank you.
THE COURT: May the witness be excused?
MR. DAVIS: Yes.
THE COURT: You may be excused, sir.
(WITNESS EXCUSED)
THE COURT: Let's go ahead and take a 15-minute break. We will resume here at 2:45. Does the Government have any further witnesses that they are going to call?
MR. DAVIS: No, Your Honor.
THE COURT: And does the defendant have any witnesses that the defendant is going to call with respect

to the objections to the presentence report?

MR. NOBLE: No, Your Honor.

THE COURT: So we will be adjourned until 2:45.

(A SHORT RECESS WAS TAKEN, AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD:)

THE COURT: Are the parties ready to resume?

MR. DAVIS: Yes, Your Honor.

THE COURT: Is there any further testimony to be heard with respect to the objections to the presentence report?

MR. DAVIS: Nothing on behalf of the Government.

THE COURT: Any further evidence that either party wishes to submit?

MR. DAVIS: No, Your Honor.

THE COURT: I will then hear from the defendant with respect to the objections that the defendant wishes to move forward on.

MR. BOYD: May I proceed, Your Honor.

THE COURT: You may.

MR. BOYD: The first objection is to the added third level for the extent of injuries. We are contending there that has not been credible or substantial evidence to support the third level. Specifically, we heard about the torn labrum. There was no medical testimony put on from a

medical expert.

However, it was clear from what limited knowledge Mr. Athanas has regarding the injury that it can be remedied by surgery, and I think that's relatively common knowledge as well, thus does not fit into the permanent or life threatening bodily injury category.

As to any allegations regarding mental faculties being permanently damaged, there hasn't been any evidence to that whatsoever. Mental faculties I think we are talking about things like damage to the brain that causes, for example, an inability to speak, inability to remember things for the rest of your life, like permanent impairment to mental faculties, such as short-term memory. There has been evidence that he suffered psychological damage as a result of this incident, but nothing as an impairment of his ability, his mental faculties. But I do believe there has been evidence of serious bodily injury.

As to the testimony regarding nerve damage and that being there for the rest of his life, I don't know that it's in accordance with the medical field, but there hasn't been any expert on except his just speculation as a lay person with no foundation of any medical knowledge whatsoever that that is true. And personally from a case I worked on, I know that there is remedies for nerve damage despite them being severe, but nonetheless --

THE COURT: All nerve damage can be repaired?

MR. BOYD: My point is that there's varying levels of nerve damage and that some can be repaired and numerous types can, but today we haven't heard any testimony from an expert saying that his is, you know, X type and that that type and this level can't be repaired. It's just him saying that he feels like it can't be repaired with nothing credible to back it up other than his own lay opinion. And that's why I believe it falls into a two-level enhancement instead of the third level, Your Honor.

THE COURT: All right. Why don't we take these one at a time. Mr. Davis.

MR. DAVIS: Your Honor, my position is the exact opposite of counsel. It's not necessarily a lay opinion as to somebody else. This is a man testifying about his own body and the physical damage that was done to him during these three days. He has a torn labrum. I don't suspect that that's something that he just made up after reading a medical book. A doctor has advised him this is the condition of your shoulder. It is remedied by an invasive surgery. If that's not serious physical injury, I can't imagine what is, albeit it's not life threatening, but it requires a surgery that could take several months of rehabilitation.

As far as the nerve damage, he testified that he loses feeling or has tingling sensation in his hands and feet. The exhibits of the zip tie injuries to his hands would certainly support that kind of nerve damage, whether it is treated or not, he is not aware of any treatment that would make that go away.

Finally, psychologically he's been diagnosed with Post Traumatic Stress Disorder and he testified to the Court as to the long lasting psychological effects that has and he's been seeing a psychologist, I don't know how many months now, but well over a year to treat those conditions.

THE COURT: All right. You may proceed.

MR. BOYD: I'm not saying that the torn ligament is not a serious injury, but for the third level to apply it has to be permanent or life threatening, and somewhere between serious bodily injury. I do believe it can qualify, if the Court finds it to be credible evidence, as serious bodily injury, but doesn't rise up to the extent of permanent life threatening. The serious bodily injury which the second level talks, level two enhancement, specifically talks about requiring medical intervention such as surgery, hospitalization or physical rehabilitation which the torn ligament can be remedied with all those things.

THE COURT: Anything further?

MR. DAVIS: No, Your Honor.

THE COURT: As I read the sentencing guidelines under Section 2A4.1(b)(2)(A), if the victim sustained permanent or life threatening bodily injury we increase it by four levels, which is not being sought here. If the victim sustained serious bodily injury, increase by two levels. But if the degree of injury is between that specified between subdivisions A and B, increase by three levels. I specifically find based upon the testimony that I have heard in this matter, that it falls within section 2A4.1(b)(2)(C). I find that the injury here, serious bodily injury could be nothing more than the facial abrasions, the abrasions and harm that we saw to the defendant's face. We certainly have more than that here. We have nerve damage. There is no reason, I find no reason to find that the victim's testimony with respect to the numbness that he continues to feel in his hands and his feet, to not be credible. I find it to be credible. We are talking what, a year and a half since these events took place -- is that right time wise? Well, a year and three months, four months, over a year. This nerve damage has not gone away during that time period. The defendant's speculation that it might be cured through surgery carries no weight with me. And we have psychological damage that has been continuing throughout this time period for which

the defendant is still receiving treatment.

I think that to state that in this particular instance the degree of injury is between that specified by subsections A and B is putting it mildly. And I find it to fall well within the subsection three -- subsection C, excuse me, category such that three levels, not four, not two, are appropriate in this matter, and so I do overrule that objection by the defendant.

The next objection, and also I -- the testimony with respect to the torn labrum, is undisputed in this matter. Again, I see no reason why this Court is not permitted to rely on that evidence and I do rely on that evidence. Next objection.

MR. BOYD: Your Honor, I believe that would be to the amount of restitution, especially from EA's father. There's been nothing provided to the defense to establish those items were taken as part of this incident, other than they were missing, that they believe they were missing subsequently from and I believe he's trying to claim EA, Jr. is trying to claim approximately, over $17,000 in restitution as a result of this incident, and without any evidence having been provided to the Court of that, bills, that these items were taken as a result of this incident and that's where we stand on that objection.

THE COURT: Mr. Davis, maybe you can breakdown

for me the various categories of restitution that the Government is seeking with respect to Mr. Athanas, Jr.

MR. DAVIS: Your Honor, The only information that the Government has regarding Mr. Athanas, Jr.'s claims is declaration of victim's loss that was filed, wherein there are 10 items that were stolen from the residence that the third testified about, where he was abducted from. It's my understanding is that is Mr. Athanas, Jr.'s residence that the third was living in. There was damage done to the floor of the kitchen where the assault took place, and he has included a proposal invoice from a flooring company indicating repairs of $7,000.

THE COURT: Have you provided this information to the defendant?

MR. DAVIS: I have not.

THE COURT: Why don't you give it to them?

MR. DAVIS: I have not. What victim's witness assistance has, I'm not aware of it.

THE COURT: Is this breakdown in the Court record?

MR. DAVIS: I thought it was filed with the Court as proposed -- I can't remember the name of the document, the declaration of victim losses.

THE COURT: I have to tell you, all I have in my file and all I am seeing in the record is a sheet that has

a gross amount. I can see the 30,502.30 and the 20,300, but it doesn't provide me any breakdown.

MR. DAVIS: I can mark this as Government's Exhibit 10 and submit it for the Court's perusal. It is a declaration.

THE COURT: I know that these details, a lot of these details are described in the presentence report. I saw them there. I just, you know, didn't see it as a part of my Court record. I have just that one form.

Is there any reason why we cannot delay proceedings with respect to restitution here?

MR. DAVIS: Not on behalf of the Government.

THE COURT: Because I don't have this information. It sounds like the Government has not provided this information to the defendant, the actual breakdown and any bills that you have. Obviously, restitution in the amount being sought for the defendant could be provided to him solely based upon the psychological injury that he has, but if the defendants really want to have another hearing about whether 3,000 or 2,000 or 1,000 dollars should be deducted from that amount in restitution, I will have it. But we are going to have it after all of the breakdown and the evidence has been provided to the defendant, so that the defendants have a fair opportunity to address it, and so that I can make sure

I am working off of the same figures that the Government is working off of.

MR. BOYD: We're withdrawing our objection with regard to the defendant's -- I'm sorry, not the defendant, to Ellis Athanas, III's restitution amount as far as his medical bills and that part. I should have made that clear to the Court. We are talking about Ellis Athanas, Jr.'s claim that all that stuff was stolen and damaged, that was it.

THE COURT: I had thought his claim also included some of the medical bills that he is paying for his son, was that not part of his restitution amount?

MR. DAVIS: The amount that I have is $3,000 towards the ransom out of his father's pocket.

MR. BOYD: That we consent to.

THE COURT: Okay. What else?

MR. DAVIS: $7,850 that I referred to for the repair of the house where the assault, initial assault took place.

MR. BOYD: Your Honor, we are going to withdraw the objections to the restitution calculations.

THE COURT: All right. I mean, there are restitution amounts owed to others as well as the defendant's mother, if I recall correctly.

MR. DAVIS: That has been withdrawn by the

Government.

THE COURT: So what amounts of restitution is the Government seeking and let's make a clear record of what is being sought and what there is an objection to, if anything, at this point.

MR. DAVIS: On behalf of the father Ellis Athanas, Jr., his declaration of victim losses totals $20,300.

THE COURT: Okay.

MR. DAVIS: It's comprised of a litany of items that were missing from the house following the assault that total 9,450 total.

THE COURT: Well, I understand that the defendants are withdrawing their objection to that amount; is that correct?

MR. BOYD: That is correct, Your Honor.

MR. DAVIS: That's the total amount, the 20,000.

THE COURT: With respect to the third? I just want to know the amounts we're talking about.

MR. DAVIS: It is $30,502.30.

THE COURT: And is there any objection to that amount?

MR. DAVIS: But insurance has covered $25,518.20 of that. So, it's a difference of $4,950.50 that is out of

the pocket of the third.

THE COURT: All right. And then -- so the $14,000 amount with respect to Lynn Gellerman, that's being withdrawn?

MR. DAVIS: Yes.

THE COURT: And what about from the two insurance companies?

MR. DAVIS: The only one I have information on is United Health Care having paid the $25,518.20 amount.

THE COURT: I've got United Health Care Choice Plus for $16,555.

MR. DAVIS: That is not included in the victim's loss statement. That other insurance amount is withdrawn, that was a claim were Ms. Gellerman, the mother --

THE COURT: She is withdrawing that. She is not seeking that?

MR. DAVIS: Yes.

THE COURT: So the three amounts of restitution that the Government is seeking on behalf of these victims is $4,984.10 on behalf of Ellis Athanas, III, $20,300 on behalf of Ellis Athanas, Jr., and $25,518.20 on behalf of United Health Care?

MR. DAVIS: Correct.

THE COURT: And does the defendant have any objection to those three amounts of restitution?

MR. BOYD: No, Your Honor.

THE COURT: All right. The next objection.

MR. BOYD: The next one is regarding the motorcycle. It's my understanding the Government is consenting regarding that objection.

THE COURT: What about your objection to the prior objection, to paragraph 88?

MR. BOYD: I'm sorry?

THE COURT: You had an earlier objection, in paragraph three you are objecting to other information in paragraph 88.

MR. BOYD: I believe that is now moot as the final presentence report was amended.

THE COURT: So paragraph three, the entirety of paragraph three is now moot?

MR. BOYD: Yes, Your Honor.

THE COURT: Now, with respect to paragraph four.

MR. DAVIS: Your Honor, I will weigh in and say that paragraph 88 as reported in paragraph four is moot as well. It's the Government's belief that defendant Beckman does not own that motorcycle that's referenced there.

THE COURT: But the presentence report currently provides that he does; is that correct?

MR. DAVIS: That is correct.

THE COURT: I assume then that the presentence report needs to be amended?

MR. DAVIS: Yes, please.

THE COURT: To reflect that objection.

MR. DAVIS: That property has been transferred.

THE COURT: I knew where that was at one point and now I'm not finding it. Where is that in paragraph 88?

MR. BOYD: It's now paragraph 90.

MR. DAVIS: In the final copy, Your Honor.

THE COURT: And we're just talking about to the extent that is listed among the assets?

MR. DAVIS: Yes.

THE COURT: All right. So, I will ask that the presentence report be amended with respect to the inclusion of that motorcycle, where it is listed in paragraph 90.

PROBATION OFFICER: Will do, Your Honor.

THE COURT: Thank you.

THE COURT: Any other objections on behalf of the defendant?

MR. BOYD: Nothing further, Your Honor.

THE COURT: So, getting back to the sentencing guidelines calculations, if I am understanding correctly, the only objection that the defendant raised with respect to the guidelines calculations themselves as opposed to matters related to restitution was the three additional

points for the degree of damage sustained by the victim. And I have overruled that objection, and so based upon that I find that the presentence report properly reflects the guidelines calculations and this Court adopts the calculations found in the presentence report and finds that those calculations reflect a Total Offense Level of 40, a Criminal History Category of I, which places the defendant at a sentencing guideline range of 292 to 365 months. Are both parties in agreement that at level 40 and Criminal History Category I those are the sentencing guidelines calculations?

MR. DAVIS: Yes.

MR. BOYD: Yes, Your Honor.

THE COURT: All right. And obviously the Court is also aware that as a result of the plea agreement, that with the dismissal of Count Two, that would have resulted in a minimum seven year consecutive sentence, correct?

MR. DAVIS: That's correct.

THE COURT: A seven year sentence that would have run consecutive to any other sentence that was imposed, and it is my understanding as a part of the plea agreement with the defendant -- that the Government is moving to dismiss Count Two of the indictment as part of the sentencing today; is that correct?

MR. DAVIS: Government so moves.

THE COURT: And so the Court is also taking into effect the impact of the parties plea agreement, and the fact that as part of this plea agreement the Government has not only limited itself to a request of no more than 240 months, but also moved to dismiss Count Two which would have, if found guilty, resulted in a minimum seven year consecutive sentence to be imposed in addition to any other sentence.

Now, under Local Rule 13.05 it is the procedure of this Court to hold a bench conference in every plea and every sentencing hearing. We will now conduct the bench conference and this portion of the transcript of this hearing will be filed under seal.

Now Mr. Beckman I'm going to need you to come on up here to the podium again.

What's going to happen here is that in a minute the attorneys are going to come up here, and they are going to speak to me at sidebar. This probably occurred when you entered into your plea as well, and when that happens I'm going to ask you to put on those headphones and at that time the first thing I'm going to ask you is if you can hear me, and I want you to just nod your head for yes or shake your head for no, because I won't be able to hear you. And if at any time you cannot hear or you don't understand anything I'm saying, just raise your hand and I

will send your attorney back to speak with you, okay?

THE DEFENDANT: Okay.

THE COURT: Counsel approach please.

(PURSUANT TO LOCAL RULE 13.05, A BENCH CONFERENCE WAS HELD ON THE RECORD AND UNDER SEAL, AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT:)

THE COURT: Now, as I stated, the statute Section 3553 lists the factors that I am to consider before I can set an appropriate sentence. In connection with this matter I am aware that both victims -- that victims have filed victim impact statements and I am also aware that many letters have been filed on behalf of Mr. Beckman both by friends and family members and others with whom Mr. Beckman worked. And I want you to know that I have received and reviewed those letters, and I assume that both parties have had an opportunity to review the letters submitted by each other?

MR. DAVIS: Yes.

MR. BOYD: Yes, Your Honor.

THE COURT: All right. So, what we will do next is I understand that there are victims who wish to be heard with respect to this matter. And I understand that the defendant also has -- there are a few individuals who wish to read letters to the Court as well. I assume this is something different than the letters they have already

submitted to me?

MR. BOYD: Yes, Your Honor.

THE COURT: All right. Thank you. So I will hear first from any victims that the Government wishes to present with respect to this matter, and Mr. Beckman why don't you have a seat again.

ELLIS ATHANAS, III: Thank you, Judge Fleissig, for allowing me to address the Court today. I need to begin by saying and recognizing that I've done many wrong things in my life, including the actions leading up to assault, my kidnapping, and my three-day torture.

Those actions include being involved in drug dealing, theft, and other misconduct. I'm ashamed of myself for those actions and I know that without God and following his commandments, this shame will remain for eternity. I have confessed these bad acts to God, to my family and friends, and now to the Court. They all are here today in small part because of my past mistakes.

I hope and have faith that God will hear my plea for forgiveness and continue to assist me in dealing with the tribulations, difficulty and stress that I'm struggling with. I am confident you have read the impact statement that I submitted to you a couple of months ago, but I'm not going to go over the details in that. I'm just going to summarize. I stand here a victim of kidnapping, torture,

terror and multiple beatings, the effects of which will follow me and last forever.

I was kidnapped from my own home and held for ransom by Todd Beckman and associates. I was bound in handcuffs, zip ties, duct tape and brutally assaulted with handguns, fists, kicks, and a taser. Todd Beckman even shaved my head. This torture lasted for than three days, in two different locations, the last of which was in a metal storage container, located outdoors in late November. I was forced to spend the night there while chained to an interior wall. During the three-day nightmare I was repeatedly threatened and was convinced at the end of a gun barrel by Todd Beckman that my life was over.

As a result, I have an overwhelming sense of terror and shock through my whole body when speaking the name Todd Beckman. That is just one of several ordeals I must struggle with, and hopefully one day get over and move on from. Just imagine for three days being strapped to a pole and not knowing if at any moment you are going to be shot, wrapped in plastic and disposed of. It was sheer terror.

Todd Beckman is by far the most brutal and abysmal human being I've ever met, but thankfully by the grace of God and the intervention of the police and this Court, this power of torture, terror, and pain has been cut

short. I thank God I'm here and for the justice being upheld by law enforcement and this Court.

I sincerely ask the Court to sentence Todd Beckman to the longest sentence possible. I will live with the mental and physical effects of his crime for the rest of my life. Thank you again, Your Honor.

THE COURT: Mr. Davis, does the Government have additional victims who wish to be heard in court?

MR. DAVIS: No, as the Court is aware the father filed a letter, but is not present.

THE COURT: I have reviewed that and those letters have been filed in the Court file. I understand that they would be available at the terminals that are available in the Clerk's office, at least the letters that are submitted on behalf of the defendant. I'm not sure what happens with victim letters.

MR. DAVIS: Nothing further.

THE COURT: Now, I will hear from the defendants in this matter. And as I stated, Section 3553 lists the factors that I am to consider, and I will hear from the defendants right now, both by way of allocution and to address those factors. I will leave to you whether you wish to have the individuals who want to present letters, go before you address the Court or after. I leave that to you. And, of course, Mr. Beckman will also be given an

opportunity to make a statement, if he so desires.

MR. NOBLE: Thank you, Judge. I have represented Mr. Beckman in this case since the beginning of it. It is without question maybe the strangest case I've ever been involved in. I can't imagine what this man went through during those three days. I know he doesn't know this, but I've known Mr. Beckman for some years. This is a unique case for me in that it's not a typical case, and I don't often know the person before they obtain my services. In this particular case, I knew Mr. Beckman for some time. We have been a member of the card clubs and business organizations and things of that nature. He was, I know this sounds crazy in this case, but my friend before this case.

I can tell you I was as shocked as anyone the day I spoke to his ex-wife on the phone and asked what in the world was going on and she was shocked as well. I think the people closest to him were absolutely shocked.

As the Court knows I think that looking at 3553A and talking about at the age of 43 Todd was diagnosed with ADD, anxiety disorder, and was prescribed Adderall and as the Court read he apparently started abusing that and was taking twice the amount required. He then was also drinking alcohol and using marijuana, cocaine, oxycontin, a list of drugs on a daily basis back then. I can tell you

that Todd was probably a pretty functioning alcoholic, drug addict, in terms that there were not a lot of people who noticed and realized what he was doing to maintain his daily levels of activities.

I can't imagine in terms of the stress he was under at the time. I think he was -- at one time had 46 companies, 85 tanning salons. Todd started as a young man, his parents owned a hair salon and he talked them into allowing him to put a tanning salon in the hair salon and renting it out. He was a pioneer in St. Louis and has been described in the media here. He built that to 85 stores around St. Louis and around the country. And he then started a company Massage Luxe that is huge.

Mr. Beckman was running these companies up until the time this occurred. How he ended up getting into and involved in getting marijuana delivered from California and then providing it to the Laubingers for them to provide to people in this case, I can't imagine.

I think people start out -- I know the tanning salon business hit a dip for a while, and in order to maintain a certain lifestyle and children and family's expectations and bills, one crosses that line. He finds himself in this spot. He was apparently having some real issues with regard to alcohol and drugs at that time, and there was even an issue while the DEA was at his business,

having to look for keys and he literally went to a freezer while there in the DEA custody and attempted to try to pour himself alcohol and had to be then stopped by the agents and brought back to the task that he was attempting to do.

He has -- this is so out of his character in terms of a kidnapping and violence, maybe one of the last people I would have suspected as to being violent. I've heard the description by the victim of Mr. Beckman apparently pointing a gun and hitting in the face, and such could not be further from the person who I knew previously and who I dealt with since this case has gone on in terms of our interactions in meetings while at the jail.

Maybe one of the softer spoken and not aggressive human beings I've every dealt with and met with. I don't know even know that Todd Beckman has ever been in a physical fist fight in his life up until this incident. And then now here he finds himself with these kinds of charges. He has pled guilty to conspiring in this kidnapping and he absolutely realizes and knows that his participation in this and the people that he has let down during this, and I think the Court is going to at least hear from his 28 year old daughter, Paige Beckman, and then hear about his other two small children. This is out of his character, not like him, I don't believe he has any prior history of violent acts, things of that nature.

I believe that his diagnosis and alcohol treatment are necessary. He obviously has shown the ability to be successful in terms of legitimate businesses with Tan Co and Massage Luxe and all the companies that the Court or anybody in this building as they drive home tonight, will probably drive by more than one of his businesses. Every other strip mall has got them. Massage Luxe, a Tan Company, a Life Xist, one of the companies that he built. And as he and I have talked for hours at the jail about the fact that he recognizes and will tell you that he understands that he threw a very large chunk of his life away, and he is now going to miss his children. We are hoping that this Court will consider not taking all of it.

Now, he understands, he's got two small children, Jade and Race who are racers, following in their father's footsteps. Beckman was a professional boat racer at one time for Bud Light and one of the top boat racers in the country and he is hoping that his children follow in his footsteps. In fact, the day he was arrested on these charges, he was getting ready to go pick up a coach that he had flown and hired to help his two children in their racing. And they have gone, these two young kids have gone on to succeed even while he's locked up and their mother is here, and to do very well within the racing that they are

doing now.

He is hoping -- he realizes he's going to miss a good portion of their lives and high school and college. He's already missed his oldest daughter's wedding. She got married last week and she didn't have her dad there to walk her down the aisle, and he said to me, I took that from her. He's not locked up saying, I'm locked up and why is this happening to me. He said, I took that from her, meaning he recognizes that these are his actions, what he did to both cause injury to this young man and to injury that he's caused to these people over here.

His oldest daughter, Paige, is going to address you in a minute. I've known this young woman for some time and she was married I think last week without her father present. He was locked up on these charges because of the actions that he took, and he's going to tell you it's because of him and no one else, not this young man or no shifting of blame of any kind, he understands what he did in this case. And he's ready to accept the Court's imposition of sentencing in this case. We would hope that his life history, his background, his lack of serious crime and history, what he's accomplished in his life, his family, the drug abuse that has apparently taken him over as of some time now, the Court would consider all those things when sentencing Mr. Beckman.

I understand that we've been in agreement that they would not ask for any more than 240 months and we would ask the Court for a specific number or if the Court would entertain it, and consider it, we would ask in this case if the Court would consider 156 months, I believe that it would meet the requirements of justice, that it would play as a deterrent to both the defendant and other people, also play in terms of being equal with other people charged with similar crimes and facts and circumstances as in this case.

We would ask the Court to consider all of that in finding that Mr. Beckman is a 53 year old man, spending the next 13 years in a federal prison, that he had an opportunity then to get out and then see his children and now once they are definitely into their 20s and he may be able to participate and walk his next daughter down the aisle possibly, and at the very least see those grandchildren be born. Thank you.

THE COURT: Does Mr. Beckman wish to make a statement?

MR. NOBLE: He does.

THE COURT: Mr. Beckman, I just want to tell you, sir, it is now your opportunity to make a statement if you wish. Please understand, sir, you are not required to say anything at all. Your attorney has spoken on your behalf

both here in court and in writing, but it is your right to do so. I will hear anything you wish to say, sir.

THE DEFENDANT: He did steal my lines, but I would like to speak.

THE COURT: That's all right. They are still your lines.

THE DEFENDANT: Your Honor. Thank you for the opportunity to allow me to formally apologize to the victim and victim's family and my family, my friends and to the Court. Ellis, and you're back there, I'm sorry and I apologize. To your family I apologize for my part. Shouldn't have happened. I am a 53 year old man, three kids, 28, 11, and six, whom I love with all my heart.

When I encountered this terrible situation I failed to be the mature, elder guide I should have been. Please, please, please forgive me. To my family, I'm sorry. Words cannot express how much I love you. We are a Christian family. We know the power of forgiveness and grace and the place it has in healing and getting through tough times.

My daughter did just get married a week ago and I missed it. I don't want to miss anymore than I have to. I don't want to miss my grandchildren. I have an 11 year old and a six year old, that's tearing me apart that I can't be with them while they grow up. My 11 year old's

father/daughter dance is tonight. I'm not going to be there. My six year old has got a race because he was going to race cars just like his dad. The two young ones want to be NASCAR drivers. They need their dad to help them through to reach their goals. Paige, my oldest, beautiful, I love her so much.

To the Court, I'm sorry, please have mercy on my life. I know what I did is wrong and nothing will ever happen again. Thank you.

THE COURT: Thank you, Mr. Beckman.

Does the defendant have some additional individuals who would like to make a statement on the defendant's behalf?

MR. BOYD: Yes, Your Honor. At this time I would ask that Christopher Ahring be allowed to speak on Mr. Beckman's behalf.

THE COURT: All right.

MR. AHRING: Good afternoon, Your Honor, thank you for giving me this opportunity to talk. I became neighbors with Todd Beckman in 2007. We had ate dinner, our families had, that weekend we got along really good and families hit it off quite well. Our families became very close. Our 11 year old daughters are best friends.

Todd has always thought of other people, seems like he always put people first, always followed through.

If he had something or a plan or had an idea or a recommendation, it always amazed me how he always followed through with it, just a talk that really showed action and how well he did with the kids. And, you know, we spent family vacations together, did a lot of boating together. So, we had a lot of good family interaction with Todd Beckman, with our family.

He would bring things to our kids after he had been out of town, just the thoughtfulness is incredible. This past week I had an opportunity to speak to Todd, and I apologize, I didn't prepare any notes. I just wanted to speak from the heart. I'll jump around a little bit. I was talking to Todd, and I could tell Todd is down and I was talking a lot about what I have going on with my company, and some challenges to say the least, and, you know, Todd was giving me a pep talk, you know, and encouraging me, you know, hey, keep going, it's going to be okay, and, you know, at the end of that conversation it should have been me talking to him the same way.

Todd Beckman means a lot to our family. When you know this man and get around him, his enthusiasm about life, business, family, friends, it pours out like no other individual I have ever met. It just pours out of him. You can be down and within a minute of just a conversation with him, he's got you here. He's got you lifted up. I miss

that. I miss that a lot. I've kept in a lot of close contact with him and I do miss that.

He is a Christian man. He pointed us to his church, he introduced us to his church about four years ago. And my life has been a work in progress in trying to work on myself, I think we all probably could in one way or another. We can always stand to be better and that's been a personal goal of mine. And when he introduced me to his church and pastors, man, that totally changed my life, like no other. Pastor texted me today, was asking me, how is it going, a little feedback because he cares.

I've also seen Todd introduce others to the same church, that have been able to make a huge impact in large ways because of the people that and the friends that Todd has. One family donated an aircraft to the pastors because of Todd's introduction, they made that happen.

These pastors in the church here in St. Louis and in West Palm Beach, Florida, 3000 miles plus, they travel and they make that happen because Todd Beckman made an introduction and an aircraft was donated. That's one. I know for a fact that Todd has had an impact, not on 100 lives, not on a thousands lives, but several hundreds of thousands of lives he's had an impact on in a positive way.

He's been a great mentor to our kids. Again been neighbors with him and really good friends, and I ask you,

Your Honor, to please have leniency. We were just as shocked about this because this is not Todd Beckman. This is not the Todd Beckman that we know and love. Thank you, Your Honor.

THE COURT: Thank you.

MR. BOYD: One final, Paige Beckman, statement.

PAIGE BECKMAN: Good afternoon. So, I know you have received my letter, but I wanted you to hear it from me too. I might not get through it all. I'm speaking to you today on behalf of myself, my eleven year old sister and my six year old brother, who are not in this room today for obvious reasons. I'm also speaking to you today on behalf as well for my dad. I'm writing you this letter in a valiant effort to enable you to get to know my dad through my eyes.

For 28 years my dad has been by my side, rooting me on, supporting me and loving me unconditionally. Throughout those years our relationship blossomed from a father/daughter relationship to best friends as well.

I am and was the number one constant in his life. People come and go, circumstances change, but I've been by his side the longest. And with that I can say with the utmost honesty that I probably miss him the most of anyone. My dad's love for his family knows no limitation. It is without conditions or terms. It is from that unconditional

love that I know my dad was with me, even when he couldn't be like when I walked down the aisle just a week ago.

It's because I love him so incredibly much that I also don't make excuses for him. I am always the first person to call out his mistakes, and while I'm his toughest critic, I'm also his biggest fan. So you can only imagine the devastation and disappointment that I have endured. This earth shattering disappointment I feel is because the dad I know and love wouldn't have stepped foot down the path he went down had he not been fighting his own demons. Like I said though, I make no excuses, but I can't help but think that the repercussions he is facing would be better served through the help he needs.

Your Honor, do you watch the show "This Is Us"? You may or may not, but there is a part in the episode titled "The Most Disappointed Man" where the father, William, pleads guilty to a crime. The Judge comes and visits him in jail and says, "I gave a young man 10 years today. He stole a TV. Ten years for stealing a TV. Wasn't even a good TV. I didn't want to do it, just like I didn't want to give five years to a different fellow yesterday, 15 years to another guy, the day before that, but I'm a Judge and the strange thing is I don't make the rules. So, round and round it goes and I know the ending to each one of those stories. They haven't even been

written yet. I'm here today because you said something yesterday that stuck with me. You said you were the most disappointed man in the world and I am telling you I'm here, I am a close second because I'm the man that writes terrible stories, day after day and I can't change the ending. So, I want to see if we can find you a different ending here. I'm going to take a chance on you, get you out and get you help. I don't expect you to be perfect. I know you will make mistakes just like the rest of us, but I will ask one thing of you, I want you to look at my face, lock it in your brain and if you ever start heading toward and ending I don't want you to write, I want you to picture my face and you make a different choice. Can you do that? Can you find me a different ending to your story?"

So, Your Honor, I'm putting all my hopes and prayers in you that these mistakes will not define my dad, that this will not be the ending to his story.

So, how do I help you to understand who my dad truly is without going into a novel of stories. A few simple facts will have to do. You heard from Chris before, but he can command a room with his infectious and lively personality. I've said it before and I'll say it again, brightens whatever room he walks into, even in a courtroom and room full of judgment, he managed to make feel warm. He looked at me during one of his hearings and even though

this is the hardest thing we have gone through, he mustered up the courage to point to his eye, then to his heart and then to me. I love you.

Just like his love, his generosity knows no limitations either. My grandpa, my mom's dad, was sick with prostate cancer a while back. And without telling anyone, my dad went over and spent time with him. He brought him over a digital clock to make sure Grandpa would have it by his bedside, a small act of kindness my Grandpa will never forget. While his generosity knows no bounds, this story particularly warms my heart.

Lastly, he is a born motivator. I could sit there for hours listening to him tell a story. There's a reason hundreds of his employees -- there's a few in the back today -- looked up to him and it's because he made you feel something. He motivated you to want to be better and do better. He wanted people to reach for the stars and he would be their support ladder to the top; he was mine, that's for sure. And while I resemble my mother more these days, my blonde hair, my eagerness to help others and my drive for success, I owe to him.

It's been over a year that my dad has been in jail waiting his fate. In that time I've seen this man become wrecked with sadness, a man seeking forgiveness, a man who shows appreciation, a man who loves even more

deeply than before, and so sorrowful for his misdoings. The light in his once bright eyes has faded when he looks at me and everyone with sorrowful regret. He apologizes endlessly. I spent the last year going over this in my head every day, and some days the grief would take over me like today, and some days I knew I had to be strong. My heart hurts all the time. You see, I've had the very best of my dad, but that's not enough, it's not enough for me, it's not enough for my younger brother and sister, for our family or anyone else yet to come in contact with this man. Thank you.

THE COURT: Thank you. Is there anything further from the defendant?

MR. NOBLE: No, Your Honor.

THE COURT: Mr. Davis?

MR. DAVIS: Briefly, Your Honor. I realize the hour of the day and I don't mean to belabor the point --

THE COURT: Mr. Davis, can you just give me one moment. I'm sorry. I had understood that we were going to be done hours a ago. I did have other Court proceedings scheduled today, are there attorneys here for the 3:30? That's all right. You don't need to come in. I just wanted to let you know that I would like to still proceed with it, unless that's going to be a problem for the Marshals. So, we will do the next sentencing as soon as I

complete this one, okay?

MR. DAVIS: The commonality between what defense counsel has said, and family and friends have said in person and in the letters the Court has received and I know reviewed, is that this isn't the Todd Beckman that we all know and love. And what about the possibility that all of those people who talked don't know the real Todd Beckman. And the truth of the matter is, Mr. Athanas, III, is not the only victim in this case, who, by the way, friends and family didn't even mention. The absolute sheer terror that man had to go through for three days, honestly not knowing on the day before Thanksgiving if he would ever see his own mother, his own father or family and friends again because a bullet to the head at any moment could end all that.

The terror of being hooded up, and taken to acreage that he's not familiar with and strapped inside in the weather in late November, to possibly await his death, which is what this man told him was going to happen there.

So maybe these individuals and the letter writers don't know the real Todd Beckman. I agree with Mr. Noble, he's a businessman and I probably will pass up several of the companies that he's been involved with on my way home. He's a salesman. And I agree with everyone who said he can light up a room and he can motivate people, make you feel good, that's a manipulator.

Imagine the fear, the terror himself that Blake Laubinger must have been under, because he realized, holy cow, the money I owe this man is missing by my hand, not that he stole it, but I am the one that was responsible for it, to the point that it motivated him so much that he recruited his own brother to sit in that man's house and wait for him, lie in wait for him to come home to abduct him in the manner that they testified happened. That motivation was driven by that man, who can light up a room and motivate people.

I contend it's manipulations and the business that he's in, isn't necessarily Tan Co and Massage Luxe and the gym. He is a run of the mill drug dealer that we see day in and day out in this court and courts just like it.

He made the conscious decision to create another business that's off the books, that apparently nobody knows about, that is generating hundreds of thousands of dollars in cash, and having high-grade marijuana shipped in from California to his own business. The thing that is so precious to him that he's built up all these years.

Heard several references to this man being a Christian man. Up until that point that I heard that today in this Court, I didn't hear a shred of evidence that he was living a Christian life, in fact quite to the contrary. The defendant himself apologized to his family because when

he, quote, encountered this situation, unquote, he didn't make the right decisions. Mr. Beckman you didn't encounter a situation, you created a situation. And then three days of opportunity to pull back and say I quit, you just exacerbated that situation. You continued on and on until this young man doesn't know what day he's going to die with a bullet to his head that you are dry firing into him.

THE COURT: Mr. Davis, I'm going to ask you to address me and not the defendant, please.

MR. DAVIS: Very well. Your Honor, the Government's recommendation obviously to avoid a trial in this matter and to come to a resolution was 240 months. The Government is respectfully requesting 240-month sentence, which the Court is aware, is well less than the guideline range of 292 to 365 not to mention the additional sevens years that would have followed if Count Two had not been dismissed.

Your Honor, I know why the defendant did what he did. It's the lure of easy money. It's the exact same story as every dope dealer that we've encountered here, and we certainly have a victim, Mr. Athanas, but in the end it's a breach of the social contract and he has really breached it. I'm quite certain that although Mr. Athanas is a victim, that the lead story on KMOV this evening is

going to be this very story. It's going to be on the front page of the Post Dispatch tomorrow and the Laubinger brothers are going to go back to a secured facility and I have to believe the media is going to be all over the jailhouse. They are victims of this as much as they are defendants and they pled to the exact same plea agreement that this defendant did. I believe, the Government believes, that 240 months meets the factors of 3553 and I am imploring this Court to impose that sentence. Thank you.

THE COURT: Anything further from either parties?

MR. NOBLE: No, Your Honor.

THE COURT: Mr. Davis, anything further?

MR. DAVIS: No, Your Honor, thank you.

THE COURT: All right. So, obviously this is a most remarkable, unbelievable case that we have here -- if I did not make it clear previously, I do adopt the findings of fact and legal conclusions that are contained in the presentence report. As I stated previously, many of the facts that are important to me in this matter are set forth in the defendant's own plea agreement. And they are set forth as undisputed facts in the presentence report.

But there are other facts, it is clear to me here based upon the defendant's own admission at the time of his plea agreement, that he, that this defendant, Mr. Beckman,

and Blake Laubinger devised a plan to locate Mr. Athanas and attempt to recover the stolen items, that Mr. Roades and Caleb Laubinger were asked and agreed to assist in that endeavor. I do not find that this was an incident that Mr. Beckman encountered. I find that Mr. Beckman was the driving force behind this incident. Like the presentence report, I find that Mr. Beckman is among the most culpable of the individuals involved in this, and he is not someone who stood by and watched something that was happening and being created by Blake Laubinger, and just didn't act maturely in stopping this.

This was Mr. Beckman's doing here. He created it, he participated in it and I find based upon his own admissions that he knew that Mr. Athanas had been abducted, he arrived at that house and he arrived at that house in order to punish Mr. Athanas, in order words to threaten Mr. Athanas, in order to try to get back what was taken from them. This was not just Mr. Laubinger who was ripped off, it was Mr. Beckman who was ripped off as well.

And all of these activities by Mr. Beckman were undertaken by him in connection with his drug trafficking activity. We're not talking about Mr. Beckman receiving $400 and some ridiculous suggestion that all of this was over $400. We are talking -- it's undisputed that in this case we are talking about 50 to 80 pounds of marijuana

being brought in on a regular basis with Mr. Beckman receiving half of the profits of that. And if it was only $400, we're talking about $20,000 each time. And money is of course owed to those who are supplying the marijuana to Mr. Beckman.

Now, why Mr. Beckman chose to engage in this activity is, I guess, something that I will never know. Here is a gentleman who had a successful business. I'm hard pressed, looking at the assets that are listed in this presentence report, to believe that he somehow needed to do this because he had no options available to him, and he just was doing this to support his family and keep a roof over his head. This is a man who has millions in assets who has successful businesses and yet he is choosing to traffic in drugs as well.

And all of this conduct takes place in connection with and to support his drug trafficking activity. I don't know if any of the people who speak so glowingly about Mr. Beckman -- I'm sure he has many wonderful traits -- I'm left wondering whether any of those people knew that he was a drug trafficker on a regular basis, and didn't need the money.

I also find, although Mr. Beckman was not willing to admit these facts at the time of his plea, I find that Mr. Beckman did in fact strike Mr. Athanas several times in

the head, that he did dry fire his gun. There is no question that the gun that was taken from Mr. Beckman was the gun at the scene. The DNA of the victim is on that gun. So, I find that Mr. Beckman did in fact threaten, terrorize Mr. Athanas, hit him with a gun in the head, jumped on him, dry fired his gun into Mr. Athanas' head, threatened to wrap him in plastic, shoot him, shrink wrap the plastic with a heat gun, that he was observed going to Lowe's, on the security cameras and buying these items, that he then brought back and threatened Mr. Athanas with. I have never seen a case like this. I have seen cases where some horrible things took place, but short of somebody shooting or killing somebody, I have never seen a case in this Court where a defendant has elected to abduct, detain, threaten, terrorize a person and then turn around and threaten and terrorize that person's parents.

I have no doubt that Mr. Beckman loves his own children. I have no doubt that he has been an absolutely fabulous parent to his children. But I guess Mr. Beckman wasn't thinking about how Mr. Athanas' parents would feel when he got on the telephone and told those parents that they would have to come up with money that they didn't have, in order to keep their son alive. There was clearly no thought to that parent/child relationship.

It is not just Mr. Athanas who was a victim here,

his parents were victims here as well. And those parents were tortured for a day and a half as well, while they had to figure out how they could come up with the money, get it here, go to car dealerships to try and transfer title to Mr. Beckman, to cars to get money that Mr. Beckman doesn't even need. I find the whole situation just simply appalling.

Clearly we have two different individuals here. We have the generous wonderful person that all of the people who wrote letters on his behalf know. But we have another Mr. Beckman as well. And that Mr. Beckman is a drug dealer. And that Mr. Beckman, in support of his drug dealing activities when he didn't even need the money, chose to set in motion three days of terror to an individual. It is one of the most violent and callous series of facts I have ever run into as a judge.

I am taking into account that Mr. Beckman has some physical health problems. I am taking into account that he has had some mental health issues as well, and also the fact that over time he has developed some fairly significant substance abuse issues as well. And but for those, I would be imposing an even more significant sentence here, but I find that the plea agreement that the Government has entered into with the defendant here under all of the facts and circumstances, is in fact a fair one.

And I find that a sentence of 240 months is in fact justified here.

It is well below the sentencing guideline range which I believe properly takes into consideration the factors that I am to consider when I am considering the seriousness of this offense, the need to avoid, to deter such conduct in the future and the need to protect the public.

I don't suggest to anyone that Mr. Athanas is some angelic being either. Clearly Mr. Athanas was involved in some very risky business himself, involved in illegal conduct himself. Clearly what he did with respect to Mr. Beckman and Mr. Laubinger in going and stealing this from them was an illegal and opportunistic and wrongful conduct on his part. But nobody deserves what occurred here. To sit and participate in, put in motion, watch and act, and be an active player in three days of torture is just beyond my imagination. I cannot imagine what Mr. Athanas must have felt from moment to moment to moment.

And I am sorry that this sentence will cause Mr. Beckman to lose participating in activities with his children as they grow up, but I cannot imagine what these three days of torture or what effect these three days of torture are going to have on the mental health of Mr. Athanas for the rest of his life.

And so for the reasons that are set forth in the presentence report and having found that the defendant has in fact benefited from the plea agreement that was given to him by the Government in connection with this, with his plea, which as I stated previously what the defendant was facing was a guideline range of 292 to 365 months, to be followed by a seven-year consecutive sentence on Count Two.

And I find that he has received a significant benefit by virtue of this plea agreement. I know that the plea agreement does not prevent me from going below 240 months, and even if I were to have granted the defendant's objection to the presentence report and assessed two rather than three points, that sentencing guideline range would still be well above the sentence that I am imposing, and I would have still imposed this same sentence even if I had granted the defendant's objection to the sentencing guideline calculation. And so I am imposing a sentence of 240 months to be followed by five years on supervised release.

In addition I am imposing a fine of $50,000 which is the minimum amount of fine in this matter, and also restitution in the amounts that have been agreed to by the parties here which total $50,802.30. And there is, of course, a special assessment of $100 that I must impose as a part of any sentence. And in addition, the defendant

agreed to the forfeiture of certain items as a part of his sentence, and I will also impose forfeiture consistent with the amended preliminary order of forfeiture that has been filed in this matter.

Now, does either party have any objection to my consideration of the statutory sentencing factors or believe there is any particular factor that I neglected properly to consider?

MR. DAVIS: No, Your Honor.

MR. NOBLE: No, Your Honor.

THE COURT: All right. Then I will now formally impose the sentence.

THE COURT: Pursuant to the Sentencing Reform Act of 1984 and the provisions of 18 United States Code Section 3553(a), it is the judgment of the Court that the defendant, Todd Beckman, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 240 months.

While in the custody of the Bureau of Prisons it is recommended that the defendant be evaluated for participation in the Residential Drug Abuse Program and mental health treatment.

It is also recommended the defendant be evaluated for participation in the occupational/educational program. Such recommendations are made to the extent they are

consistent with the Bureau of Prisons policies. And, Mr. Noble, do you have any further requests to make with respect to the Bureau of Prisons?

MR. NOBLE: No, Your Honor.

THE COURT: And I'm sorry, I need the defendant, Mr. Beckman, to come back up here as I impose sentence. Mr. Noble, were there any further requests to be made with respect to the Bureau of Prisons placement?

MR. NOBLE: We would ask -- I was speaking to Mr. Beckman, I apologize -- one, that he be designated as close as possible to Missouri, and also that he be able to participate in any drug, alcohol treatment programs that would be available to him.

THE COURT: I have recommended the RDAP program. I am further recommending that the defendant be housed as close as possible to St. Louis. Mr. Beckman, you understand I can't order that you be sent to any particular facility, I can only make that request.

THE DEFENDANT: Greenville would be good.

THE COURT: Okay. Would you like Greenville as your first request? So I will recommend that the defendant be housed at the Greenville facility or as close as possible to St. Louis.

THE DEFENDANT: Thank you.

THE COURT: And you understand I can only make

that request, the placement will be up to the Bureau of Prisons?

THE DEFENDANT: Right.

THE COURT: Upon release from imprisonment, the defendant shall be placed on supervised release for a term of five years. Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the Probation Office in the district to which the defendant is released.

It is further ordered that pursuant to 18 USC Section 3663(a), the defendant shall make restitution in the total amount of $50,802.30. To Ellis Athanas, III, in the amount of $4,984.10. To Ellis Athanas, Jr., in the amount of $20,300. To United Health Care, 13655 Riverport Drive, Maryland Heights, Missouri, 63043 in the amount of $25,518.20. This obligation is joint and several with Kerry Roades, Caleb Laubinger and Blake Laubinger in this case, meaning that no further payment shall be required after the sum of the amounts actually paid by all defendants has fully covered the compensable injuries.

Should future defendants be determined to be responsible for the same losses, this obligation shall be joint and several, meaning that no further payments shall be required after the sum of the amounts actually paid by all defendants has fully covered the compensable injuries.

Payments of restitution shall be made to the clerk of court for transportation to the victims. The interest requirement for the restitution is waived. All criminal monetary penalties are due in full immediately. The defendant shall pay all criminal monetary penalties through the clerk of court.

If the defendant cannot not pay in full immediately, then the defendant shall make payments under the following minimum payment schedule. During incarceration it is recommended the defendant pay criminal monetary penalties through an installment plan in accordance with the Bureau of Prisons Inmate Financial Responsibility Program at the rate of 50 percent of funds available to the defendant. If the defendant owes any criminal monetary penalties when released from incarceration, then the defendant shall make payments in monthly installments of at least $250 or no less than 10 percent of the defendant's gross earnings, whichever is greater, with payments to commence no later than 30 days after release from imprisonment.

Until all criminal monetary penalties are paid in full, the defendant shall notify the Court and this district's United States Attorneys Office, Financial Litigation Unit, of any material changes in the defendant's economic circumstances that might affect the defendant's

ability to pay criminal monetary penalties.

The defendant shall notify this district's United States Attorneys Office Financial Litigation Unit of any change of mailing or residence address that occurs while any portion of the criminal monetary penalties remains unpaid.

It is further ordered that the defendant shall pay to the United States a fine of $50,000. Payments of the fine are to be made to the clerk of court. The interest requirement for the fine is waived. All criminal monetary penalties are due in full immediately. The defendant shall satisfy this obligation by paying the full amount within 30 business days. The defendant shall pay all criminal monetary penalties through the clerk of court. Until all criminal monetary penalties are paid in full, the defendant shall notify the Court and this district's United States Attorneys Office, Financial Litigation Unit of any material changes in the defendant's economic circumstances that might affect the defendant's ability to pay criminal monetary penalties.

The defendant shall notify this district's United States Attorneys Office, Financial Litigation Unit of any change of mailing or residence address that occurs while any portion of the criminal monetary penalties remains unpaid.

Now, I have to say that I was a bit concerned when I read in the presentence report that substantial amounts of funds had been transferred from Mr. Beckman to certain trusts. I am hopeful that Mr. Beckman has not been attempting within the last month or two to transfer assets in a way that makes him unable to satisfy his fine, his special assessment, and his restitution obligation.

MR. NOBLE: Let me say this, Judge, I have not participated or done anything in terms of finances, trusts, or anything like that in my office. We didn't do it, so I don't know what's going on and what's happening with that.

THE COURT: I suggest that you discuss that with Mr. Beckman because I assume, if I begin to hear that he is unable to pay these amounts as I have ordered them, namely in full within 30 days because in December he transferred more than three million dollars into trusts, that will certainly cause me concern. We are not talking about substantial amounts of money here, compared to the amounts that have been transferred. So, I expect you to discuss this with Mr. Nobel.

THE DEFENDANT: Okay.

THE COURT: As part of your supervision, you must comply with the following mandatory conditions of supervision.

You must not commit another federal or state or local crime.

You must not unlawfully possess a controlled substance. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter as determined by the Court.

You must cooperate in collection of DNA as directed by the Probation Office, if the collection of such a sample is authorized pursuant to 42 USC Section 14135A.

You must make restitution in accordance with 18 USC Sections 2248, 2259, 2264, 2327, 3663(a) and 3664.

As part of your supervision you must comply with the standard conditions of supervision that have been adopted by this Court.

Now, Mr. Noble, those standard conditions were set forth in detail in the presentence report, did you have an opportunity to review them with Mr. Beckman?

MR. NOBLE: I did, Your Honor.

THE COURT: Would you like me to read them or do you wish to waive reading?

MR. NOBLE: We will waive reading, Your Honor.

THE COURT: All right. Thank you. As part of your supervision you must comply with the following

additional special conditions. If it is determined there are costs associated with any services provided, you shall pay those costs based on a copayment fee established by the Probation Office.

You must submit to substance abuse tests to determine if you have used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods.

You must participate in a substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program on matters such as provider location, modality, duration, intensity, et cetera.

You must participate in a mental health treatment program and follow the rules and regulations of that program. The probation officer in consultation with the treatment provider will supervise your participation in the program on the types of matters that I previously stated with respect to substance abuse.

You must submit your person, property, house, residence, vehicle, papers, computers as defined in 18 USC Section 1030(e)(1), other electronic communications or data storage devices or media or office to a search conducted by a United States probation officer. You must warn any other occupants that the premises may be subject to searches

pursuant to this condition.

The probation officer may conduct a search under this condition only when reasonable suspicion exists that you have violated a condition of supervision and that the areas to be searched contain evidence of this violation. You must provide the probation officer with access to any requested financial information and authorize the release of any financial information.

The probation officer may share financial information with the United States Attorney's Office. You must not incur new credit charges or open additional lines of credit without the approval of the probation officer. You must apply all monies received from any anticipated and/or unexpected financial gains, including any income tax refunds, inheritances or judgments, to the outstanding Court ordered financial obligation. You must immediately notify the probation office of the receipt of any indicated monies. If the judgment imposes a financial penalty, you must pay the financial penalty in accordance with the schedule of payment sheets of the judgment.

You must notify the Court of any changes in economic circumstances that might affect the ability to pay this financial penalty. Now, you understand, Mr. Beckman, some of those financial conditions will only apply so long as there is a court ordered obligation still outstanding.

It is further ordered that the defendant shall pay to the United States a special assessment of $100 which shall be due immediately. I further order that the defendant shall forfeit to the United States the items of property that are listed in the amended order of forfeiture that was filed by the Government, and I believe that I entered today.

Mr. Davis, does the United States have a motion at this time?

MR. DAVIS: Pursuant to the plea agreement, we would orally move for dismissal of Count Two.

THE COURT: Count Two will be dismissed on motion of the United States. Does either party know of any reason why the sentence should not be imposed as stated?

MR. DAVIS: No, Your Honor.

MR. NOBLE: No, Your Honor.

THE COURT: Mr. Noble, are there any further requests with respect to the defendant for inclusion in the judgment?

MR. NOBLE: No, Your Honor.

THE COURT: So, Mr. Beckman, I have just a few other things to state to you. Obviously, you are going away to prison for a very long time and when you are there you are going to have all kinds of opportunities unfortunately to make some bad decisions. But you will

also have opportunities to make some decisions to further your education, to get drug treatment, to get mental health treatment, to engage in training and other programs in the Bureau of Prisons. You've shown that you know how to make a whole lot of really, really good decisions. You have shown that you know how to be caring to people. You've also shown that you know how to make some very bad decisions, and I hope that while you are in the Bureau of Prisons that you will choose to make the kinds of good decisions that you have shown that you know how to make.

I also want to advise you, sir, that when you are released you will be on supervised release. After such a long period in the Bureau of Prisons I have no doubt that you will really need the assistance of the Probation Office in making the transition back into life, and we have a very excellent Probation Office, and they will want you to succeed. And I hope that you will keep that in mind and that upon your release you will work with the Probation Office and let them help you with any treatment, with any help that you need in making the transition back into life after such a lengthy term in prison.

I also want to advise you, sir, that you may appeal your conviction if you believe that your guilty plea was somehow unlawful, involuntary, or if there was some other fundamental defect in the proceedings that was not

waived by your guilty plea.

Under some circumstances a defendant also has the right to appeal the sentence imposed. However, a defendant may waive that right as part of a plea agreement, and you have entered into a plea agreement that waives some or all of your rights to appeal the sentence itself.

Now, those waivers are generally enforceable, sir, but if you believe that the waiver itself is not valid or doesn't cover some ground that you wish to raise, you may present that theory to the appellate Court. You have the right to apply for leave to appeal in forma pauperis which means without payment. I don't know that you would qualify for that, but you have the right to request it. And your attorney -- regardless your attorney or the clerk of court will prepare and file a notice of appeal upon your request, but please know, sir, that with few exceptions any notice of appeal must be filed within 14 days of the entry of judgment and it is unlikely that that judgment will still be entered here today, but I fully expect that that judgment will be entered no later than Monday. And Mr. Noble I ask that you review with your client and promptly file the form in compliance with Local Rule 12.07. Is there anything further for the Court's consideration?

MR. DAVIS: Nothing on behalf of the Government.

MR. NOBLE: Nothing on behalf of the defendant, Your Honor.

THE COURT: Then we would be adjourned on this matter. Good luck Mr. Beckman.

(COURT ADJOURNED AT APPROXIMATELY 4:30 P.M.)

REPORTER'S CERTIFICATE

I, Patti Dunn Wecke, Registered Merit Reporter, hereby certify that I am a duly appointed official court reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the entitled cause, and a true and correct transcription of my stenographic notes.

I further certify that this transcript, containing pages 1 - 267 inclusive, was delivered electronically and that this reporter takes no responsibility for missing or altered pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 14th day of May, 2018.

/s/Patti Dunn Wecke, RMR, CRR, CMRS
Official Reporter